**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CASSIDY WHITE, Individually and For Others Similarly Situated, | |
| Plaintiff, | |
| v. | Civil Action No. 1:23-cv-05464 |
| APFS LLC d/b/a ADDISON PROFESSIONAL FINANCIAL SEARCH, | |
| Defendant. | |

**DEFENDANT APFS, LLC d/b/a ADDISON GROUP'S
<u>L.R. 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS</u>**

## INDEX OF EXHIBITS

**Page(s)**

**Exhibit A** – Deposition of Cassidy White ("White Dep.") ..................................... 1, 2, 3, 4, 5, 6, 7

**Exhibit B** – White Offer Letter ("Offer Letter") ......................................................... 1, 2

**Exhibit C** – Commission Bonus Change Memos ........................................................... 2

**Exhibit D** – White Training Transcript ......................................................................... 3

Pursuant to Local Rule 56.1(a)(3) of the United States District Court for the Northern District of Illinois, Defendant APFS, LLC d/b/a Addison Group ("Addison"), respectfully submits the following Statement of Undisputed Material Facts[1] in support of its motion for summary judgment:

## I. The Parties and Jurisdiction

1. Addison is a company that offers staffing and recruiting services to clients in industry sectors such as information technology, finance and accounting, non-clinical healthcare, human resources, administrative, and digital marketing. (Dkt. 17 at ¶ 33).

2. Addison employs recruiting personnel to provide recruiting services to its clients. (Dkt. 17 at ¶ 34).

3. Plaintiff Cassidy White ("White") was employed as a Recruiter in the Finance and Accounting Division at Addison from November 2019 until August 2021. (Dkt. 40 at ¶ 11; **Exhibit A** – Deposition of Cassidy White ("White Dep") at 10:8-10; 21:13-14; **Exhibit B –** White Offer Letter Packet ("Offer Letter") at 1).

4. White brings this lawsuit alleging violations of federal law, specifically a violation of the Fair Labor Standards Act, and state law, specifically a violation of the Illinois Minimum Wage Law, therefore this Court has jurisdiction over her claims pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper in this Court as Addison maintains its headquarters in Chicago, Illinois. (Dkt. 40 at ¶¶ 7-10).

## II. Addison's Business Operations

5. Addison is organized by staffing verticals which correspond to the professions of the employees Addison recruits. (White Dep. at 51:15-22).

---

[1] Throughout the body of Defendant's Memorandum in Support of Summary Judgment these facts will be referenced as "SMF" and the corresponding Paragraph number.

6.      White was employed as a Recruiter in the Finance and Accounting Contract vertical ("FAC") in Addison's Chicago, Illinois office. (White Dep. at 59:19-60:4).

7.      The FAC handles the placement of financing and accounting professionals in contract and certain direct hire roles. (White Dep. at 34:6-23; 59:19-60:4).

8.      White's manager assigned her to fill specific job orders. (White Dep. at 61:25-62:5).

9.      Job orders are generated by Business Development Managers ("BDM") within the FAC and consist of open job positions within Addison's client companies. (White Dep. at 61:13-18).

10.     It was White's responsibility to find candidates with the requisite skills to fill the assigned job orders. (White Dep. at 61:19-62:8).

**III.    White's Employment at Addison**

11.     White received an annual base salary of $42,000.00 plus commissions and bonuses for the entirety of her employment at Addison. (White Dep. at 27:22-28:15; 36:18-37:1; Offer Letter at 1; **Exhibit C** – Commission Bonus Change Memos).

12.     White earned commissions based on her contract placements, specifically based upon her individual "spread," which is the difference between the bill rate and the pay rate of the candidates she placed. (White Dep. at 33:13-34:5).

13.     White could earn more commissions by maximizing her spread, or, in other words, placing a candidate in a contract role at a lower pay rate so that the difference between the candidate's bill rate and pay rate was higher. (White Dep. at 35:11-14).

14.     White was subject to a training period at Addison, which began when White was hired in November 2019 and lasted approximately one-and-a-half months and consisted of online

2

training modules and in-person training in the Chicago office. (White Dep. at 44:14-22; 97:8-21; **Exhibit D** – White Training Transcript).

15. When asked how she learned to recruit, White testified "I mean, you do something for so long you just kind of get the experience." (White Dep. at 98:1-11).

16. According to White, her job duties as a Recruiter at Addison included the following: (i) cold calling candidates; (ii) conducting interviews of candidates; (iii) prepping and informing candidates of the open job positions and related expectations; (iv) ascertaining candidates' expectations with respect to pay, benefits, etc. (v) editing candidate resumes; (vi) identifying open job orders that candidates would most likely be interested in based on their qualifications; (vii) informing candidates of job orders they may be interested in; (viii) submitting candidates to job orders; (ix) prepping candidates for job interviews with the client companies; (x) negotiating candidates' offers from the client companies; (xi) checking in with the candidates and the client companies once the candidates commence their positions at the client companies; and (xii) addressing conflicts between the clients and candidates during the candidates' employment. (White Dep. at 50:5-13; 69:8-70:9).

**IV.    Recruiter Cold Calling**

17. Job orders assigned to White contained specifications of the position, including, among other things, (i) what type of software was required; (ii) how many years of experience were required; and (iii) whether a degree was necessary for the position. (White Dep. at 99:2-10).

18. White would then identify and call candidates who she determined may be qualified for the position based on the specifications in the job order. (White Dep. at 68:11-25; 69:19-2; 99:2-17).

19. White was solely responsible for deciding which candidates she would contact for a specific job order. (White Dep. at 83:12-18).

20.     White would begin her search for qualified candidates by looking in Bullhorn, a recruiting software program containing information about candidates. (White Dep. at 68:19-25).

21.     Candidate information was entered into the Bullhorn database by White and other Recruiters. (White Dep. at 70:6-16).

22.     While looking in the Bullhorn database, White would filter her searches to reveal only those candidates who had been already interviewed and whose resumes had already been edited. (White Dep. at 68:19-25).

23.     White would then begin calling the candidates she located in Bullhorn and determined were qualified. (White Dep. at 68:22-25).

24.     White's goal in cold calling candidates was to "expand the pipeline," or, in other words, to not only to potentially find a candidate to fill an assigned job order, but also to find candidates that could be used to fill future job orders. (White Dep. at 72: 9-13; 73:17-74:8).

25.     White testified that she used her judgment during these cold calls to determine (i) what sort of position the candidate was interested in; (ii) whether the candidate would be a good fit for an open position; and (iii) whether the candidate had the requisite industry experience for the open position. (White Dep. at 79:13-80:16).

26.     White testified that she accepted candidates who she deemed as "good," *e.g.,* candidates that (i) have experience; (ii) know what they are doing; and (iii) have worked in contract positions before and therefore have realistic ideas of what the expectations are in terms of their employment with Addison. (White Dep. at 66:14-23).

## V.     **Initial Candidate Interviews**

27.     White would then conduct one-on-one in-person interviews with candidates because "[y]ou can pretty much tell when someone is pulling your leg on the phone or not and that's why we'll want to meet with them in-person." (White Dep. at 79:18-24).

28.     During these interviews, White would (i) discuss candidate resumes; (ii) go over the candidates' specific job duties; (iii) explain the software the candidates would be working with; and (iv) provide any information the candidates were seeking regarding their employment. (White Dep. at 76:17-77:9).

29.     White testified that she used her judgment in these interviews to determine whether the candidates (i) had experience in the finance and accounting industry; and (ii) would be good to work with. (White Dep. at 71:17-72:8; 78:6-20).

30.     In addition, White would negotiate candidates' pay expectations during these interviews. (White Dep. at 93:1-10).

31.     White testified that she would use her judgment to determine the lowest salary amount a candidate would be willing to take for a certain position. (White Dep. at 93:1-94:5).

32.     At times, White would also use a "negotiating tactic," which involved persuading the candidates to accept a salary amount below their expectations because the job opportunity would be good for the candidate. (White Dep. at 93:23-94:14).

**VI.     Candidate Placement**

33.     White would edit a candidate's resume to be submitted for a job order once she had met with the candidate and determined that the candidate had the requisite experience and would be good to work with. (White Dep. at 77:10-14).

34.     White testified that she would use her judgment to edit the candidate's resume and determine how to best present the candidate to the client company, including by (i) confirming that the information in the resume accurately reflected the candidate's actual experience; (ii) adding an Addison letterhead to the resume; and (iii) removing any "stuff fluffed" in the resume. (White Dep. at 77:10-14; 80:17-81:22).

5

35.     White would then send the edited resume back to the candidate for approval. (White Dep. at 81:23-25).

36.     With the candidate's consent, White would submit the candidate's resume to the job order. (White Dep. at 77:20-21).

37.     In addition to submitting the candidate's resume to the job order, White also presented the candidate to the BDM via a submission tool in Bullhorn. (White Dep. at 87:16-25).

38.     White testified that she used her judgment to decide which aspects of the candidate's background made them a good fit for the job order, and would include those aspects in the submission to the BDM. (White Dep. at 88:1-13).

39.     The BDM then decided whether the candidate would be submitted to the client company. (White Dep. at 88:12-18).

40.     White would also inform the candidate of any relevant job orders as they came in, along with details of the specific job order, including (i) job duties; (ii) company information; (iii) pay scale; (iv) benefits; and (v) contract length and timing. (White Dep. at 77:10-19).

41.     After a candidate received a request for an interview from a client, White would be responsible for (i) informing the candidate of the interview process; (ii) preparing the candidate for the interview; and (iii) debriefing with the candidate after the interview. (White Dep. 77:20-23).

42.     White would prepare a candidate for a client interview by reviewing the information about the client in the job order and relaying that information to the candidate. (White Dep. at 90:22-4).

43. For example, White may let a candidate know that the client (i) has a "spunky personality"; and (ii) will likely ask the candidate a lot of detailed questions about the role. (White Dep. at 91:3-9).

44. White would also coach the candidate on what questions to ask a client during an interview. (White Dep. at 91:23-92:11).

## VII.    Post-Placement Duties

45. White's duties as a Recruiter continued even after the candidate began working for the client.  (White Dep. at 94:15-96:21).

46. White would follow-up the candidates on their first day of work and once a week thereafter to discuss how the job was going "because the candidate has to like the role as much as the role likes the candidate." (White Dep. at 94:15-23).

47. Candidates would also reach out to White if they were having issues at their job, after which White would bring those issues to the BDM, and would then go back to the candidate to communicate the proposed resolution of the issue to be decided by the BDM and the client. (White Dep. at 94:24-95:13).

48. BDMs would similarly reach out to White with any negative feedback from clients regarding the candidates, and White was responsible for calling the candidates to communicate that feedback. (White Dep. at 96:9-21).

Dated: August 2, 2024

Respectfully submitted,

By: */s/ Michael R. Phillips*
Michael R. Phillips
Katharine P. Lennox
McGuireWoods LLP
77 West Wacker Drive, 41st Floor
Chicago, IL 60601
T: (312) 849-8100  /  F: (312) 849-3690

7

mphillips@mcguirewoods.com
klennox@mcguirewoods.com
*Attorneys for Defendant APFS, LLC d/b/a*
*Addison Group*

8

**CERTIFICATE OF SERVICE**

I hereby certify that on August 2, 2024, I electronically filed the foregoing *Defendant APFS, LLC d/b/a Addison Group's L.R. 56.1 Statement of Undisputed Material Facts* with the Clerk of the Court using the CM/ECF system, which will send notification and service of such filing to all registered counsel of record.

/s/ *Michael R. Phillips*
Michael R. Phillips

9