# EXHIBIT A

# Deponent: Cassidy White, Plaintiff
# Date of Deposition: March 29, 2024

Page 2

ORAL DEPOSITION OF CASSIDY WHITE
MARCH 29, 2024

ORAL DEPOSITION OF CASSIDY WHITE, produced as a witness at the instance of the Defendant and duly sworn, was taken in the above styled and numbered cause on Friday, March 29, 2024, from 9:30 a.m. to 2:47 p.m., before WINETTE SMITH, Notary Public in and for the State of Texas, reported remotely by computerized stenotype machine, in Houston, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record herein.

Page 4

INDEX

PAGE

Appearances.................................. 3

CASSIDY WHITE

Examination by Michael Phillips................ 6

Corrections & Signature........................ 157

Reporter's Certificate......................... 159

Page 3

A P P E A R A N C E S

FOR THE PLAINTIFF:
CARL FITZ
JOSEPHSON DUNLAP LLP
11 Greenway Plaza, Suite 3050
Houston, Texas 77046
cfitz@mybackwages.com

FOR THE DEFENDANT:
MICHAEL PHILLIPS
MCGUIREWOODS LLP
77 West Wacker Drive, 41 Floor
Chicago, Illinois 60601
(312) 849-8100
mphillips@mcguiirewoods.com

Page 5

EXHIBIT INDEX

| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 1 | Resume | 22 |
| Exhibit 2 | Offer Letter | 27 |
| Exhibit 3 | Peg Buchenroth Memo | 32 |
| Exhibit 4 | Addison Group Handbook | 39 |
| Exhibit 5 | Training Transcript | 100 |
| Exhibit 6 | Candidate Visit List | 100 |
| Exhibit 7 | Performance Review | 109 |
| Exhibit 8 | Recruiting Activity Report | 116 |
| Exhibit 9 | Job Order Example | 122 |
| Exhibit 10 | E-mail | 125 |
| Exhibit 11 | Bullhorn Note | 130 |
| Exhibit 12 | W2 Statements | 131 |
| Exhibit 13 | Vacation Hours Record | 140 |
| Exhibit 14 | Discovery Responses | 141 |
| Exhibit 15 | Opt-in Consent | 150 |



Page 6

THE REPORTER: We are on the record. Today's date is Friday, March 29, 2024. The time is 9:30 a.m. This is the oral deposition of CASSIDY WHITE, and it is being conducted remotely by agreement of the parties.

My name is Winette Smith with Magna Legal Services. I am the court reporter. I will be administering and reporting the oral deposition remotely by stenographic means.

Would counsels please state their name and appearance for the record.

CARL FITZ: Carl Fitz on behalf of Plaintiff.

MICHAEL PHILLIPS: Michael Phillips on behalf of the Defendant.

CASSIDY WHITE, having been duly sworn, testified as follows:

EXAMINATION

BY MICHAEL PHILLIPS:

Q. Ms. White, first of all, could you please state your full name for the record.

A. Cassidy White.

Q. No middle name?

A. Jerileigh.

Q. Can you spell Jerileigh for us?

A. J-E-R-I-L-E-I-G-H.

Q. Could you state your current address please.

Page 7

A. 1100 South Lamar Boulevard, apartment 1437, Austin, Texas, 78704.

Q. And your date of birth?

A. January 4th, 1996.

Q. Okay. Let's let the record reflect this is the deposition of Cassidy Jerileigh White being taken pursuant to the federal rules of civil procedure, local rules for the Northern District of Illinois and pursuant to notice.

Ms. White, have you ever had a deposition taken before or given testimony in court?

A. No.

Q. Let me explain to you just a few ground rules for what we will do today. I'm representing Addison Group in the lawsuit that you filed against them. I will ask you a series of questions related to the lawsuit and I'd like for you to answer those questions to the best of your knowledge and ability, okay.

A. Okay.

Q. If you don't understand my question please tell me that you don't understand. I'm happy to rephrase or restate it, all right.

A. Okay.

Q. Couple things I'd like for you to do for the benefit of the court reporter since we're trying to get a clear record of what is being said today.

Page 8

One is to response verbally. Yes or no instead of nodding your head or shrugging your shoulders or other forms of nonverbal communication because that makes it difficult for the court reporter to take down your responses, all right?

A. Okay.

Q. Likewise, try to say yes or no instead of uh-huh or uh-uh. Those kinds of responses are hard for the court reporter to distinguish whether you're agreeing with the question or not, all right.

A. Okay.

Q. And then third of all, try to wait until I'm done with my question until you start your answer. I'm going to try to wait until you finish your answer before I start my next question. And the reason for that is, that the court reporter has difficulty taking down what we're saying when we are both talking at the same time, all right.

A. Okay.

Q. Great. How long have you lived at your current address?

A. A year and a month.

Q. So you moved in there approximately February of 23?

A. Yes.

Q. How long have you lived in the Austin area?

A. Same timeframe.

Q. Anyone live at that address with you?

Page 9

A. No.

Q. Are you married?

A. No.

Q. Have you ever been married?

A. No.

Q. Any children?

A. No.

Q. Ever gone by any other name than Cassidy White?

A. No.

Q. When you were working for Addison Group, where were you living when you first start working for Addison Group?

A. Are you asking for the address?

Q. The address if you remember it. If you don't remember it just tell me what you remember in terms of the street or whatever.

A. I was living in Lake Wood area, north of Lincoln Park.

Q. You remember what street you lived on?

A. Oak Dale.

Q. So you were living in Chicago at that time?

A. Yes.

Q. And how long did you live in Chicago?

A. From September 2019 until June of 2020.

Q. Where did you move in June of 2020?

A. Peoria, Illinois.



Page 10

Q. Is that where you are from originally?
A. Yes.
Q. And how long did you live in Peoria?
A. Before Chicago or after?
Q. Starting in June of 2020, how long after June of 2020 did you continue to live in Peoria?
A. Until August 2021.
Q. And August 2021 I believe is approximately when you left Addison Group?
A. Yes.
Q. And where did you move after August of 2021?
A. Fayetteville, Arkansas.
Q. And how long did you live in Fayetteville?
A. From August 2021 until February 2023.
Q. Were you working when you were in Fayetteville?
A. Yes.
Q. Where were you working?
A. A company called Hologic.
Q. Is that your current employer?
A. Yes.
Q. You just mentioned a moment ago you grew up in Peoria, where did you attend high school?
A. Peoria Notre Dame High School.
Q. And did you graduate from that school?
A. Yes.

Page 11

Q. In what year?
A. May of 2014.
Q. I believe I saw you went to college at the University of Missouri; is that correct?
A. Yes.
Q. And did you go to Missouri straight out of high school?
A. No.
Q. What did you do after high school?
A. I went to the University of Illinois in Chicago.
Q. And how long did you attend USC?
A. I was there from August of 2014 until that first semester, which ended in December of 2014 and I transferred.
Q. So you started at Missouri in --
A. January of 2015.
Q. And for how long did you attend school in Missouri?
A. Until completion.
Q. And that was what year?
A. I graduated May of 2019.
Q. And what was your degree in?
A. Biological sciences.
Q. Any other formal education beyond your bachelor's degree?
A. No.
Q. Do you hold any licenses or certificates?

Page 12

A. No.
Q. Have you ever had any other involvement with the legal system, you ever been a plaintiff or a defendant in a lawsuit?
A. No.
Q. Have you ever been a witness in a lawsuit to your knowledge?
A. No.
Q. Other than traffic tickets, have you ever been involved in any other proceeding such as a criminal proceeding, bankruptcy proceeding, workers' compensation proceeding?
A. No.
Q. What did you do to prepare for your deposition today?
CARL FITZ: And Ms. White you can testify that you spoke to an attorney just do not go into the contents of that communication.
THE WITNESS: I spoke with an attorney.
Q. (By Michael Phillips) And would that attorney be Mr. Fitz?
A. Yes.
Q. And I don't want to know anything that you said to Mr. Fitz or anything Mr. Fitz said to you. I just want to know when you spoke to Mr. Fitz specifically about this deposition?
A. Prior to this meeting.
Q. You mean this morning?

Page 13

A. Yes.
Q. And for how long did you speak with Mr. Fitz about this deposition?
A. One minute.
Q. Have you had any prior meetings with Mr. Fitz before this morning about this deposition?
A. Yes.
Q. When was your prior meeting with Mr. Fitz?
A. Since the last time we were supposed to do the deposition.
Q. So we had this deposition scheduled as you recall for mid February, correct?
A. Yes.
Q. And I believe you were ill and couldn't, correct?
A. That is correct.
Q. And so I think what you're saying is that you met with Mr. Fitz since that time about your deposition; is that correct?
A. Yes.
Q. When was the last time you met with him before this morning?
A. Earlier this week.
Q. Do you remember what day?
A. Either Tuesday or Wednesday.
Q. And was that meeting conducted by remote, either

Page 14

phone, zoom, or some remote platform?

A. Yes.

Q. And for how long did you meet with Mr. Fitz on Tuesday or Wednesday this week?

A. 30 minutes.

Q. Was anyone else present when you met with Mr. Fitz?

A. No.

Q. And did you review any documents to prepare for your deposition here today?

A. Yes.

Q. What documents had you reviewed?

A. There were several.

Q. Tell me which ones you recall.

A. My offer letter, my job duties, things of that nature.

Q. And this would be your offer letter, your job duties at Addison, correct?

A. Yes.

Q. Anything else you recall reviewing other than your offer letter and your job duties?

A. Yes. There were a lot of documents. Probably 14 or 15.

Q. What else do you remember reviewing?

A. I remember reviewing -- There were tons of documents.

Q. Just tell me what you recall.

Page 15

A. I did tell you what I recall.

Q. You don't recall anything else you reviewed?

A. Not specifically.

Q. And did you review any policies -- Addison Group policies?

A. Probably.

Q. You remember any specific policies that you reviewed?

A. No.

Q. Did you review any e-mails?

A. Yes.

Q. And who are the e-mails with that you reviewed?

A. They were e-mails that I sent on my Addison account.

Q. To whom?

A. I don't remember. Probably candidates.

Q. Did you review any training materials?

A. Yes.

Q. What training materials did you review?

A. What was required of me to train for Addison Group, a schedule for why I was going to train and what I was going to train for it.

Q. Did you review the complaint in this case?

A. Yes.

Q. And did you review any of your discovery responses such as your interrogatory answers?

A. Yes.

Page 16

Q. Do any of those questions jog your memory as to anything else you reviewed besides what you've already discussed?

A. No.

Q. Why are you suing Addison Group?

A. For not paying for overtime.

Q. And why do you think that Addison should've paid you for overtime?

A. Because I worked overtime.

Q. Meaning you worked more than 40 hours in a workweek?

A. Absolutely.

Q. Did you ever request overtime pay at any time when you worked at Addison Group?

A. No. I was an salary employee.

Q. Meaning that you received a fixed payment from week-to-week, correct?

A. Yes.

Q. And the amount of money that you received was always at least a certain amount, correct?

A. Yep.

Q. If I'm not mistaken you also received bonuses and commissions at Addison Group; is that correct?

A. Yes.

Q. Why didn't you request overtime pay from Addison Group while you were working there?

Page 17

A. Because Addison Group didn't initiate any type of compensation for overtime.

Q. Did you believe when you worked there you were entitled overtime pay?

A. Yes.

Q. Did you ever voice that to anybody at Addison Group?

A. We discussed it that we were working overtime but to our managers and to our leaders that were in our group, but it wasn't like we were talking about scheduling a payment option. We all knew that we were working overtime.

Q. And when you say the managers knew, who are you referring to?

A. Jason Douglas and Lauren Sherer.

Q. And did you have any discussions directly with either Jason or Lauren while you were employed about why you and your coworkers were not receiving overtime pay?

A. We didn't have a direct discussion as to why but we were talking nonstop about how Addison was expecting us to work overtime.

Q. And when you say we, does that mean you were discussing that with Jason and Lauren or you were discussing that with your coworkers?

A. Both.

Q. How did you become aware of this lawsuit?

A. The news.



5 (Pages 14 to 17)

EXHIBIT A

Page 18

Q. So you heard about this lawsuit on the news?

A. I heard about it through that and other individuals who received the compensation they deserved.

Q. So you were aware of an earlier lawsuit against Addison; is that correct?

A. Yes.

Q. Which coworkers told you they had received compensation from that lawsuit?

A. Coworkers of mine -- None of my direct coworkers received it. It was other people amongst Addison Group.

Q. But who told you they received compensation? Let me rephrase. Did anybody who you worked with at Addison tell you that they received compensation from the earlier lawsuit?

A. Yes.

Q. Who was that?

A. Nina Freundt.

Q. Who is Nina?

A. She was my roommate in Chicago.

Q. And she also worked for Addison Group?

A. Yes.

Q. What did she do for Addison Group?

A. She recruited for healthcare.

Q. Anyone else who told you they received compensation from the earlier lawsuit?

A. No.

Page 19

Q. And you lived with Nina at the address on Oak Dale?

A. Yes.

Q. Other than your attorneys, have you spoken to anybody about this deposition today?

A. No.

Q. Are you taking any medications that will interfere with your ability to testify truthfully and completely here today?

A. No.

Q. Is there any other reason that you can't give your best testimony here today?

A. No.

Q. Have you ever been convicted of a felony or a crime involving dishonesty?

A. No.

Q. When you were preparing for this deposition, did you review any personal notes that you took when you worked at Addison Group?

A. No.

Q. And did you take any notes of your daily activities at Addison Group either in the a daytime or diary or by any other means?

A. No.

Q. Are you on social media?

A. Yes.

Page 20

Q. What social media are you on?

A. All of them. Like, you want me to list all the social media that I have?

Q. Yeah.

A. I have a Facebook, Instagram, and Twitter or an X if you will.

Q. What's your Facebook handle?

A. Cassidy White for all the above.

Q. Same for all the above?

A. I mean, my Instagram is Cassidywhite4 and I think my Twitter is the same.

Q. And I assume you have a cellphone that you use?

A. Yes.

Q. What's the number?

A. (309)472-3866.

Q. And is that the same cellphone you were using when you worked at Addison Group?

A. Yes.

Q. You have a personal e-mail account that you use?

A. Not for Addison Group but for myself. Yes.

Q. What is your personal e-mail account?

A. Cassidy.white42@gmail.com.

Q. And were you using that personal e-mail account when you worked at Addison Group?

A. For Addison Group or when I was employed there?

Page 21

Q. No. At the time you were working at Addison Group --

A. Was that my personal e-mail?

Q. Yes. Thank you. That's the question.

A. Yes.

Q. Was Addison Group your first job out of school or did you have other jobs after you graduated college?

A. That was my first nine to five if you will.

Q. What other jobs had you had before Addison Group?

A. I served at restaurants.

Q. And that was while you were going to school?

A. Through school and after school. I was not serving while I was working in Chicago.

Q. When did you join Addison Group?

A. November 4th of 2019.

Q. And you had graduated school in May of that year; is that accurate?

A. Yes.

Q. And were you working between May and November?

A. Yes. At a serving job.

Q. How did you find out about the job at Addison Group?

A. I applied to every job under the son when I moved to Chicago.

Q. Do you remember where you saw the job posting for Addison Group?

A. Google.



MAGNA
LEGAL SERVICES

Page 22

Q. Did you at that time know anybody that worked at Addison Group?

A. Nina and I applied at the same time and she accepted an offer about a week before I did and started at the end of October. We simultaneously found it. In a week she was employed there and I started an application process.

Q. And you and Nina were roommates before you worked at Addison together?

A. We moved to Chicago together in September.

Q. I want to show you a document. Give me a moment as I get it up on your screen. Ms. White, are you able to see this document?

A. Yes.

Q. We will call this exhibit number one. Could you take a look at this and tell me if this is a resume you prepared?

A. Yes.

(Exhibit No. 1 was marked.)

Q. And is this the resume you submitted to Addison Group when you applied?

A. Yes.

Q. And is this resume completed with respect to your work experience before working at Addison Group?

A. Those are my professional roles, correct.

Q. According to your resume, you worked in a job called marketing manager and outreach coordinator from 2017 to 2019 at

Page 23

Houlihans Restaurant and Bar, can you tell me what that job was?

A. I started at Houlihans as a server, and their marketing manager left and they asked me to step up. So I would create their social media post and work with other businesses in the area to do promotions amongst the two of us.

Q. And where was Houlihans?

A. Columbia, Missouri.

Q. So is that a job you held while you were in school?

A. Yes.

Q. Did you work as a server in Chicago after you moved here?

A. No.

Q. The other jobs on your resume appear to be in the dental field as a dental assistant or a dental intern; is that correct?

A. Yes.

Q. Was that a field that you were considering?

A. Yes.

Q. And is there a reason why you didn't go into that field?

A. Life.

Q. Tell me what you mean by that?

A. I applied to dental school and decided that wasn't the path I wanted to take so I pivoted.

Page 24

Q. It doesn't appear from your resume that you had any prior experience in staffing before Addison; is that correct?

A. Yes.

Q. So what motivated you to apply for a job in the staffing field?

A. Ease abuse.

Q. Explain what ease abuse means?

A. It was the easiest job to get at that point.

Q. So it wasn't because you had a particular interest in staffing?

A. No.

Q. Just scrolling down to your education, is this accurate and complete in describing your educational background before you started at Addison Group?

A. Yes.

Q. You had told me earlier that you found the Addison Group job through Google, does that mean you found it on Google search or some kind of job board, where did you actually see the posting?

A. I Googled jobs in Chicago and that's how I found it.

Q. So just a simple Google search?

A. Yes.

Q. And you found it on the Addison Group's website or someplace else?

A. On the Google. They were hiring and then I went to

Page 25

Addison Group's website and applied.

Q. And at the time you applied at Addison Group, were you just looking for any job that paid money or were you looking for specific types of jobs?

A. Any job that paid money.

Q. After you applied for the job at Addison Group, did you have a job interview?

A. Yes.

Q. Who did you interview with?

A. I interviewed twice. I interviewed with their healthcare manager and with Lauren Sherer who is their finance accounting manager. I wanted the healthcare role but that was the job that Nina got so and they didn't want roommates working on the same team so they pivoted me to finance and accounting.

Q. Did you have any background in finance and accounting?

A. No.

Q. And did you interview with anybody in finance and accounting aside from Lauren?

A. Jason Douglas after what they decided they wanted me to do.

Q. What did you understand the job to involve at the time you interviewed?

A. Placing people in roles.

Q. Did you think that would be a job that you would be



Page 26

good at?

A. I didn't think I would be bad at it.

Q. But you didn't think you would be good at it either?

A. I had no idea. I didn't have no prior experience.

Q. But it was something you were willing to try?

A. Yeah.

Q. Did they explain to you what the job paid?

A. Yes.

Q. What did they explain to you about compensation?

A. That I would have a base salary and depending on my time working there if I was able to place candidates in position that's when I would be able to get bonuses or commissions.

Q. Did you speak with them, meaning Lauren and Jason about how much you could expect to make on the job?

A. That wasn't one of my initial questions.

Q. Did you speak with anyone at Addison Group about that anytime before you were hired or received an offer letter?

A. No. They made the offer letter. They let me know how much I would be making.

Q. In both times you interviewed, did you interview for a recruiter position?

A. Yes.

Q. And that's the job you accepted at Addison Group, right?

Page 27

A. Yes.

Q. And did you remain in that job throughout your employment at Addison Group?

A. Yes.

Q. Let me show you another document. Give me a moment. We will mark this as exhibit two. Ms. White, do you recognize this offer letter that you received from Addison Group?

A. Yes.

(Exhibit No. 2 was marked.)

Q. And is it correct that you received this letter on or about October 23rd, 2019?

A. Yes.

Q. Just scrolling down on page two of exhibit number two, first of all, is Lauren Sherer the person who signed this letter on behalf of Addison Group?

A. Are you asking or telling?

Q. I'm asking.

A. Yes. It was virtual but yes.

Q. Is that your electronic signature that appears on page two of exhibit two?

A. Yes.

Q. Is it correct that the offer letter explained to you what your compensation would be at Addison Group?

A. Yes.

Q. And according to this letter, you received an annual

Page 28

base salary of $42,000.00 paid in weekly installments plus commissions and bonuses, correct?

A. Yes.

Q. And then it sets out a bonus schedule that we can see here on page one, correct?

A. Yes.

Q. And then on page two, there's a section concerning monthly commissions, correct?

A. Yes.

Q. So was it your understanding when you accepted this offer letter that your compensation structure would be salary plus bonus plus commission?

A. Yes. I didn't necessarily know what the difference between commissions and bonuses were at the time but that was my understanding.

Q. And did you learn later the difference between the commissions and bonuses?

A. Yes.

Q. So going back to page one. You understood that you would receive this salary amount of $42,000.00 in weekly installments every week or biweekly or however as you were paid, correct?

A. Yes.

Q. And you understood that you could receive additional amounts that depended upon your performance; is that correct?

Page 29

A. Yes.

Q. Did you understand when you signed this letter that you would be an exempt employee, in other words, not entitled to overtime pay?

A. It says nothing of overtime pay on there so no, I had no idea I was not entitled to overtime pay.

Q. So you're saying you didn't know whether you weren't or you assumed you were not?

A. I assumed I was not.

Q. Okay. And did you have any discussion with Lauren or Jason or anybody with whom you interviewed about the subject of overtime?

A. In my initial interview process that didn't come to my mind. Typically, I steer away from asking anything about compensation in the interview process until they make an offer letter.

At that time I was honestly just happy to get a job and overtime pay was not crossing my mind at that point.

Q. So I assume from that answer that you did not discuss overtime pay with Addison Group before you signed this letter?

A. No.

Q. I don't see a date on your signature, do you have any recollection of when you signed this offer letter?

A. I do not without looking at a calendar.

Q. Do you have a recollection that you signed it pretty



Page 30

quickly or you waited a while?

A. I remember receiving it. I was talking to an intern recruiter -- someone that recruits for Addison Group employees and I remember discussing with her that they were going to send over the offer letter and I was to sign it after reading it and send it back so that's exactly what I did.

Q. So you sent it back pretty quickly then?

A. Yeah.

Q. Your offer letter states that your employment with Addison Group will be on a at-will basis. Consequently, Addison Group may terminate your employment at any time, for any reason, just as you may resign at any timeframe.

I'm assuming you read that when you read through this offer letter, correct?

A. Yeah.

Q. And did you understand at that time what at-will employment meant?

A. Yes.

Q. I'm just going to page four of exhibit two. When you received this offer letter, did you understand that you would also receive the opportunity to participate in certain benefits from Addison Group such as medical, dental, disability, life insurance, et cetera?

A. Yes.

Q. And then going to page five, did you receive this

Page 31

employment noncompetition, non-solicitation, and nondisclosure agreement at the time you received the offer letter?

A. I did not know what this meant but obviously I learned it because this was also something that we have our employees do. They have to sign their own so I learned at that point in time.

Q. You did receive it though when you received the offer letter?

A. I received this entire document. Yes.

Q. And scrolling down to page 12 of exhibit two, is that your electronic signature on page 12?

A. Yes.

Q. And does this refresh your recollection to what your address was in Chicago?

A. Yes. I was going to say there is my address.

Q. Okay. You told me earlier that moved out of that address in June of 2020, was that related to Covid or was that for some other reason?

A. Our lease was only a nine-month lease and I had gone back to Peoria when Covid started at the end of March of 2020, and was going back and forth for things such as clothes, make-up, et cetera, but I officially moved out whenever that nine-month lease was up.

Q. But is it correct after March you were not living full time in Chicago?

Page 32

A. Fair. Yes.

Q. Did your compensation at Addison Group ever change, and by that I mean, did you receive any changes in base salary?

A. No. But I did ask for a raise which I was denied.

Q. When did you ask for a raise?

A. In either January or February of 2020.

Q. And who did you ask?

A. Lauren Sherer and Jason Douglas.

Q. And are they the ones that told you no?

A. Yes.

Q. Did they explain why you were not going to receive a raise?

A. Because I did not have prior recruiting experience.

Q. And when you say that you asked for a raise, you mean you asked for a change in your base salary?

A. Yes.

Q. Did you receive any other bonus plans or commission plans when you were at Addison Group?

A. No.

Q. Let me show you a document which we will call exhibit three. Do you remember receiving this memo from, Peg Buchenroth in October 2020?

A. I don't remember receiving it but the commission looks vaguely familiar.

(Exhibit No. 3 was marked.)

Page 33

Q. Just to go through this memo, this first paragraph indicates that your base salary would be the same $42,000.00, correct?

A. Yes.

Q. And then it goes on to say you will be eligible for commissions and bonuses as outlined below, and you said this commission table looks familiar?

A. The table looks familiar. Yes.

Q. The table refers to something called individual weekly net spread, can you tell me what that is, what does net spread mean?

A. I truthfully do not know.

Q. Do you remember how you earned commissions at Addison?

A. From placing candidates in positions.

Q. And would you receive as commission a percentage of the amounts that Addison Group was making on those placements?

A. Yes.

Q. Were all of your placements at Addison Group contract placements?

A. Yes.

Q. Did you work in the contract position or area of finance and accounting?

A. Yes.

Q. Was spread the difference between the bill rate and



MAGNA
LEGAL SERVICES

Page 34

the pay rate of the candidate?

A. Yes. It would have to be.

Q. Okay. So you got paid a commission based upon the spread between the bill rate and the pay rate?

A. Yes.

Q. And then according to this memo, you were also entitled to commissions under direct hire referrals and contract-to-hire conversions, correct?

A. Yes.

Q. And just briefly, is direct hire when Addison Group places a candidate for, I guess what you call permanent and indefinite employment as opposed to temporary employment?

A. Yes. Direct hires are individuals that we find for companies that are looking to place someone.

If there was a contract role they would still technically be an Addison employee but if they were placed in a direct role they would become the employers' employee.

Q. And then what's a contract-to-hire conversion?

A. If they had an opportunity to become a full-time employee with said company, they would negotiate a salary and we would -- if they accepted the offer then they would switch from being an Addison employee to being their employer's employee.

Q. And according to this memo you would receive ten percent of the entire conversion fee, you see that?

Page 35

A. Yes.

Q. And what's the conversion fee?

A. Ten percent of the entire conversion fee for placement you generate. It would be ten percent of however much you negotiated their salary to be. I don't know. I guess.

All I remember from this timeframe is that we were encouraged to get these contract-to-hire conversions or the direct hires because we could negotiate higher salaries because we would get more commission.

Contract roles were different because we wanted to have them accept a lower amount so that difference between that spread -- they wanted us to have them be paid lower so we could have a higher spread and we would get more commission.

Q. Did you ever earn commissions from either direct hire, referrals, or contract to- hire conversions?

A. I never placed someone in a direct hire position. I believe I had maybe one contract-to-hire conversion.

Q. And then you also were entitled to bonus compensation based upon personal production goals, you see that?

A. Yes.

Q. And it seems to me that your bonus was based on reaching average spread targets for fiscal or calendar quarter, right?

A. Yes. Addison set a certain quota for us to hit in

Page 36

terms of what they expected us to do for phone calls, candidate visits, et cetera, which is where this bonus would come from.

Q. Did you earn bonuses under this bonus program?

A. Yes. They came monthly and it was always our last paycheck of the month but it was never a large amount.

Q. And is that your signature on page two of exhibit three?

A. Yes. That is my name.

Q. And then there is a memo starting on page three dated September 16th, 2020 about a compensation change, do you know why there was a memo on September 16th and then a second memo on October 1st, 2020?

A. I have no idea why there is two.

Q. Did this compensation change memo -- and I'm referring to the one on page one and two -- represent an increase in your compensation?

A. No. They are the same documents with different dates.

Q. Right. But as of October 1st of 2020, did your compensation increase from where it was from where you started at Addison Group on November 2019?

A. No. I was still being paid $42,000.00 a year.

Q. Did you have a more generous commission or bonus plan?

A. Not to my knowledge. My compensation never changed when I was at Addison Group. The only thing that would change

Page 37

if I was able to place candidates in positions.

Q. And your take home pay which you earned was variable in the sense that the more candidates you placed the more you would earn; is that accurate?

A. Yes.

Q. Do you recall any other changes to your compensation, meaning either your base salary or your commissions or bonuses other than this one that we are looking at here in exhibit three?

A. Like I said, the only time that you could --

(Connection Interruption at 10:22 a.m.)

REPORTER: We are back on the record at 10:26 a.m.

Q. (By Michael Phillips) Okay. My question is, do you remember any other changes to your compensation at Addison Group other than the changed we've looked at in exhibit three?

A. I was only paid a $42,000.00 a year base salary for my entirety of work at Addison Group, and the only thing that could increase my pay was how many people I placed in position.

Q. And your pay would also increase if you had different commission plans wouldn't it?

A. I'm sure that would but I don't know what the other commission plan offers.

Q. Right. But my question is, did your commission plan ever increase in a way that allowed you to earn more from the



EXHIBIT A

Page 38

same placements?

A. They would have to give us a higher percentage on the spread.

Q. Did that ever happen?

A. No. I'm sure there's a document or documents out there that allow other employees at Addison Group but not to my knowledge that was ever an opportunity for me.

Q. Were you successful in your job at Addison Group?

A. Yes.

Q. And why do you say you were successful?

A. Because I was doing well in my none experienced time. I didn't have any experience in recruiting and I came into the position and I was able to connect with candidates and place them in positions.

Q. Okay. And what made you successful in that?

A. The fact that I was making connection with the candidates.

Q. Yeah. I mean, how were you able to be successful in doing what you did at Addison Group which was connect with candidates and place them?

A. I just did my job. I had the drive to keep calling.

Q. Okay. Let me show you another document. This is going to be exhibit four.

Do you remember receiving an Addison Group handbook when you started working at Addison Group?

Page 39

A. Not physically but yes.

(Exhibit No. 4 was marked.)

Q. Do you remember it being available electronically?

A. Yes.

Q. And you remember having training on the handbook?

A. Yes.

Q. Let me show -- This is on page five on exhibit four. Do you remember reading or being trained on the different employment classifications specifically non-exempt and exempt?

A. I do not. I don't remember. It was five years ago.

Q. Did you know when you worked at Addison Group or you started at Addison Group what the difference was between exempt and non-exempt?

A. No. I don't remember.

Q. Do you know today what the difference is?

A. If you let me read this well quick.

Q. I will give you as much time as you need. And by the way, if you need to stop and read something let me know. You're welcome to do that.

A. I don't know -- okay. I'm reading the differences.

Q. Okay. But you're saying that beyond what you're reading here in exhibit four you don't know what the difference is between exempt and non-exempt?

A. I read it and I now know what's exempt and non-exempt.

Page 40

Q. Based on reading it today you mean?

A. Yes.

Q. But prior to today you didn't know the difference?

A. No.

Q. Were you aware at the time that some employees are eligible for overtime and other employees was not?

A. I was not under that impression.

Q. Your impression at the time was that everybody was eligible for overtime?

A. With Addison Group -- that was employed by Addison Group?

Q. I'm talking in more general in the world. In other words, was it your understanding that in general in the United States that some employees are entitled to overtime and some not?

A. Yes.

Q. Okay. And in your prior jobs previous to Addison Group, were you entitled to overtime pay?

A. I didn't ever work at roles that I was at for 40 hours or more a week.

Q. So just never came up?

A. No.

Q. Did it ever come up in the context of placing candidates, did candidates ever ask you will I be entitled to overtime in this role?

Page 41

A. Yes.

Q. And is that something that you would have to find out or tell the candidates whether or not they would be eligible for overtime?

A. Yes.

Q. You understood in your role at Addison Group that you were not entitled to overtime, correct?

A. That was my understanding.

Q. That was your understanding?

A. Yes.

Q. How did you obtain that understanding?

A. Initially, when I first started working at Addison Group I was working approximately 40 hours a week, and things became different after my training period and we were expected of us to stay at Addison Group longer or show up earlier and work longer, which is when I was realizing that I was working overtime and I was not being compensated correctly.

Q. And at that time, did you ask anybody a question about whether you should be getting overtime?

A. As I mentioned earlier, these were conversations I was having amongst my coworkers because at Addison Group there are multiple divisions. I forgot what they were called.

We at finance and accounting on the contract on a contract-to-hire basis, we amongst ourselves were having a conversation of -- We are -- Addison Group is expecting us to



11 (Pages 38 to 41)

Page 42

show up here an hour before work to make cold calls as a group because apparently that drives our motivation.

We were expected to work within our lunch hour cold calling for an hour as a group because that drives motivation, and if our manager, Jason Douglas was staying after our 5:30 time it was expected of us to stay until he left. That was when the conversation of we are not being paid properly to stay all these extra hours.

Q. And that was the conversation you had amongst your peer group?

A. My peer group and I brought it up to my direct manager which was Lauren Sherer, and she stated that this was going to drive our business and that is where we would see our compensation.

Q. Did she say anything specifically about whether or not you would receive overtime pay?

A. No.

Q. Let me direct your attention to what we have on the screen, page five outside employment. Did you understand Addison Group's policy about outside employment when you worked there?

A. It was never brought up. We were never trained on outside employment.

Q. Did you have outside employment while you worked at Addison Group?

Page 43

A. No.

Q. And then on page six, do you see Addison Group time keeping policies?

A. I see it. Yes.

Q. Were you aware of this time policy while you were working at Addison Group?

A. No.

Q. Did you record your time in any way when you worked with Addison Group?

A. No. I was an salary employee so it's not like I had to sign in and out every day.

Q. And so is it correct that nobody from Addison Group ever instructed you to record your time?

A. Yes.

Q. And it's also correct that you didn't record your time yourself?

A. I did not record the exact moments that I got to and from work. No.

Q. Do you have any records that show how many hours you worked at Addison Group?

A. Not in my possession. The only thing I would have that showed would be e-mails that were sent by our managers requiring us to be there hours earlier before our shift -- before our regular day started in order to continue these cold calls and in order to drive business further.

Page 44

Q. Who sent those e-mails?

A. Jason Douglas.

Q. And when you say hours earlier what do you mean, do you mean one hour, two hours, three hours?

A. Our day was supposed to start at 8:30 and we would have to get there either at 7:00 or 7:30 to continue these cold calls.

Q. And was that every day or just some days?

A. They would have us do it about once a week for a month and that started probably two months prior to Covid happening.

Q. So that would be around January of 2020, right?

A. January or December.

Q. You mentioned earlier a training period, how long was your training period?

A. I don't know the exact timeline off the top of my head.

Q. Give me your best approximation.

A. I'm sure it was about a month or month and a half.

Q. So that kind of took you from early November when you started through the holiday season?

A. Yes.

Q. And I think you mentioned earlier that during that training period as you described you were working generally 40 hours a week or less?

Page 45

A. Yes. During my training period I was working 40 hours a week.

Q. And then you said that things changed after that training period, right?

A. After my initial training period we didn't have another employee be added on for several months. We were a very solid team at that point which is why the cold calling in the mornings had begun.

Q. How many people on the team?

A. There was five employees that were doing the roles and two managers.

Q. The two managers being Jason and Lauren?

A. Yes.

Q. And were they both your boss or did one report to the other?

A. They were more of like a president and vice president.

Q. With Lauren being the vice president?

A. Yes. Lauren was the vice president. She was the manager of recruiters and Jason was the business development manager.

So him and a team of -- At that time I think it was just one other person. The rest was recruiters but him and one other individual would go out and find the businesses that were seeking employees.



12 (Pages 42 to 45)

EXHIBIT A

Page 46

Q. And you said there were about five recruiters that worked with you?
A. Yes.
Q. That included yourself?
A. Yes. And Lauren is a recruiter.
Q. So Lauren was a working manager?
A. Yes. And so was Jason.
Q. So you mentioned that after your training period things change in terms of hours, was that just based on having to come in earlier to do cold calls?
A. Coming in early to do cold calls, sitting at the desk during lunch period. That was something that was expected of us that Addison preferred us to do if we were behind on making placements -- if we were really trying to get people on roles because they feared that we would be losing business.
It was expected of us to sit at our desk during lunch to continue working, and if Jason was staying after 5:30 it was almost looked down upon us to leave before he did.
Q. Let's talk about those two things separately. In terms of staying at your desk during lunch, did anybody communicate that expectation to you directly?
A. It was more of the peer conversation.
Q. And then likewise, you said that if Jason was staying you were expected you to stay, again, did anyone communicate that expectation directly?

Page 47

A. These are conversations amongst my peers that was described to me as the Addison way. Like the respect slash politeness that you have throughout the day, it's the same thing.
The Addison way is to work when your managers are working even if it's at your desk and after hours.
Q. Was that the way it was described to you by your peers or your managers?
A. It was more of a peer conversation but I also wasn't close with either one of my managers.
Q. And getting back to the cold calling in the morning, you said that would go on once a week for a month?
A. Yes. For months. It started -- I would probably say it started in January and continued until March when we were remote.
Q. And prior to March 2020, were you working in the Chicago office?
A. Yes.
Q. And when you refer to your peers in this group of five recruiters, were they also working physically in the Chicago office?
A. Yes.
Q. When the job started it was a five day a week in-office job?
A. Yes. It was offered -- The role was offered to me

Page 48

saying that we would be a 8:30 to 5:30 position.
Q. With a half hour for lunch?
A. Yes. Full hour.
Q. An hour for lunch. And who described it that way to you?
A. Lauren Sherer when she offered me the position.
Q. Did you have a morning meeting?
A. Yes.
Q. Was that at 8:30?
A. They would ask us to be there at eight.
Q. And did you have an afternoon meeting?
A. We do like a roundup. We would all be at our desks. We wouldn't have to physically go to a conference room or anything of that nature which was what we had to do in the mornings.
Q. Right. So the morning meetings were in a conference room?
A. Yes.
Q. And who would lead those meetings generally?
A. Jason.
Q. What would you talk about in those meetings?
A. The open positions and candidates we had that we believed were vital options for these positions.
Q. And you said you would do a roundup sometimes in the afternoon?

Page 49

A. Every afternoon after lunch when we would all come back to our desk. If we were able to leave and if we were sitting at our desk when we were completed with lunch and put all of our food away.
Q. So what time was that?
A. Probably like 1:00 or 1:30.
Q. And what would happen during the roundup?
A. We would discuss the same exact things.
Q. And by the same exact things you mean positions opened, candidates --
A. Positions that were open, candidates that we had but it was -- At that point in the afternoon that's when Addison Group would start assigning the jobs to recruiters.
So if there was a accounts payable position at Walgreens they would say, Cassidy this is what you are working on until the end of the day.
Q. So in between those meetings, would you generally working on filling job orders?
A. They had us doing cold calls in the morning. That was what Addison required us to do. And then once 8:30 started and we started talking about the positions that we opened they would assign us roles.
So we didn't get to choose which roles that we were working on. They would assign them to us and then we would have in between that timeframe and lunch to call

Page 50

candidates that fit those descriptions amongst bullhorn.

And if we had interviews that was the only time we were able to veer off from those roles that we were working on.

Q. So you were expected then to be calling candidates, conducting interviews, anything else you were expected to be doing during work day?

A. Editing resumes, sending the resumes into the positions, interviewing/prepping our candidates for the position.

If they were submitted to a role by us and the employer wanted to meet with them we would have to interview prep them.

Q. And tell me what was involved in the interview prepping?

A. Our interview prepping would be discussing the job duties with them, seeing if they had any questions, making sure they had questions to ask the employers.

If it was a contract position, what was expected of them, if it was remote, in-office, things of that nature.

Q. Tell me if you could how your office was laid out and where did you sit and where did your peers sit?

A. It was an open office setting. They would just sit over a little so we could all see each other.

Q. And where did the managers sit?

Page 51

A. They sat with us in the desks.

Q. And you had a cube type of arrangement?

A. Yes.

Q. And Jason and Lauren both had cubes on the floor with you?

A. Yes.

Q. And were all the FAC recruiters in BDM sitting together in the same general space?

A. Yes. So the BDM's basically sat -- There was one that wasn't Jason, Jason, one that wasn't Jason, and on the other side there was a recruiter, Lauren, recruiter, and then recruiter, recruiter, recruiter, but some of the desk were empty because we were not fully staffed or they allotted us too much space I guess. I'm not sure.

Q. You understood that Addison Group was organized by staffing verticals?

A. Yes.

Q. Do you remember the other verticals aside from FAC?

A. There was finance and accounting, healthcare, IT, HR admin roles. I don't know what their division was called but they were more like HR admin. And then they had all the direct hire positions too -- like direct hire teams.

Q. And some employees in the verticals sat in your office; is that correct?

A. Yes. There's only one division that sat on the floor

Page 52

below ours and I think that was IT direct. I think the whole IT department was a floor below us.

Q. Did you interact with any other employees from other verticals?

A. Nina.

Q. Aside from your roommate?

A. Not on a day-to-day basis.

Q. Do you have any knowledge about how other verticals were trained?

A. We did a new hire training so that would be, you know, going over things in the handbook, how to sign up for benefits, things like that and we would all be together.

But a part from that, they would break us into groups on finance and accounting, healthcare, IT, HR admin, et cetera.

Q. And those other verticals had different management as well, right?

A. Yes.

Q. And as far as you knew your supervisor Jason and Lauren did not supervisor anybody from other verticals; is that accurate?

A. Not to my knowledge.

Q. Let me ask you about after Covid, after March of 2020. I know you said that you were remote after that time; is that correct?

Page 53

A. Yes. We were all remote until they were wanting me to go back in the office on August of 21 but I was resigning to take a new position with my current company.

Q. So is it correct that after March of 2020 you never worked in the Chicago office again?

A. I did not.

Q. And is it correct that you were remote and not working in any physical office after March of 2020?

A. No.

Q. Okay. After March of 2020, did the schedule -- the expectation of when you would be working change?

A. We still did a morning meeting every single morning via zoom. We still did a afternoon meeting every single day via zoom and we would have --

Addison expected us because we didn't have our equipment from our laptops. We were expected to use our phones and to use like a different Google number that was associated with a 312 number because not all of us had 312 numbers.

The hours didn't necessarily change at all. It was just a little bit harder for them to dictate our schedules in terms of like cold calling in the morning but they would still try to do that.

It just didn't really have the same effect because we weren't in person and it wasn't a motivational drive with us cold calling together.



Page 54

Q. You mentioned that once a week you were expected to be at the office early and be cold calling candidates, did that continue after March 2020?

A. We would have cold calling hours. So they would say from 10:30 to 11:30 let's try to cold call as many accounts payable specialist as possible, and that would be -- they would decide what we were going to -- like what qualifications.

If it was account receivables or if it was CFO's, they would tell us you need to try to -- they would say in these timeframes you need to expand your portfolio.

You need to be calling CFO's to see if you can find any hire-ups to see if they have these qualifications and this is what you will be spending your next hour calling.

Q. That cold calling was being done during the work day, in other words, between 8:30 and 5:30?

A. They would decide when that was. Yes.

Q. Do you have any recollection of a call block that was before 8:30 after Covid?

A. After 8:30?

Q. No. Before 8:30 in the morning.

A. I think we tried to do a couple but it wasn't as affective because we were all together. They wanted us to be doing it together because everyone was doing it so it was supposed to drive our motivation to continue calling candidates.

Page 55

Q. Right. In other words, they wanted you to be in the same room all calling at the same time?

A. Yes.

Q. And that obviously couldn't be done after Covid?

A. No.

Q. I'm presuming after Covid there was no way of anyone to monitor whether you were at your desk during your lunch hour?

A. I mean, they would be checking constantly. Like I said, this is when the quota became more heavily watched. We were expected to make a certain amount of phone calls, have a certain amount of candidate visits, certain amount of resumes submitted to positions a week, and that was being very closely monitored by Jason and Lauren.

Q. You had what they called activity metrics, correct?

A. Yes.

Q. Which are the things that you described, like number of candidate calls, number of interviews, and so forth?

A. Yes. And it can all be tracked in bullhorn. How many phone calls you're making, how many conversations you've had, how many voice mails you leave, how many candidate visits you have, how many resumes you submit, anything of that nature.

Q. You had those metrics all throughout your employment at Addison Group, correct?

A. Yes.

Page 56

Q. And you're just saying they weren't being closely monitored at some points in time; is that right?

A. It was a little bit easier for them to track us when/what we were doing in person versus they were very heavily watching our quotas when we were remote because they didn't have the luxury of being with us in person.

Q. Are you saying those quotas couldn't be achieved during an eight hour work day?

A. There were some aggressive quotas that they were expecting of us that would require us to work after our 8:30 to 5:30 start and stop time.

Q. What were those aggressive quotas?

A. How many phone calls we had to make, how many candidates we had to have, and we had to have all these notes in before the next day.

So if it was -- if I had a certain amount of interviews they would encourage us to conduct the interview, take notes on it, and not submit it until later in the day so we could use that timeframe during the day to continue cold calling other candidates.

Q. And when you submit it you mean submit it to bullhorn?

A. Yes.

Q. And you're saying that couldn't be done in an eight hour day?

Page 57

A. Like I said, the quotas that they were aggressively sending us when we were remote required us to work after the hours because they wanted us to use the timeframe that most people would be answering their phones which would be between the times of eight and five realistically, so 8:30 to 5:30 in our time for calling.

And then after 5:30, that's when we could sit on bullhorn and add our submissions, edit resumes that we could submit for the next day.

Q. Were you given any specific expectations of when you were required to be online when you were working remotely?

A. Yes. As I mentioned earlier, every single morning we had a call and every single afternoon we had a call.

Q. Those are the 8:30 and 1:30, correct?

A. Technically, I don't know the time in the afternoon. It can be at 1:00 or 1:30.

Q. Okay. Other than that, you were not given any specific expectations of when you needed to be signed in and online when working remotely, correct?

A. It wasn't like we were all on zoom like this and calling people simultaneously. No.

Q. Okay. And nobody was really monitoring or could monitor whether you were working after Jason was working in the evening or at the same time Jason was working if you were working remotely?



Page 58

A.  They would look at our submissions throughout the day seeing how many phone calls we were making.  That was all trackable.  They could pull up for any employee of Addison Group where they were at for the day and when they would stop submitting stuff.

Q.  Right.  But you described earlier a situation when you had a time where Jason was still there and you and your peers felt like you needed to be there, right?

A.  Yes.

Q.  And that didn't continue after Covid did it?

A.  No.  Because we couldn't see when he would sign off.  Like I said, the Addison expectation was that we would use 8:30 to 5:30 to be calling as many candidates as possible in order to hit our quotas that they set for us.

Then if our candidate visits were low but we hadn't submitted them yet we would be expected to continue to submit those candidate visits and enter them into bullhorn even after if it was past 5:30.

Q.  And you said after Covid you were using your personal cellphone for those calls?

A.  Yes.  Because they didn't give us phones to use.

Q.  Does that mean your phone bill would reflect when you were making calls during that time period?

A.  I was using an app.  Google phone or something like that.

Page 59

Q.  Google voice or something.  I know the app.  It's an app where you can use the app to call and it will make it appear as if it is coming from a different number than the number on your cellphone.

A.  Yes.  And that was encouraged for us to do by Lauren Sherer.  She let us know when Covid had started that is what we should pivot to because we would all have 312 numbers.

Q.  Does that mean you have no records of when you were calling candidates after March of 2020?

A.  Yes.

MICHAEL PHILLIPS:  All right.  Let's go off record and take maybe a ten minute break.

(Off the record at 11:00 a.m.)

REPORTER:  We are back on the record at 11:11 a.m.

Q.  (By Michael Phillips)  Ms. White, are you ready to resume?

A.  Yes.

Q.  Okay.  We talked earlier about the different verticals.  I want to ask you a couple of things about the verticals.

Was it your understanding that each staffing vertical was focused on a different type of job function?

A.  Yes.

Q.  And your vertical was focused on financing and

Page 60

accounting professionals?

A.  Yes.

Q.  But specific to contract as opposed to direct hire?

A.  Yes.

Q.  And was it your understanding that the IT vertical was focused on technology candidates?

A.  Yes.

Q.  So those verticals comparing F&A to IT would have different types of candidates you'd be looking for, correct?

A.  Initially, yes.

Q.  And different types of job orders?

A.  Initially, yes.

Q.  And when you say initially, what do you mean?

A.  I thought that the roles would be different but truthfully they were just in different industries.  So healthcare was recruiting for accounts payables and accounts receivables but for hospitals rather than finance and accounting firms.

Q.  Okay.  So some of the verticals were industry specific and some were related to job function?

A.  Yes.

Q.  Okay.  And your job would not involve finding candidates with information technology skills, correct?

A.  No.

Q.  Your job was involved in finding candidates with

Page 61

specific finance and accounting skills; is that correct?

A.  Yes.

Q.  And we talked a little bit about job orders but I never really asked you what a job order is, can you explain to us what a job order is or what it was to Addison Group?

A.  A job order was the employer looking for a candidate.  They are looking for a accounts payable specialist that has some experiences with excel or something of that nature and that was the job order.

Q.  And you never worked on job orders for other verticals or did you?

A.  No.

Q.  Is it accurate to say that in your role or your vertical the business development manager or the BDM was responsible primarily for generating job orders?

A.  Yes.

Q.  Was that part of your job at all?

A.  No.

Q.  Was your job and the job of the other recruiter who you worked with to generate and find candidates with specific skills?

A.  Yes.

Q.  And would those be skills generally specific to the job orders?

A.  Yes.  But we didn't get to decide what job orders we



16 (Pages 58 to 61)

Page 62

wanted to worked on. It was assigned to us by our managers at Addison Group.

They would say I have job order A, job order B, job order C, and Cassidy you're going to work on job order A. Joe you're going to work on job order b, and things like that.

Q. Right. But regardless of who job order it was your job was to fill the job order, correct?

A. Yes. With candidates.

Q. Do you know how other verticals worked in that regard? Do you know if every vertical had the same separation between the people that got the job or as in the people that filled them?

A. I assumed it was a same but I don't know. That wasn't my responsibility to know.

Q. Do you have any knowledge or did you ever hear about full desk recruiting?

A. No.

Q. We talked a little bit earlier about direct hire, and you told me that direct hire was when you were trying to find a candidate who would become an employee of Addison Group's client, correct?

A. Yes.

Q. And was it your understanding that the contract candidates who you were recruiting if they accepted a role would become employees of Addison Group?

Page 63

A. That is the contract. Yes.

Q. And then we talked a little bit about a spread meeting that Addison Group would pay them one amount and they would charge the client a different amount?

A. Yes. So the BDM's would say, what is your threshold for a candidate and they would pay them up to $25.00 an hour. So if our candidates that were viable for these positions --

If they were solid candidates to be placed in these positions we could quote them anywhere from $18.00 an hour to 25, but they would want us to go towards the lower end of that spectrum because that spread would be larger and that's how much more we would be getting paid.

Q. So that was part of your job too was sort of negotiating pay rate with the candidates, right?

A. Yes. That was part of the question that they wanted us to ask in the initial interview process. So if I found a candidate that hasn't been interviewed by me before I would ask to interview them, ask them what they are looking for in positions, if they are open to contract-to-hire, things of that nature. Part of that was to get what pay they were looking for hourly.

Q. Because if you could find a great candidate but if they wanted more per hour and they client was willing to pay that would not be a good candidate for Addison, right?

A. On the contract basis, yes.

Page 64

Q. And you also told me a moment ago that the bigger the spread the more money Addison Group made, right?

A. Yes.

Q. That's different in direct hire, correct?

A. Yes. We would want more for direct hire. But the direct hire positions that we were recruiting for -- that we had a opportunity to recruit for, had a certain threshold. So if there's over $100,000 it would have to go toward the direct hire FAD team.

Q. So did you do some direct hire recruiting?

A. I would if they had the job order and they assigned it to me, yes.

Q. And when you are recruiting for direct hire there's really no concept of a spread or is there?

A. We would see how much money they would be looking for depending on the position and if they were offered -- if it was a direct hire position we would negotiate for more because we get a certain percentage of that and that's where our bigger commissions would come from.

Q. Would you negotiate more for the client?

A. Yes.

Q. In other words, the more this client paid this candidate for salary the more money Addison would make from the fee; is that correct?

A. Yes.

Page 65

Q. And you're aware that there were F and A recruiters who did exclusively direct hire recruiting?

A. Yes. FAD.

Q. FAD, right. And the FAD recruiters I think you just mentioned recruited for positions of 100,000 in annual salary or more, right?

A. Yes.

Q. And as I understood it, you never worked in FAD, right?

A. No. I only did FAC.

Q. And it sounds like as you're describing it, FAD positions although they were finance and accounting positions they would be different kinds of finance and accounting positions?

A. It could be the same finance and accounting positions but they typically would be CFO's and things of that nature. Finance directors those weren't necessarily contract positions that we would be recruiting for. It wasn't that we never did it was just -- It was more of a rarity.

Q. It wasn't typical that someone would be looking for a contract CFO?

A. Yes.

Q. It would be more common they would be looking for a contract for a accounts payable clerk or something along those lines?



Page 66

A. Yes.

Q. And I believe you said you never worked in any other vertical other than FAC, right?

A. Correct.

Q. Did you work with other Addison Group offices at all?

A. Because we weren't -- I mean, we were in the city of Chicago but if we ever had an account that was kind of in the out skirts we'd have to coordinate with the Schaumburg office but no.

Q. Okay. No you never worked with any other office?

A. I mean, if one of my good candidates was moving to Nashville finance and accounting recruiter and bullhorn and that would be it.

Q. When you say one of your good candidates, what does that mean?

A. A candidate that has experience. A candidate that knows what they are doing. A candidate that worked in contract positions before and has a realistic idea of what the expectations are in terms of their an Addison employee. It's only contract, things of that nature.

Q. So you accept candidates who you thought were good candidates because of those attributes?

A. Yes.

Q. Was never a situation when Addison Group Houston office would call you up and say we have a job order in Chicago

Page 67

can you help fill it?

A. That was once again, one in a million. I think that happened maybe once in my almost two years of being there.

Q. So typically the group you worked with was the FAC team in Chicago?

A. Yes.

Q. And were you aware that each vertical had a different president?

A. Yes.

Q. Was J. Houston the president of FAC when you worked there?

A. Yes.

Q. And you're aware that FAD had a different president from FAC?

A. Yes.

Q. And IT had a separate president, et cetera, right?

A. Et cetera. Yes.

Q. Okay. So different management team and management structure for each vertical?

A. Yes.

Q. We have talked a little bit about what you did as an Addison Group recruiter, but could you just tell me after your training period what your day typically looked like?

A. It was kind of dictated by whatever my managers were asking for. If we had our morning meeting and they would say

Page 68

this has an urgency to be filled. They're looking for someone to be back filled right now.

They need someone to sit in the seat. I need three people to be working on this or I need two people to be working on this, and then the other few people would be doing this.

So like I said, it started off with the cold calling seeing if we had candidates to fit these roles. It was very much -- our days were very much encouraged to be followed a certain way that our managers were setting for us.

Q. So tell me a little bit about that. So you said that you might have a morning meeting and a manager would assign a job order to you that would be urgent?

A. Yes.

Q. And so a job order might look like, client is looking for a accounts receivable manager, would that be a job you might fill?

A. Yes.

Q. After you get handed that job order -- that assignment, how do you go about finding somebody that's qualified for the position?

A. We look in bullhorn under candidates already interviewed, candidates who resumes that are already edited, and I would call them and see if they would be interested in the position.

Page 69

If they are interested in the position I will submit the resume to the job order and there would be an interview and the rest is the recruiting process.

Q. All right. So you said you were looking for candidates you already interviewed, does that mean there was a process by which you reached out to candidates, identified candidates, and interviewed them?

A. Yes. So the process of recruiting is cold calling, getting someone on the phone, getting someone interested in working with you, interviewing them, going over their resume, talking to them in specifics about the job duties of their previous roles, going over the expectations of Addison Group.

If you get a contract while you are an Addison employee, how much are you looking for a year. Do you need benefits, do you need et cetera, et cetera.

Editing their resume on an Addison letter head, sending it to them, making sure they approve of it, and then going on and finding positions that you think they would be best in.

If they have certain qualifications, if they are an accounts payable specialist, if they only do bookkeeping, if they are CFO, if they're a finance person that's looking to move in a different direction for the position, and things like that submitting them to the role.

If they get an interview, interview prepping



Page 70

them. If they get an offer, negotiating their offer. If they're contract role, making sure the spread was acceptable by Addison standards and sending them on their way, checking in on them, making sure the job is going well, making sure they're happy, employer's happy, et cetera.

Q. Got it. So by interviewing candidates and reviewing their resumes, and editing resumes, would you be building a pipeline of candidates with specific skills?

A. Yes.

Q. And would that pipeline of the candidates have profiles that you would have created in bullhorn?

A. They are already created in bullhorn. Yes. Candidates can either submit an application on Addison Group and they are automatically put in bullhorn or they are cold called a certain amount of times. Their profiles are still in bullhorn.

So if someone refers you, like, you're cold calling Michelle and she has Beth who's interested in working with Addison Group and she does the same thing, she gives me Beth's number and I call Beth.

Q. So there's a bunch of ways you can find candidates is what I think you're telling me?

A. Yes.

Q. So if a candidate applied online to Addison Group and they're put into the database that way, it is somebody job --

Page 71

recruiter's job specifically to contact that candidate, interview them, get a copy of their resume, edit the resume, and figure out what their skill sets are, and so forth?

A. Yes.

Q. So that would've been part of your job too, right?

A. Not necessarily to find them in the bullhorn but -- I don't know what the process is but I'm pretty sure it's someone that works at Addison Group that's like an administrator that gets all the applications, submits them, and will tag all of the managers for finance and accounting or tag the manager for healthcare.

Hey, this person just submitted an application and Addison Group calls them.

Q. So would Jason or Lauren sometimes give you a profile of a candidate who applied online and said call this person?

A. Yes.

Q. Then it was your task to interview them, get their resume. Were you trying to determine if they were a good candidate for Addison or just what their skill set was or all of the above?

A. Yeah. The whole part of the interview process is to see if it's someone you can work with unless they may have done accounts receivable forever. But if they had been working in clinics or for HR places or things like that then I would pass it on to a different vertical because they haven't been working

Page 72

in accounting firms.

Q. When you interviewed candidates, were you also trying to find out their industry knowledge?

A. Yes.

Q. Is that important in terms of placement that someone has a specific experience in a specific industry?

A. Yes. If they been working in law firms a law firm wants someone who has been working in law firms.

Q. You said or you talked about cold calling candidates, and is that a process by which you were trying to expand the pipeline -- expand the number of candidate in your pipeline?

A. That is the goal of cold calling. Yes.

Q. How did you know who to cold call?

A. By searching in bullhorn. If we needed -- If we were starting our cold calling and Jason said we needed more CFO's, we need more bookkeepers, we need more people that know how to run this software SAP, there's a way to search in bullhorn SAP.

It's just like Google searching but for the bullhorn system. If we need more people that know how to navigate SAP, so I would type in SAP accounts receivables and all these candidates will show up.

They had to be called at a certain timeframe. Like if Shannon called them on Monday and it's Tuesday, I'm going to say call them again because she has 24 hours to follow up with them. And if you talk to them or interview them then

Page 73

you have more length of them being your candidate.

Q. So you're calling candidates in that process that you've already described that are already in the bullhorn database?

A. Yes.

Q. And when we talk about calling them, is that actually picking up the phone and calling them as opposed to e-mail or text or something else?

A. If I never called this person before I would call them and leave a voicemail. I would set up a reminder to call the next day, and if they didn't answer that day I would maybe send them a e-mail or followup with them.

And two days from there I'd leave them a voicemail. There's just a certain time where people are not answering the phones, phone numbers change, things of that nature.

Q. And was the goal of cold calling not necessarily to find a candidate for a specific job order but simply to find additional candidates who you would get to know and understand their skills and maybe use in the future?

A. Yes. That was also part of the quota. They would require of us to call 40 people a day and have 20 conversations a day. We would have to continue doing this until we hit our quota.

Q. So that was everyday that you would be cold calling



19 (Pages 70 to 73)

Page 74

trying to fill the pipeline?

A. Yes. That was part of our job duties everyday.

Q. And was that separate from any duties that you had with respect to filling job orders?

A. What do you mean?

Q. In other words, did you fill job orders through cold calling or were those two separate activities?

A. They all lead to finding candidates.

Q. Okay. When you were cold calling -- you said when you would cold call you would be instructed to look for specific types of position, right?

A. Yes.

Q. SAP was the example you gave, right?

A. Yes.

Q. You mentioned earlier referrals, was that also a goal of cold calling and talking to candidates was to find maybe they know someone else -- a coworker?

A. It wasn't part of the goal but it wasn't discouraged. If they happen to mention somebody and they wanted to refer them we would be more than happy to contact those people.

Q. Were you sometimes contacting candidates who were not in the bullhorn database?

A. For me personally only on referrals.

Q. Did you ever use LinkedIn or any other career builder or any other kind of tools to find candidates?

Page 75

A. I personally did not.

Q. Were you aware there were others who did?

A. We had one individual who would search on other job boards for employees who are looking for -- that wasn't automatically submitting resumes.

He would submit them in bullhorn or search bullhorn to see if they had been already added in there but it was not a -- Addison preferred us to use bullhorn in order for us to place our candidates.

Q. And is that why you were only using bullhorn or was there any other reason why you were just using bullhorn?

A. I found the candidates I needed in bullhorn and that's the way that Addison wanted it to be done and that's the way I continued to do it.

Q. And who told you that's how Addison wanted it to be done?

A. Our managers, our trainers. They let us know there would be other job boards but it's not like we were trained on working Indeed. We were trained on working bullhorn.

Q. Was there anything restricting you from finding candidates in other ways?

A. It wasn't discouraged but it was -- If we were continuously finding candidates from LinkedIn and Indeed and that was our main method it would raise eyebrows.

Q. But you could find candidates, for instance, from

Page 76

your personal network?

A. Not necessarily.

Q. So let's say your roommate say hey, my brother is looking for a contract finance and accounting job, is he someone you could interview if he sounds like he would be a qualifying candidate?

A. I could.

Q. You could interview him and put him into bullhorn?

A. That was probably or maybe two percent of candidates that I would contact. I could probably count on one hand how many times that had happened to me at Addison Group.

Q. It didn't happen very often in other words?

A. No.

Q. But if you came across somebody like that you could recruit them and you could add them to the database?

A. Yes.

Q. We've talked about cold calling, filling job orders, was there any other activity that you did during a typical day at Addison Group?

A. Like I said, I would cold call. If someone would answer the phone and they were interested in working with Addison I would set up an interview. I would have to interview this candidate.

I would either do this on the phone or when I was working in person I would do it in person. And by phone I

Page 77

don't mean I would just call them. I would do a zoom with them. I would have to physically see them. That was something that Addison Group encouraged us to do.

Make sure you see the candidate and meet with them that way. And once I would meet with them we would discuss their resume, go over the specifics of their job duties, the software that they would be working with, get all the information they were looking for on their job moving forward.

And then I would edit their resume, send it to them. Let them know that this is the resume with Addison title head I would be using to submit them to roles, let them know when roles came about, tell them what the job duties were, the company -- the pay, et cetera.

And then the benefits, contract-to-hire, the length of the contract, you know, if it's holiday, things of that nature. Like if it was over Christmas or New Years or whatever it is the company was looking for, why they were looking for a contract specialist, a back fill, whatever.

Submit them to the position, see if they would get an interview. If they got an interview let them know, do an interview process, prep them, do a debrief, make sure they were thanking the person.

And if they got submitted and they were offered the role, negotiate their pricing and continue to follow up



Page 78

with them to make sure that the role was going on.

Q. And so even after a candidate was placed in a contract role you'd still have some ongoing responsibilities with respect to that candidate?

A. Yes.

Q. Just to focus on the interview process for a minute, when you were interviewing candidates after your training period so after January of 2020, would anybody be with you from Addison Group in the interview?

A. No.

Q. So you would be doing that one-on-one, right?

A. Yes.

Q. And you said you were trying to assess whether the candidate was somebody who you could work with at Addison Group, correct?

A. I mean, that's how all interviews go technically.

Q. That's right. You were using some judgment to say that is a person I could work with and would be a good candidate or not, right?

A. Yes. And vice versa.

Q. Meaning they were sizing you up or sizing up Addison Group?

A. I mean, I would hope that they would ask questions about working with the contract company.

Q. Were the people that you were interviewing

Page 79

necessarily people --candidates that were already doing contract work?

A. They could. They could have been laid off. They could've been furloughed, their company could've been depleted and they lost their role, or they needed something quick because they were fired, something of that nature.

That's something that we would try to communicate. I would ask them to communicate with me in that initial interview process.

Q. So it could be people in a current contract role, people out of work. Did you ever have people you interviewed who were working a full-time job?

A. If they were interested in a leaving role. That's was part of the initial conversation that you have when you cold call someone.

Q. Determining what they were interested in?

A. Yes.

Q. And you were using some judgement to say this is a person who might be interested in a contract role or somebody who probably isn't?

A. Yes. You can pretty much tell when someone is pulling your leg on the phone or not and that's why we'll want to meet with them in-person to show how serious they were about working with a contract company.

Q. You also said you were assessing their skills to see

Page 80

sort of what their skills would be in financing and accounting?

A. Yes.

Q. And you were then using some judgment to determine this is somebody who might be a good candidate for this type of position but maybe not so much for that type of position; is that right?

A. Yes.

Q. And the same thing is true with respect to industry, you were trying to determine from somebody's background where they had industry experience?

A. Yes.

Q. And then again, you were using judgement to say this might be a person who would be good for a role in a law firm but maybe not so much in a manufacturing company; is that right?

A. Yes.

Q. You said that you would edit someone's resume, can you explain how you would edit the resume?

A. I would make sure it was created correctly. They were using the same tints at the beginning of every word. I would make sure if there's kind of stuff fluffed in there. I would make sure they come down to the specifics of what their job actually was that they were doing.

If they were using SAP, I would make sure to add that in a certain job, things of that nature. I would make

Page 81

sure they were a little bit more specific with it and the dates were accurate, all the same times new roman 12 font and make sure it looked nice and on a Addison letter head.

Q. So part of it is making sure their resume actually reflected the experience they described during the interview?

A. Yes.

Q. So would there be times when somebody would say I used SAP in this job and that job and you looked at their resume and it didn't say anything about SAP?

A. Yes.

Q. And then that would be part of your job to say, well if you worked with SAP at the company we should add that into your resume, right?

A. Yes.

Q. So again, you're using some judgement to kind of figure out how to best present this candidate to a client, right?

A. Yes.

Q. And obviously you want their resume to be accurate and also reflect all of their relevant experience; is that right?

A. Yes.

Q. And then would you send their resume back to them for approval?

A. Yes.



Page 82

Q. And you mentioned earlier that there were times or just about everyday you were given job orders to fill, right?

A. Yes.

Q. And then you had to use judgment to determine which of the candidates in your pipeline had the best skills and experience for this particular job order; is that right?

A. Yes.

Q. And once you made that determination, would you then contact candidates who you thought would be good fits for the role?

A. Yes.

Q. And in terms of fit, were you looking both at skill set and industry experience?

A. The industry experience was pretty -- I mean, we handled everything outside of healthcare. If they worked in healthcare and industry had something to do with it -- like if they worked at a law firm before and it was law firm specific, yes.

But industry for the most part, a lot of these people were already working in manufacturing, construction, which is a lot of the jobs that we were looking for. Unless it was very specific that's when industry would come into place.

But for the most part, they had a proprietary website or if they were specifically using a website that was necessary for the role, I would search my pipeline for that

Page 83

specific website or whatever that they were using -- the software they were using and call them for the role.

And if it was something they were interested in or I thought they would be overqualified for or under qualified for, they would communicate that to me and say no this is not the position I'm interested in and we would move on.

Obviously, it would take a little bit. If it was someone I thought that would do well there and we really needed a placement, I would be encouraging or I would try to talk them into it. That would work sometimes and sometimes it wouldn't.

Q. Right. So just first of all, you were the one who was determining who to call for that specific job order that had been assigned to you, right?

A. Yes. And if there was -- I was doing a job order and the other person was also doing it and based if I had interviewed this person they would tag me in and tell me to call them.

Q. When you say someone would tag you in and tell you to call them that would be --

A. On bullhorn.

Q. Would that be a manager or peer or maybe both?

A. Both.

Q. Sometimes when you were calling candidates about a specific job order would there be candidates who you had

Page 84

previously interviewed?

A. Yes.

Q. And would they sometimes be candidates that you hadn't interviewed previously?

A. Yes. And I would have to interview them in order to submit them to the job order.

Q. And that was my question. Was it different if it was someone you had interviewed before as opposed to someone you hadn't?

A. No. I still have to interview them.

Q. So either way you had to interview them specifically for the job order?

A. If I wanted to submit a candidate to a job order I had to interview them, edit their resume, and get their approval to submit them to the position before I submitted them to it.

Q. Gotcha. If someone's in bullhorn does that mean a recruiter has already reached out to them, interviewed them, edited their resume, and given them their resume back for review or not necessarily?

A. If I interviewed a candidate or if I left them a voicemail or if I had a conversation with them, if I had a candidate visit which would be the interview that I have with them planned, there's a certain timeframe that you have ownership over a candidate.

Page 85

So if I leave them a certain amount of voicemail's and they don't answer 24 hours from then it's up for grabs. If I have a conversation with them I have 48 hours over them. If I do a candidate visit with them and I continue to follow up with them their my candidate. If I submit them to a position and they accept the role they're my candidate.

Q. Right. So let me ask you because let's say there's a candidate who you interview, you edited their resume, and you do all the steps we talked about before and put them in bullhorn, are you saying that there's a period of time for which nobody else can contact that candidate?

A. Yes. Or they can contact them on my behalf.

Q. So if your colleague two cubes over is working on a job order and the candidate you interviewed yesterday would be a great fit for that job, how does that person get connected with that job?

A. They would tag me in it and tell me to call them for that role. I would tell my manager Jane Doe had realized that I had a good position for this other job and I would tell them and they would let me pivot over and submit them to that role and go back to whatever I was working on.

Q. Makes sense. When you're working a job order and you contact a candidate that's in bullhorn but not somebody you knew before or interviewed before, are you trying to assess whether they'll be a good fit for that specific role or job



Page 86

order?

A. Can you repeat the question?

Q. Yeah. You're working a job order, you find a candidate in bullhorn, looks like a good fit, you get them on the phone, you interview them or you get them on zoom and interview them, are you trying to assess is this person a good fit for this job that I'm working?

A. Yes. That's recruiting in a nutshell.

Q. So sometimes you'll see somebody in bullhorn that looks like they got the right skills and you get them on a zoom call and they're not the right person, did that ever happen?

A. Yeah.

Q. And sometimes you get them on the zoom call and they seem great and you say this seems like a good fit, right?

A. Yes. For the most part I would let them know I'll always continue to keep them on my pipeline and if they need anything they can reach out to me.

But for the most part, they are -- you can tell when someone is interested in a role or if they have the correct experience. Like new grads don't necessarily have they experience to do contract roles nor do they really want a contract role they just don't know it yet.

So it's letting them know these are the positions and being honest with them and still editing their resumes and asking do they have any questions and keeping an

Page 87

open door. That was my personal policy.

Q. Right. But there were some candidates you would submit to a job and some candidates you would choose not to submit, correct?

A. Yes.

Q. And you had to use judgment to decide who to submit and who not to submit, correct?

A. Yes.

Q. And is it correct when you submitted somebody to a job order it was because in your judgment they were a good candidate for that role?

A. Yes. Just because I submitted them to a job order doesn't mean they will be submitted to the client.

Q. Right. That's a decision made by the BDM?

A. Yes.

Q. Is it your role or was it your role to present the candidate to the BDM?

A. Yes.

Q. How did you do that?

A. Through submissions.

Q. Is that in bullhorn?

A. Yes.

Q. And when you submitted a candidate through the submission tool, did you write up a summary of the candidate?

A. Yes.

Page 88

Q. And when you wrote that summary what were you trying to do, what was your objective?

A. To show that they would be a good candidate for the role.

Q. Would you emphasize the aspects of their background that --

A. Yes.

Q. And once again, you were using judgment to decide what aspects their background made them a good fit for the job order, right?

A. Yes. The job order has A, B, C on it, they have A, B, C, in their resume. You highlight that A, B, C, in both of those things and you submit it.

Q. Was there sometimes after you submit a candidate interaction between you and the BDM?

A. Yes. We would talk about it.

Q. Would you do that in every case or just in some cases?

A. Certain cases. Some cases they would say okay I'm going to submit them and other cases they would say I don't know if this is a good candidate or I've already submitted three candidates to them and they like all three of them.

If they do the interview and the interview doesn't go well with these candidates then I'll submit your candidate.

Page 89

Q. Would sometimes the BDM give you feedback of this is not quite what the client is looking for this role?

A. Yes.

Q. And then would you incorporate that feedback as you continued to search for candidates?

A. Yes.

Q. And am I correct in saying that your goal in submitting a candidate was for the candidate to get hired by the client?

A. Yes. Unless it was for a contract position.

Q. Yeah. Hired for a contract position.

A. If it was a contract position they would know that they would have the potential of being hired by the client. They would be hired by Addison Group for a period of time. Sometimes there's a potential for extension and sometimes there's not.

Q. Thank you for correcting that. A better way to put it is the client would select that candidate for the contract role?

A. Yes.

Q. And not only did it make the client happy that Addison Group gave them a good candidate for the role but it helped you make money?

A. Yes.

Q. Because as we discussed earlier, the way you made



Page 90

more money than your base salary was by placing candidates?

A. Yes.

Q. And so while you're trying to be truthful in the way that you present a candidate, you're also trying to sell the candidate to the BDM; is that accurate?

A. Yes.

Q. And likewise, are you trying to sell the candidate on the role sometimes?

A. Yes.

Q. And again, you're trying to be truthful and accurate with the candidate I'm assuming, right?

A. Yes.

Q. But you're also trying to persuade them in some way that this job would be a good opportunity for them?

A. Most of the time they would not need to be persuaded. For the most part they knew what a contract role entitled. They would want to be submitted to any and all roles for the most part. For the most part these people wanted to work.

Q. Okay. So it wasn't every time that you had to sell the candidate on a job?

A. Yeah.

Q. You mentioned interview prep, how would you prep a candidate for an interview?

A. The BDM would give us information of how the client is like, what their personality was like, what kind of

Page 91

questions they like to ask. Just from their own experience understanding what it is their looking for in a candidate.

They would communicate that onto the job order. I would review it. I would let the candidate know they have a very spunky personality. They will ask you a lot of detailed questions about your role, they're going to do this and that, let them know, ask them if they have any questions and if they want any interview prep, if they do or don't schedule it that way and send them off.

Q. So you get the candidate on a zoom call?

A. Either zoom or phone call.

Q. And then you would create a prep plan, in other words, you would decide what you needed to tell this candidate about the role?

A. Yes. Whatever the BDM's communicated to us about the client they wanted us to communicate that to the candidate.

Q. And you mentioned that you wanted to make sure the candidates had good questions for the client, right?

A. Yes. Just asking about the environment, asking about the contract, what kind of employee they are looking for. Never anything about money or benefits or things like that because that was negotiated on our end.

Q. So you would give the candidate some coaching on what would be good questions to ask during the interview?

A. Just like every other interview, yes.

Page 92

Q. But in other words, you wanted them to be prepared for the part of the interview where the interviewer says to the candidate, what questions do you have for me about the job?

A. Yes.

Q. Because it doesn't look great if the candidate says I don't have any questions, right?

A. Yes.

Q. And it doesn't look good for the candidate asking about money or what kind of donuts they have in the morning or things that are not relevant to the job?

A. Exactly.

Q. Okay. And so would you give the candidate advice on what would be good questions to ask or good questions not to ask?

A. I would ask them if they already had questions prepared. I would ask them to read them to me. I would say, you know, make sure you ask about the environment, make sure you ask about the person that was filling this role before you, what qualities they had that they liked, what they didn't like, and seeing if it was a good fit on both ends just like every other job.

Q. So again, you're using the specifics of the job order and the specifics of the interviewer to create an effective prep for your candidate, right?

A. Yes.

Page 93

Q. In terms of money, you mentioned that you negotiate money on your end, would you ever have to discuss money with a candidate, in other words, how much a job would pay or what someone's expectation would be in a contract role?

A. I would do that prior. If I interviewed them and they said they were looking for $18.00 to $22.00 an hour, so if the role was going for $28.00 an hour, I would consult and say where would you like me to submit them to my manager and they would say submit them at 20 because they are kind of getting the best of both worlds.

Q. And your managers would decide or you would decide?

A. I would consult them.

Q. Consult your managers?

A. Yes.

Q. Would you ever have to say to a candidate, I don't think I can get you $22.00 an hour but I think the client will pay 20?

A. Yes.

Q. Okay. And would you sometimes have to use your judgment to figure out what was the lowest amount that the candidate would be willing to take in order to work this role?

A. I particularly do that in the interview process.

Q. You try to figure out where they're bottomed out in terms of pay rate?

A. Yes. But if it was like a contract-to-hire position



Page 94

and there was opportunity to hire but the contract pay was 17 and they are looking for 18, I would tell them if you do well in this role you have the opportunity to be hired on full-time and this is where your salary would be and for the most part that was a negotiating tactic.

Q. So sometimes you would try to persuade them to accept a pay rate that was below their expectations based on the opportunity in the role?

A. Yes.

Q. And did you view yourself as negotiating with the candidate about the pay?

A. It wasn't a every day occurrence.

Q. But sometimes?

A. Sometimes.

Q. And one thing I want to ask you about, you said after the candidate was placed in a role you had ongoing responsibility to manage that candidate, can you tell me what those responsibilities were?

A. I would talk to them on the first day of work, see how it went, talk about the first week of work and try to follow up with them once a week in order to see how everything is going because the candidate has to like the role as much as the role likes the candidate.

Q. So did you ever have a situation where a candidate would say to you, I like the job I like the pay but I'm having

Page 95

a problem with the manager and dont understand what his expectations are?

A. Yes.

Q. What would you do in that circumstance?

A. Talk to the BDM.

Q. And what would you tell the BDM?

A. Exactly what my candidate talked to me about.

Q. Do you know what the BDM would do?

A. Talk to their client I would assume. That wasn't my responsibility.

Q. Was it your responsibility to communicate back to the candidate though what the resolution was of an issue like that?

A. Yes.

CARL FITZ: We have hit noon so whenever you're at a stopping point can we take the lunch break?

MICHAEL PHILLIPS: Absolutely. I'm just going to finish up this line of questioning.

CARL FITZ: Okay.

Q. (By Michael Phillips) Would you sometimes have to give your candidate coaching on how to deal with a manager who was communicating in a way they didn't -- wasn't effective or they didn't understand?

A. That wasn't a very large portion of my position. Most of the time candidates and the managers would get along. If they didn't get along it was typically resolved between the

Page 96

BDM and the client on how to move forward I would say.

You have a meeting coming up bring up these issues in the meeting and find a resolution and I would follow up with them. They're adults. They're not children.

Q. Right. And you would say this to the candidate, you have a meeting coming up and bring up those issues in the meeting?

A. Yes.

Q. Would you ever get feedback the other way whereas the BDM would contact you and say your candidate does a nice job but she's been late three times?

A. Yes.

Q. What would you do in that circumstance?

A. Call the candidate, let them know if you are late one more time you are going to get fired.

Q. Would you ask them is there a reason why you are late?

A. Yes.

Q. And that was part of your role as well, right?

A. Yes. It wasn't my job responsibility but that is what Addison expected of me.

Q. And you sometimes had to use your judgement to try to resolve those kind of issues between the candidate and the client after the candidate was placed in the role?

A. The way that Addison wanted me to handle it is the

Page 97

way that I handled it.

Q. Okay.

MICHAEL PHILLIPS: Why don't we sign off and take a lunch break for a little bit.

(Off the record at 12:01 p.m.)

REPORTER: We are now back on the record at 12:54 p.m.

Q. (By Michael Phillips) Ms. White, what training did you receive at Addison Group?

A. I received modules and in-person training.

Q. Can you explain what the modules were?

A. They were ways to navigate bullhorn and what the specifics to APAR bookkeeping was.

Q. Were they like the trainings that you take on a computer?

A. Yeah.

Q. And then you said you had some in-person training?

A. Yes. They had all the new hires come to the Chicago office and we would go over the employee handbook and how to sign up for benefits. And they would break off in work groups and do like vertical specified training.

Q. How long did that in-person training last?

A. I believe it was like three days.

Q. And do you know how many modules you had to do?

A. I don't remember.



Page 98

Q. How did you learn to recruit, do the things that you described?

A. Training.

Q. The in-person training that you discussed or some other form of training?

A. I mean, you do something for so long you just kind of get the experience.

Q. Yeah. So it's more learning by doing?

A. Yes.

Q. Did you have any one-on-one training with anybody?

A. No.

Q. Okay. So in other words, you and Lauren didn't sit down and discuss how to recruit or how to work a job order or anything like that?

A. She definitely would sit there and help me when I had questions especially in my initial phrases of it. Once you learn the Addison way of how to recruit that's the way to go about it.

Most of the time I had questions about how much money to place someone at the job or things of that nature and that's when I would consult them and they would tell me what to do.

Q. But generally you were working on your own?

A. I'm an independent person but like I mentioned before lunch, I was told what to do on a day-to-day basis like what

Page 99

job to work on, who to recruit, things of that nature.

Q. Once you were given a job order, were you given any specific direction on how to recruit for that job order?

A. Yes. Based on what was put in the job order.

Q. So what kind of things would be in the job order that would help you recruit for the job?

A. Like what software was needed, how many years of experience, if they needed a degree, things of that nature.

Q. So basically the specifications of the job?

A. Yes.

Q. And then it was your role to find candidates that met those specifications, correct?

A. Yes. And I would do the whole bill that we already spoke about on how to recruit. And if I believed they would be a good fit for the role I would submit them to the job and then it was no longer in my hands if they were submitted to the client or not.

Q. Were you recruiting on job orders from your first week at Addison Group or did it take a little while before you were given that responsibility?

A. My first week at Addison Group I was learning the modules and going though and learning how to navigate bullhorn.

Q. So how long until you started working job orders?

A. Probably a week or two. They wanted me to build my pipeline first so they asked me to cold call. They would give

Page 100

me a list of searches. So accounts receivable with excel experience or bookkeeping with SAP.

They would help me and tell me what to go through on what to search and I would call those people and build up my pipeline. And once I had probably a hand full of interviews that's when they started letting me do job orders.

Q. Let me show you a document. I will mark this as exhibit five. Do you see that this is labeled as your training transcript?

A. Yes. These are the modules I was talking about.

(Exhibit No. 5 was marked.)

Q. I will scroll through this but my question is, did you complete all the modules listed on this document?

A. Yes.

Q. I will show you a document that I will call exhibit six. Give me just a moment. Do you remember receiving this document?

A. I do not remember receiving this document but I know what these things mean.

(Exhibit No. 6 was marked.)

Q. So tell me what they mean.

A. So the candidate visit list is the interviews that I would conduct. Left messages, no conversation -- This is just how they wanted us to submit everything in bullhorn.

If I left a conversation it would include my

Page 101

name, when I left a message, and then what role I thought they would be good for. And they would want me to hash tag 1,2,3,4 role bookkeeping at Walgreens and then keep continuing on.

If I did a conversation this is everything Addison Group expected of us to put into bullhorn under these list basically.

Q. Let me go to the next page. This is page three of exhibit six. Have you seen this before, this call blocks document?

A. Like I said, this is the same document. I don't recall getting them but this is exactly what they wanted us to do in the call block. They would tell us Cassidy, I want you to look a CFO that doesn't have a degree but is looking for a contract role under $30.00 an hour.

So I would look up CFO's that had certain experience that they would be looking for and this is how my call logs would need to go and if they did answer when I was planning on reconnecting and maintaining maintenance on all of them.

Q. Okay. So you don't remember this document but it seems like instructions for calls?

A. Yeah.

Q. And is that the cold calling that you referred to earlier?

A. Yes.

**MAGNA**
LEGAL SERVICES

Page 102

Q. They have this recruit calendar example, does this look familiar to you?

A. Yes. It's just the timeline is a little bit different. So it would be a little bit earlier and a little bit later.

Q. In terms of this is how your day was supposed to be structured?

A. Yes. They would expect us to have days like this and they also wanted them to be tagged in on when our candidate visits were and things of that nature so they can keep track of what we were doing.

Q. I will go to page five exhibit six. Let's start at the top with the example of what they have Boolean search, is this something you ever did or used?

A. I would use Boolean searching. Not reverse but I would use Boolean searching inside of bullhorn. I never used it outside in different job boards.

Q. And then there's a couple example e-mails we see here, are these examples that you ever saw or used in your job?

A. Like I said, I didn't ever use other job boards so Career Builder does not pertain to me. They did give us prompts and they would e-mail us prompts and tell us to save it under our e-mail tab so we could --

They would say if they didn't -- you left them a voicemail and they didn't answer and you want to reconnect with

Page 103

them here's an e-mail that you send out to them and that's how they would have us e-mail. So it's something similar but not that on Career Builder.

Q. How would you use those prompts?

A. In an e-mail to touch base with candidates.

Q. So you might use them as a template e-mail?

A. Yes. They would have us save them in our e-mails as templates.

Q. Would you customize them for the specific situation you were dealing with?

A. They sent us what the template should look like and what to use depending on what the role was or what I was looking for. I would only specify like I see that you worked as an account specialist for this many years, I just want to engage your experience and see if you are currently working.

It was like something of that nature. The only thing I would change a part from the name is whatever role that they have done.

Q. In this example they say, I did notice that your position at Maurice Sporting Goods may have ended some time last month.

I assume that is something that you want to change and customize for a particular candidate because obviously not everybody will work at the same job and have it ended, right?

Page 104

A. Well, this isn't a template that was given to me. It doesn't pertain to me at all.

Q. Okay. Going to page seven, can you tell me this is something you have ever seen or used at your job at Addison Group?

A. I don't remember seeing this specific but this is kind of what submissions would look like.

Q. Is this what a submission to the BDM would look like?

A. Yes.

Q. Did you have any type of template that you used to draft submissions?

A. I did not have a template. I would just ask -- When I would just be letting them know I had a submission and I talked to them about the candidate there would be certain things they would want me to put into the submission because they just copy and paste our submissions to the client.

So they would ask me to change things based on their judgment on what they wanted me to put in there thinking if my candidate had a higher chance if X, Y, Z was included.

Q. When you say they you mean the BDM's?

A. Yes.

Q. And would you talk to them or have these conversations with them before you send this submissions or after or sometimes both?

A. Both. And if I submitted them and they wanted me to

Page 105

change something they would ask me to resubmit them or edit the submission that I did in order for it to look exactly how they wanted it to look like.

Q. Now, on page 11 of exhibit six, have you seen this scorecard or this chart before?

A. This is how they started basing our quota off of.

Q. When you say basing your quota off of, these are the metrics they were looking at for activities?

A. It didn't look exactly like this but yes. And especially once Covid started the numbers increased significantly.

Q. Did you receive scorecards of these metrics?

A. No. Not physically.

Q. Is there a way that you could see how you were doing to your goals?

A. Yes. On bullhorn as I mentioned earlier.

Q. So if you wanted to say how many candidate visits have I done this week you could look in bullhorn and it would give you that number?

A. Yes.

Q. I think you said that all of your candidate visits are reported in bullhorn?

A. Everything is in bullhorn. How many left messages you did, how many conversations you had, how many candidate visits you had, how many submissions, how many placements, all



Page 106

the above. It was all put into bullhorn and it was tracked on a minute-to-minute basis.

Q. I know you said that you haven't seen exhibit six before or most of it, but are there any written training materials that you recall receiving other than what we've talked about?

A. I mean, we were given paperwork and stuff during our training period like when we were in person but like, I don't have them.

Q. Okay. But did your manager, meaning Jason and Lauren ever give you any training material other than what we've talked about?

A. No. Not to my recollection. That was also five years ago.

Q. You can only testify to your recollection. To your recollection, did you receive any prompts or templates from your manager other than what we've talked about?

A. Yes. As I mentioned moments ago, they sent us via e-mail the templates they wanted us to use in order to send our candidates whether it be a followup message, whether it be something about a position. They had templates for everything that they wanted us to use and save to our e-mails.

Q. So that's what I was asking. So other than what we've already talked about which was the templates for candidate e-mails, were there any other templates or prompts

Page 107

that you received?

A. In what way?

Q. Well, in other words, did Jason or Lauren send you any other templates or prompts for any other kind of interactions other than what we've talked about?

A. Yes. For anything. Anything that I could've sent an e-mail for they had a template ready to go.

Q. And did you use those templates?

A. That's the way that they described the Addison way to me so that is what I was told to do. Yes. That is what I used.

Q. Were there any templates or scripts for the interviews you did?

A. Yes.

Q. And what did those look like?

A. They would want us to cover a certain amount, there was like -- it's like a word and each word means something or each letter of the word means something -- I don't remember what it was but it was like money, skills in terms of if they new two languages or if they were experts in excel.

It was what kind of position they were looking for, contract, contract-to-hire, direct hire, what roles they been a part of, and they wanted us to file out these templates.

That was -- When we would interview them we would bring out their resume, we would write on them on the

Page 108

backside, and pull out the templates they wanted us to do.

We would finish conducting our interview, get all these questions figured out, and then at the end of the day after we did our cold calling and after we made all our calls until 5:30 that's when we were expected to sit at our desk and complete these candidate visits inside of bullhorn.

Q. And was it like a checklist of information that they were asking you to obtain from the interviews?

A. Yes.

Q. Do you remember how many item were on the checklist?

A. I think five or six. I know it started with a C for compensation. It was CO for opportunities. There was an S in there for skills. I don't remember what else.

Q. So it was for about five or so is that what you said?

A. Five or six. Yes.

Q. They didn't give you any written out interview questions, correct?

A. Like the piece of paper and said you need to ask X, Y, and Z?

Q. Correct.

A. They had recommendations and they had some questions that they wanted us to ask but it wasn't ever like take this piece of paper in the interview and ask them verbatim these questions.

Q. All right. Any other training that you received

Page 109

other than what we've already talked about?

A. No.

Q. Did you receive performance reviews when you were at Addison Group?

A. Yes.

Q. Do you remember how many?

A. I do not.

Q. Who gave you your performance reviews?

A. Lauren Sherer and Jason Douglas.

Q. Let me show you another document. We will call this exhibit seven. Have you seen this document before?

A. Yes.

(Exhibit No. 7 was marked.)

Q. And does this look like the performance review or the format of the performance review that you received?

A. I don't remember exactly how it looked when I received it but yes this is what I'm assuming it looks like.

Q. And this review is for the period of January 1, 2020 to December 31, 2020, correct?

A. Yes.

Q. What would've been your first full year at Addison Group?

A. Yes.

Q. Do you remember the review, in other words, you remember sitting down with Jason and Lauren to discuss this



MAGNA
LEGAL SERVICES

Page 110

review?

A. No. I do not.

Q. I will show you a couple of things from this review. I will read Lauren's comment. It is at the bottom of page nine exhibit seven.

It says (as read) as previously stated Cassidy is great with creating and maintaining rapport with the candidates. I put meets expectations because I just want her to work on her communication with the BDM. BDM is a bit more -- sometimes we lose Cassidy 30 minutes into preparing a sub.

She likes to work through things on her own. I want her to be able to utilize the BDM and me to make sure the resume is up to the way it should be presented to the client, that the write-up is focused, et cetera.

I don't want her wasting too much time relying on herself when she a hasn't been in the office with us long enough to have all the tools she needs 100 percent of the time yet.

First of all, do you remember receiving that evaluation or feedback from Lauren?

A. Lauren and I had weekly meetings all the time and we discussed these things but they had a particular way that Addison Group wanted things to be done, and I tried to get that to be the way that it was for most of the time but it was also very difficult when about eight months of that year we were all

Page 111

in Covid and doing Covid for the first time so.

Q. And hopefully the last time. Is it a fair assessment to say that you liked to work through things on your own?

A. Not necessarily.

Q. You don't necessarily agree with that?

A. I mean, I'm an independent person as I mentioned but I'm not one to shy away from asking questions.

Q. Do you remember receiving feedback from Lauren either in this review or in your one-on-one's that she'd like for you to rely a little more on her and the BDM sometimes?

A. Yes. Because they wanted things to be done in a very particular way.

Q. I will give you another piece of this evaluation where Lauren says (as read) I marked needs improvement because this year will be about Cassidy being able to open her network outside of bullhorn which will help her understand the market a bit further.

First of all, do you understand what Lauren means about opening your network outside of bullhorn?

A. Yes. Because they -- at this point candidates were slimmer and slimmer during Covid, so they wanted to expand the job boards but they didn't know how to go about it because they had us using bullhorn for so long.

Q. So did you have discussions with Lauren either in a context of your review or outside of your review about

Page 112

expanding your network outside of bullhorn?

A. Yes. But she also told me that -- And as it says (as read) will be expanded upon this year -- because she knew there was a way that we needed to be trained on these and other job boards that we had yet been trained on.

And that wasn't just me, it was for all the recruiters except for the one individual who knew how to do all the stuff already. He was the only one that would ever go outside and work on other job boards.

Q. So would other job boards in this context mean LinkedIn, Career Builder, Monster, those kind or things?

A. Yes.

Q. And this was your review as we discussed for the year 2020, right?

A. Yes.

Q. Fair to assume it was given to you early in the year 2021?

A. Yes.

Q. And did you receive some training or some instruction during the year 2021 on expanding your network beyond bullhorn and using other job boards?

A. No.

Q. And did you ask for any of that?

A. No. They didn't initiate it. I had been doing just fine on bullhorn. That was the way they trained me to do.

Page 113

They didn't have any complaints and neither did I so I continued to use bullhorn as instructed.

Q. And you continued to think that you were doing fine using bullhorn?

A. Yeah.

Q. This is at the top of page 13 and I'll just read the category here. It's identify additional actions that will increase your likelihood of achieving echelon next year, do you know what echelon is?

A. It's like if you do really well you get to go on a free trip.

Q. And you said according to this, (as read) increasing my network, my candidate pool, my overall candidate submissions and my spread, right?

A. Yes.

Q. What did you mean by that?

A. Ultimately, that's the only way you get to make more money and if you make more money then you are making the company more money and you get to go on echelon.

Q. How would you increase your network and your candidate pool?

A. By continuously calling candidates.

Q. So in other words, you're referring to finding more candidates through cold calling in the means that we discussed?

A. Yes.



29 (Pages 110 to 113)

Page 114

Q. Then I will go to number nine, resource utilization. Lauren comment is, (as read) The fact that Cassidy has been so successful with everything thrown at her plus never having job board access until this month is awesome. That already sets her up for a good trajectory.

Do you know what that means, when she says everything thrown at her do you know what that's referring to?

A. Working at home and Covid with only being in the office for probably five months.

Q. Plus never having job board access until this month, do you know what that refers to?

A. They have to give you access to job boards if you -- so they have to give you a setup account through Addison in order to join them and they never did that for me.

And they gave it to me and I still never utilized it because I didn't know how because they didn't train me on it.

Q. So that's referring to using LinkedIn and so forth?

A. Not LinkedIn because you make your own account for LinkedIn. For Monster, Indeed, for Career Builder you had to have Addison's permission to get on those and they would give you access to it, and if you didn't have access and they didn't give you permission then you couldn't get on them.

Q. So this review suggest that you did get access to them, correct?

Page 115

A. Yes. They did give me access finally but I didn't utilize them because I didn't know how.

Q. Do you remember this being a generally positive review?

A. Yeah.

Q. Do you remember all of your performance reviews being generally positive?

A. I mean, I kept my job throughout all of Covid when everyone was being furloughed so yeah I would say that they weren't dissatisfied with the work I was delivering.

Q. And were you satisfied with the work you were delivering, did you feel like you were being successful there?

A. I felt like I was being successful that doesn't necessarily correlate with being satisfied which is why I found a new job.

Q. So explain to me why you were not satisfied?

A. I have a bachelor's degree in biological sciences, why would I be satisfied recruiting?

Q. So you felt that you had better qualifications?

A. I had different qualifications and different passions.

Q. So is it fair to say you left because you were looking for a job that was more in your field of study?

A. Yes.

Q. And would that describe your current job?

Page 116

A. Yes.

Q. I will show you another document which will be exhibit eight. Can you see this?

A. Yes. I see it.

(Exhibit No. 8 was marked.)

Q. Does this look familiar to you, this recruiting activity report on page two of exhibit eight?

A. Yes.

Q. What is this?

A. It tells you how many of everyone of those things I have done.

Q. So in other words, during the time period listed on here which I think encompassed your entire -- strike that. During the period listed on here this would tell you the number of candidate visit notes you had, the number of internal submissions, number of client submissions, et cetera?

A. Yes.

Q. Is this information that you used or relied upon in doing your job?

A. No.

Q. Do you know what these percentages mean as we go to the right internal submission/prescreens?

A. I do not.

Q. Was there a way that you could see your metrics compared to your quotas or your expectations?

Page 117

A. They would assign us quotas every single day. It's set in stone especially when we were in Covid times we knew the numbers.

I believe it was 40 phone calls, a certain amount of conversations, a certain amount of candidate visits that were weekly, a certain amount of submissions that were weekly, and a certain amount of leads that were weekly.

And that is a lead being if someone is working on a job and they were there on a contact and they were doing accounts receivables and their contract ended. What was that company, who did you work for, things of that nature.

Who they were specifically for the BDM's. That was something they required of us to basically attract for them. We would have to tag them in it to let them know when we received these leads.

But like I've mentioned several times throughout this is that there was a way to track by the minute every single one of these metrics in bullhorn.

Q. Right. What I was trying to ask is, did you get a report or could you access a report that showed that you were at let's just say 80 percent of your quota for candidate visits, et cetera?

A. Yes. In bullhorn like I just mentioned.

Q. Okay. Is this a document that you recognize page 12 of exhibit eight?



Page 118

A.  This is what would pull up in bullhorn.  Yes.

Q.  So this is a document that you would look at if you wanted to check out how you were doing to get your metrics?

A.  Yep.

Q.  And was it color coded the way we see it here?

A.  I believe so. It's been five years.

Q.  This document indicates at least to my reading for this time period you were below performance expectations in all the metrics except for conversations, is that consistent with your recollection?

A.  This was in 2020.  Yeah.  I would say it was difficult to do interviews and client submissions during that timeframe.

Q.  So during that timeframe was it common that you would not be meeting weekly quotas for most of these metrics?

A.  During Covid, yeah.

Q.  Were you ever disciplined for that?

A.  No.

Q.  Were you ever counseled and told Cassidy you have to get your numbers up, anything like that?

A.  They were pretty understanding during Covid that quotas were going to be a little bit different.

Q.  Okay.  Because I thought you told me that the quotas were even more strictly enforced during Covid?

A.  They were reminded of regularly during Covid but we

Page 119

weren't reprimanded during a national pandemic.  They had every opportunity to furlough me and they decided not to so I must've been doing something right.

Q.  But even though these numbers as we look at them were below performance expectations, the feedback you were getting was that you were performing at or above expectations; is that right?

A.  Yeah.  Just like the performance review that said meets expectations.

Q.  I understand what some of these metrics are but I don't understand all of them so I was hoping you could explain a couple of them to me.  COB, what is a COB?

A.  I truthfully was looking at the same thing.  I don't remember.

Q.  Do you know what conversations are for purposes of these metrics?

A.  Yeah.  When you talk to a candidate.

Q.  NSP?

A.  I don't remember that either.

Q.  Placement is pretty self-explanatory but do the numbers look correct in terms of the number of placements you were making during this time period?

A.  Yes.  As far as I can remember.

Q.  So there were many weeks or most weeks when you were not making any placements during this time period, correct?

Page 120

A.  Yes.  Placements in general were not easy to come by especially during Covid.

Q.  Okay.  I'm just looking down at this next time period which was from 8/22/2020 to 11/14/2020.  And again, does it appear to you from these metrics that you were below expectations on most of the metrics except for conversations for most of the weeks?

A.  So the candidate visits, the client submissions, and the conversations were completely in my realm.  The interviews have everything to do with the BDM's and like I said, I have no idea what the COB or NSP is.

So I was submitting to jobs that they assigned to me and I was interviewing as many candidates that would meet with me whether scheduled or a no call/no show.  The most that I could do on a day-to-day basis was have these conversations so I did my part by having the conversations.  Everything else is kind of up to the candidate or the BDM.

Q.  I understand that but my question was even for the categories of metrics there in your control, like candidate visits and clients submissions according to this document, you were below expectations for most of these weeks, correct?

A.  It was below average.  Yes.

Q.  And again, you were not reprimanded in any way for not meeting these metrics; is that correct?

A.  I was not.

Page 121

Q.  Going to the next time period from 11/21/2020 to 2/13/2021, would you agree with me the same thing your candidate visits and your client submissions were generally below average?

A.  Yes.

Q.  And same thing from 2/20/21 to 5/15/21?

A.  That's exactly what the chart shows.

Q.  And likewise from 5/8/21 to 7/31/21, yes?

A.  Yes.  They knew I was working.  They knew I was going and meeting the quota.  It wasn't that my candidates that I was talking to -- we had these weekly visits, we discussed what was going on, and they told me to continue to working on the jobs and I just listened to what they told me to do.

Q.  This column placements, was this the most important metrics, the number of placements you made?

A.  For me yes because that's how much my money was depended on.

Q.  And that was also how much money Addison Group made too, right?

A.  Yes.

Q.  In other words, Addison Group didn't make money necessarily off an interview, right?

A.  Correct.

Q.  But the other metrics fed into placements, would you agree?



Page 122

A. COB's is candidate on billing.

Q. Oh, okay. That's good. So candidates on billing, would that be the number of candidates you recruited currently on a contract with a client?

A. Yes.

Q. And as we see this time period in mid 2021, your COB's were above expectation, correct?

A. Yes.

Q. Even though your metrics were below expectations, right?

A. It's above and below performance.

Q. All right. Let me show you something else. I will mark this as exhibit nine. Ms. White, I'm showing you the first page of exhibit nine, is this an example of what a job order looks like?

A. Yes.

(Exhibit No. 9 was marked.)

Q. And we see at the top here accounts payable specialist times four bullhorn number 477263, does that mean something to you when it says accounts payable specialist?

A. They need four accounts payable specialist.

Q. And is this number 477263 the bullhorn number for this job order?

A. Must be. I can't see it in bullhorn.

Q. Is this the kind of information that you would

Page 123

receive from the BDM or your manager when you were working a job order?

A. Yes.

Q. And then going to the next page, it says page two. Do you recognize this screen that I'm showing you here?

A. No.

Q. Where it says internal submission, do you know what that means?

A. Two people submitted it from the intern side so me and whoever is blacked out.

Q. But two people submitted candidates for this job order?

A. Two people. It could be the same person that submitted a candidate twice. Two candidates were submitted to this submission.

Q. If we look in this column here it says added by Cassidy White, you see that?

A. I do.

Q. Does that suggest to you that you're the person that submitted this particular candidate?

A. Obviously.

Q. FM is the candidate's initials. Going down on page two, do you recognize what this is?

A. This is my internal submission.

Q. So does this mean this is what went to the BDM?

Page 124

A. Under their approval, yes.

Q. What do you mean under their approval?

A. They have to approve what this looks like and if they need it to be edited they will tell me to edit it and then I will submit it.

Q. But you would've done the first draft of this?

A. I wrote it, they edited it, I submitted it.

Q. And this is describing the candidate's qualifications for this particular role, correct?

A. Yes.

Q. This is an example of what you would've sent to the BDM and the BDM would've sent to the client, right?

A. Yes.

Q. Is this information that you would've obtained from the candidate?

A. Yes. Of course I got it from the candidate.

Q. And you also used that information and presented it in a way that highlighted the candidate's qualifications for this particular job, right?

A. Yes.

Q. Showing you on page six of exhibit nine, this also looks like a candidate submission; is that correct?

A. Yes.

Q. And it's for a candidate named JH?

A. Okay.

Page 125

Q. You see that?

A. Yes.

Q. I want to show you something else. Are you able to see this e-mail from you to Jason?

A. Yes.

Q. I will mark this as exhibit ten. Do you recognize what this is?

A. An e-mail.

(Exhibit No. 10 was marked.)

Q. The format of this e-mail to me looks a little bit unusual, do you know why it's formatted this way where it says action about updated by in comments?

A. The action is visible in bullhorn for a notification. I had a conversation with JH, I wrote it, and I tagged Jason in it therefore it was sent to him in an e-mail.

Q. And when you tag him, does that mean you add this part -- the Jason Douglas part?

A. Yes.

Q. Why were you tagging Jason on this bullhorn note?

A. Because it was his job order.

Q. Would that be typical of you to tag the BDM in a bullhorn note about a candidate that you're submitting for a job?

A. Yes. Because they would have to approve if it was a candidate that they think would be good for the role. So I was

MAGNA
LEGAL SERVICES

EXHIBIT A

Page 126

letting Jason know that this candidate is interested in this position and that's how much he's asking for.

Jason would have to approve that amount before I would be able to submit the candidate to the case.

Q. Okay. Just going to page two of exhibit ten. Is this similar -- is this a note in bullhorn that you tagged to Jason?

A. Yes. This is a lead. As I mentioned, if I spoke to JH about where he was working last and he said or she said, I was working at Walgreens as a accounts payable specialist for the last three months and now they are look for a payroll specialist or something of that nature, then I would look at -- I say were you recruited, no, so then there's no competitor.

Where they were working, who was hiring them, if it was a contract role, what their role was, how long it was for, and you are not allowed to ask them how much money they made there so that's why the rate is empty.

And I would have to tag Jason or the other BDM's in it to let them know I found a lead because it's their responsibility and their job duties to take the leads and develop them into roles for us to fill.

Q. So is the lead in this case for a potential client?

A. Could be.

Q. That's why you were tagging them because it was a lead that there might be an opening?

Page 127

A. We were directed to tag our BDM's especially the BDM manager, Jason in these leads. That's what was instructed to us.

Q. So that's another occasion where you were using your judgement to say based on my conversation with this candidate here's a lead for a potential client, right?

A. That was not based on my judgement, that was based on how I was trained with Addison Group to generate a lead. They said if somebody is on a role this is how you develop leads and this is how you do them. This is exactly how I was instructed and trained so that's how I generated leads.

Q. Got it. But in this case you took the initiative to put this note in bullhorn and to tag Jason on it so he would know there was a lead, right?

A. That is how -- part of -- that's not my judgment, that's not my thinking, that's exactly how I was trained to generate leads. That was part of my responsibility to make these leads and tag Jason in them.

Q. Okay. Just so I understand, this lead came from a candidate?

A. All leads come from candidates on the recruiters standpoint.

Q. Well, I'm talking about this lead. This lead came from a candidate; is that correct?

A. Yes. All leads come from candidates on the

Page 128

recruiters standpoint.

Q. And your knowledge about this lead came from information that the candidate gave to you, correct?

A. Yes.

Q. And you then put it into bullhorn as a lead; is that right?

A. Yes. Because that's how I was trained to generate leads from Addison Group.

Q. Who trained you to do that?

A. Jason and Lauren.

Q. Is page three of exhibit nine another lead?

A. Yes.

Q. And then page four the comment just says LVM to Iview and you tagged Jason, what is that mean?

A. I left a voice message for the interview process and Jason is the BDM on this so that's why I tagged him in this because he wanted me to schedule an interview for this person.

Q. And this relates again to a specific candidate JH, right?

A. Yes. Obviously.

Q. Page eight of exhibit nine, is this a bullhorn note reporting to Jason on your interview with JH?

A. No. It's JH interview with Jason's client which is why I had to follow up with it.

Q. Right.

Page 129

A. And this is the information that I got from it and I tagged Jason in it so he knew what was going on in order to gather more information from the client's standpoint because that's his responsibility.

Q. So this is based on the debrief with the candidate after the client interview?

A. Yes.

Q. So this is an e-mail. This is page nine of exhibit ten. The subject of this is JH TY?

A. Thank you.

Q. And attached to it on page ten their appears to be a thank you note after an interview?

A. Yes.

Q. Please tell me what this is.

A. The client or my candidate is thanking the client on the specific individual that interviewed them for their time.

Q. Why is it on a Addison Group letter head?

A. Because it's a contract position so they would be an Addison Group employee.

Q. And did you write this thank you note?

A. They write the thank you notes and I put it on the Addison Group letter head as instructed to me by my trainers at Addison Group.

Q. So the candidate wrote the note?

A. The candidate writes the note, I put it on an Addison



Page 130

Group letter head as instructed by Jason and Lauren, and send it back to Jason so he can send it to the client.

Q. And why are you tagging Jason on this, just so he knows?

A. Because just for the same exact reason for all above. He's the BDM so it's his client, this is his position, his job order, and he has to send this to his client.

Q. Now, I'm on page 12 of exhibit ten. What is this note that you have?

A. A conversation that I had with my candidate.

Q. And the same thing true for exhibit 13?

A. Yes. Where it says action, that's what we were doing.

Q. Thank you. Let me show you what I will mark as number 11. Are you able to see exhibit 11?

A. Yes.

(Exhibit No. 11 was marked.)

Q. I want to ask you about page two. So this is a bullhorn note about a specific candidate, GO, correct?

A. Yes.

Q. And your comment is LVM-JS reference, what does that mean, JS reference?

A. The one that was right before that was JS so I'm sure that she said or he said I have somebody that I know that wants to work in blah, blah, blah.

Page 131

Q. And when you say wants to work in blah, blah, blah you mean --

A. Wants to work in finance and accountings positions.

Q. Okay. I see. You're documenting the reference to another candidate that you received from this candidate?

A. Yes.

Q. Do you recall how many placements you made during your employment at Addison Group?

A. I do not.

Q. Do you recall your magnitude, was it more than ten?

A. More than ten for sure.

Q. Do you remember what you made during your employment at Addison Group?

A. Like how much money I made?

Q. Yeah. Exactly.

A. No. I don't remember. I was getting paid $600.00 a week?

Q. That was your salary, right?

A. Yes.

Q. Let me show you exhibit 12. Does exhibit 12 appear to be you W2 statements?

A. It does appear to be.

(Exhibit No. 12 was marked.)

Q. Let's go to your first full year which was 2020. According to these W2's you made $46,470.46 in wages and so

Page 132

forth from Addison Group in 2020, does that seem correct to you?

A. Yes.

Q. And then if we look to 2021 which is on page four of exhibit 12, for that partial year through August you made $29,269.00, right?

A. Yes.

Q. Was your decision to leave Addison Group based at all upon money?

A. No.

Q. Was the amount of money you were making at Addison Group below your expectations when you took the job?

A. No.

Q. Would you agree that you were earning more commissions in 2021 than you were in 2020?

A. I don't know truthfully.

Q. Do you think that you were getting better at your job as you gained more experience?

A. Yes.

Q. You told me earlier that you were not working any other jobs when you were -- Let me rephrase. You told me you were not working any other job at the same times that you were working at Addison Group, is that correct?

A. In Chicago.

Q. Okay. Were you working any jobs in Peoria when you

Page 133

moved back to Peoria?

A. Yes.

Q. What jobs were you work in Peoria?

A. I started working as a server at my best friend's husband restaurant when her brother died.

Q. What was the name of that restaurant?

A. Country Club Barbecue.

Q. When did you start working at Country Club Barbecue?

A. June of 2020.

Q. And how many shifts would you work a week at Country Club Barbecue?

A. One or two.

Q. And were you paid as a W2 employee?

A. I think so.

Q. Did you get paid a check?

A. Yes.

Q. And you also got tips in that job?

A. Yes.

Q. And if you got paid a paycheck you received some type of tax document at the end of the year showing what you earned in that job, correct?

A. I would assume.

Q. And I assume you filed a tax return for that year as well, right?

A. Yes.



Page 134

Q. When did you stop working at Country Club Barbecue?

A. June of 2021.

Q. And why did you stop working there?

A. Because my best friend whose husband I was doing a favor for since her brother died and they had just gotten married so they didn't need my help at the bar anymore.

Q. Did your mother or anybody in your family own a bar?

A. Own? No.

Q. Work at a bar?

A. Yes.

Q. Same place Country Club Barbecue or someplace else?

A. Different.

Q. Did you ever appear on zoom calls from either the bar where your mother worked or the bar where you were working?

A. The bar that my mother worked at, yes.

Q. And why would you be zooming into Addison Group team calls from the bar?

A. Well, the bar was closed because it was Covid and my mom still had to be there to do takeout orders so it would just be the two of us there working.

Q. So you were working in the bar during the work day while you were working at Addison Group, right?

A. You are making it sound like it's a bar, bar. It's a completely shut down restaurant during Covid.

Q. I'm not concerned about whether it's a bar or a

Page 135

restaurant. My question is really more you were working at the establishment during the day while you were working for Addison Group, correct?

A. I was not working at the establishment. I was doing my Addison Group job at my mother's place of work while it was closed down.

Q. Why?

A. Because I didn't want to stay at my house all day every day.

Q. Well you told me a moment ago that you and your mom were handling the takeout orders at the bar.

A. No. I said my mom had to handle the takeout orders.

Q. And you had to be there with her?

A. I didn't have to be. I chose to be because I didn't want to sit at home every single day all day for months on edge like everyone else during Covid had to.

Q. Well, let me ask you this. After Covid, in other words, after March of 2020, you told me the staffing business was slow or at least slower than it had been, correct?

A. Yes.

Q. That it was difficult to get interviews during that time?

A. It was a little bit more difficult. Yes.

Q. And difficult to make placements, right?

A. Well, not that the placements were hard but we also

Page 136

didn't have a lot of job orders which wasn't my responsibility.

Q. I understand that. If you don't have job orders you don't have as many opportunities to make placements, right?

A. Correct.

Q. And there's not as much work to do, correct?

A. No. There's just about much work to do. You can cold call, you can still edit resumes, still talk to candidates that are on your jobs. There's plenty of work to continue doing.

Q. And you told me that Addison Group had furloughed a number of recruiters during Covid, right?

A. They did.

Q. Was anybody on your team furloughed?

A. Yes.

Q. How many people were furloughed from our team?

A. One.

Q. Were you really working 40 hours a week during that period of time?

A. Of course.

Q. Why do you say of course?

A. Because I would do my morning calls at 8:30 every single day and I wouldn't stop working until I left that day, and my mom didn't stop working until 5:30 and we wouldn't leave there until about 6:00.

Q. So your testimony is that despite the fact that there

Page 137

were fewer job orders during Covid you were working exactly as hired as you had been before Covid?

A. As hard?

Q. As many hours?

A. I was working exactly how they asked me to work from when I was in-office to when I was out of the office. They required us to do early morning calls I would wake up early in the morning at 7:00 and I would get on cold calls until we were ready to do our meeting at 8:30.

Q. That's not my question. My question is, were you working as many hours after Covid as you were before Covid?

A. Yes.

Q. Were you working more hours or the same?

A. The same.

Q. And you told me before you don't have any record of how many hours you were working per week, but do you have any estimates of how many hours you were working per week?

A. Well, no. I don't. I could logistically think about it but I don't have any of it written or documentation on how I was working because I was an salary employee.

CARL FITZ: We've been going for about an hour and 15 minutes, when you have a moment can we take a short break?

MICHAEL PHILLIPS: Yeah, of course. In fact, we can take a break right now.



Page 138

CARL FITZ: Okay. Sounds good. Ten minutes?

MICHAEL PHILLIPS: Ten minutes is good. Okay.

(Off the record at 2:04 p.m.)

REPORTER: We are now back on the record at 2:15 p.m.

CARL FITZ: And I think that Ms. White wants to clarify a prior answer.

THE WITNESS: I was doing the math of approximately how many hours that we would have to start early and how many hours we would particularly stay and I was working approximately 45 to 50 hours a week.

Q. (By Michael Phillips) And was that true both when you were working in the office and when you were working remotely?

A. Yes. We would still have to do call blocks in the mornings. We would have to wake up earlier and it would be less of a wake up early because we didn't have to commute but we would still be required to be up and on the phone for a certain period of time and they would be able to track it based on how many conversations and left voice mails that we were having in that timeframe.

Q. How did you do that math?

A. For the hours?

Q. Yes. How did you get to 45 and 50?

A. If we were starting at 7:30 for a couple days a week

Page 139

and we would have to stay until approximately 6:30, sometimes leaving at 6:00, that's how I was getting -- it really was depended upon the week so it was 45 to 50 hours.

Q. And it varied week-by-week?

A. Yes.

Q. And were there some weeks where there was 40 hours or less?

A. No. It was at least always 40 hours.

Q. Were you frequently sending e-mails to candidates or other people before 8:30 or after 5:30?

A. The e-mails would typically come with the call blocks. So it was -- if you had a conversation or if you left a voicemail for someone, there is was way to do maintenance on it.

There was a way to remind you to call this person again tomorrow at this time because they didn't answer at this time. And there was a way to do e-mails at that point of time as well.

So if I was doing a call block at 7:30 in the morning or something of that nature and I needed to followup, and I was going to send them a e-mail, the e-mails would come at the timeframe. Same thing at the end of the day.

If I was submitting a client to a position and I was editing their resume and it was after 5:30, I would at least send out the e-mail saying hey, here's your updated

Page 140

resume and we can touch base in the morning about X, Y, and Z.

Q. Okay. Thank you. Let me show you another document and this will be number -- exhibit 13. Are you able to see, Ms. White?

A. Yes.

(Exhibit No. 13 was marked.)

Q. Is this something you've ever seen before?

A. No.

Q. You do see your name and your employee ID in there, right?

A. Yes. I didn't know I had an employee ID number.

Q. You see the column that says vacation hours?

A. Yes.

Q. And it indicates that you took, for instance 13 hours of vacation during the workweek between January 31st and February 6th. Eight hours between the workweek between March 14th and March 20, 2021.

My question to you is do these vacation hours that are recorded in Addison Group's records look to be accurate to you?

A. I don't remember those times that I would take a vacation but if I had a day off or something of that nature or a day and a half for some reason then yes that would make sense.

Q. And the records indicate 36 hours of vacation taken

Page 141

during the first week of March 2020, do you know if that was a vacation or something else?

A. I truthfully don't recall. That was when Covid was about to start. That was four days or three days. I don't know.

Q. You don't recall?

A. No, I don't.

Q. Do you recall taking any vacations or any time off during your employment at Addison Group?

A. Yes. I used vacation days.

Q. Do you recall taking a full week?

A. I can think of one trip where I took one full week off but that was my only one week I remember taking.

Q. Okay. I will show you exhibit 14. Showing you exhibit 14, do you recognize this document?

A. Yes.

(Exhibit No. 14 was marked.)

Q. Do you know what it is?

A. My responses.

Q. So scrolling down to page 68, is your page 68 your docu-sign verification of your discovery responses?

A. Yes.

Q. And you understood by signing this you were verifying that the answers or responses were true or to the extent that you have personal knowledge to believe them to be true, right?

MAGNA
LEGAL SERVICES

Page 142

A. Yes.

Q. I want to go up to your second supplemental interrogatory answers. This is for reference page 46 of exhibit 14.

So interrogatory number one asks you to identify everyone who you believe have personal knowledge of the issues or claims raising a compliant, and aside from Jason and Lauren you named these five individuals. I wanted to know who they were?

A. My coworkers.

Q. Were these all recruiters or was one of these people the other BDM?

A. Madison was the other BDM. Clark was a recruiter. He was training to become a BDM but then he left Addison Group.

Q. Have you spoken with any of these folks about this lawsuit?

A. No.

Q. Have you spoken with any of them at all, and when I say spoken I mean to include text messages, e-mail communication, Facebook messages, and everything else since you left Addison Group?

A. Friendly messages here and there. John got married, and had a child. Sarah took over Lauren's position. I congratulated her and I'm still friends with Shannon on social media so I'll like her Instagram and things of that nature but

Page 143

that's the complete extent to it.

Q. And to your knowledge, were all of these people you have listed here working the same number of hours that you were?

A. Yes.

Q. And were they also subject to the same instructions and same quotas in terms of recruiting metrics?

A. Yes.

Q. If I go down to interrogatory two, and we ask you to identify communications between you and Addison that relate to the issues and claims in your lawsuit, you said that you communicated with Warren Sherer and Jason Douglas while employed by defendant, I assume that Warren Sherer would be Lauren Sherer?

A. Yes. L-A-U-R-E-N S-H-E-R-E-R.

Q. What did you communicate with them about relating to this lawsuit?

A. I didn't communicate anything with them about this lawsuit.

Q. What about the subject matter of this lawsuit, you said that you had conversations with them about overtime and working hours?

A. While employed at Addison Group. I have not spoken to Jason Douglas since my very last day. And like I mentioned, I follow Lauren on Instagram was well and she also had a child

Page 144

and I touch base with her on that by liking her post and whatnot. I have not spoken to either one of them about the lawsuit at all.

Q. Have you told me everything that you spoke with Jason and Lauren about with respect to overtime pay or working hours?

A. Yes. I was very honest with them about my time at Addison Group that there were certain things that was going on that were making me unhappy.

I knew I wasn't being paid correctly. I asked them for a raise and they denied it. That was really the end of that conversation. I continued to work for them for about another year after that conversation.

And when Covid happened and I pivoted careers part two and I got to medical sales it was ultimately what I knew I wanted to do long term so that is why I quit Addison Group not because of money.

Q. When you said you were not being paid correctly, is that referring to not being paid overtime or some other pay issue?

A. I know that we were working overtime but I also knew that my salary was extremely low compared to everybody else so that was something else I communicated to them.

Q. And when you said compared to everybody else, you mean compared to your peers at Addison Group?

A. Compared directly to the people on my FAC team.

Page 145

Q. What did they say when you raised that issue of your salary being low relative to your peers?

A. They said to no longer ever bring up how much you make to your coworkers again.

Q. Who told you that?

A. Jason and Lauren.

Q. In the same conversation or different conversation?

A. Same conversation.

Q. Was this the only conversation you had with them about your salary being lower than that of your peers?

A. Yes. They told me if I ever talk about money again that will be a strike against me towards being fired so I never did.

Q. And those were exact words?

A. Yes.

Q. Anything else you can recall speaking with them about in the subject of pay?

A. No.

Q. And did you speak with anybody else at Addison Group about the subject of pay or overtime pay?

A. The only person I ever spoke about was with Nina but at by time that overtime and all this had become more noticeable to me she was already furloughed so she didn't really care about it anyone.

Q. Did she leave Addison Group in connection with a



Page 146

furlough?

A. Yes.

Q. So she was furloughed and never returned?

A. Yes.

Q. Are you still in touch with Nina?

A. Yes.

Q. Interrogatory 13 asked did you ever complain to anyone at Addison about the hours that you worked, Addison's failure to pay you overtime wages, Addison's classification of you as exempt, or the manner in which Addison paid you, and you said you complained to Jason and Lauren on several occasions.

Have we covered all that already in this deposition?

A. Yes.

Q. Interrogatory 14 asked whether you have been classified as a non-exempt employee in any staffing or recruiting job that you held either before or after your employment at Addison, and you said you don't recall being classified as a non-exempt employee at a prior staffing or recruiting job.

I know your current job is not a recruiting job but do you know how you're classified there?

A. I'm a non-exempt employee I believe.

Q. So you receive overtime?

A. No. So I'm not a non-exempt employee. I apologize.

Page 147

Q. You do not receive overtime?

A. No.

Q. And is your job in the nature of a sales job, your current job?

A. Yes.

Q. Then again this is interrogatory 14. You said in your answer to 14, in approximately June 2020 you worked at a bar on certain weekends to supplement your income.

First of all, is that correct that you only worked at the bar on weekends?

A. Yes. I was there two days a week max.

Q. So you sometimes worked on Saturday's and Sunday's?

A. It would be mostly Saturday and Sunday. Sometimes it would be Friday nights but that was a pretty rare occasion.

Q. And that's the Country Club Barbecue that we talked about?

A. Yes.

Q. Did you ever work at the bar where your mom worked?

A. Not during that timeframe. No.

Q. But at other times you did?

A. It's an Irish bar so I would help out on like St. Patrick's Day before this and that was really about it.

Q. And were you working at the Country Club Barbecue to supplement your income or to help your friend?

A. There became a point where it was a simultaneous help

Page 148

but also I was getting paid so it was beneficial on both ends. But I would not have applied for the role had what happened to my friend not happened.

Q. At the time that you were living in Peoria, were you living in your mother's house?

A. During those initial months of Covid, yes. I was living at my mother's house from March of 20 of when Covid happened so around about the 18th was when we stopped going to the office so from that point until the first week of June I was living at home and then I moved into my own space after that.

That was also when I stopped working at the bar with her and bars were also opening at that point in time.

Q. Interrogatory 16. It asks you to identify, itemize, and describe in detail any and all damages you claim as a result of the allegations in the complaint.

You state in your response that your damages are approximately $118.00 in back wages per week and an equal amount of liquidated damages per workweek, how did you calculate that?

CARL FITZ: I will object to the extent this calls for a legal conclusion. You can answer to the best of your ability, Ms. White.

MICHAEL PHILLIPS: I will withdraw that and ask a different question in light of your objection.

Page 149

Q. (By Michael Phillips) Did you make this calculation of $118.00 in back wages per workweek?

CARL FITZ: Ms. White, you can answer that.

THE WITNESS: Honestly, I don't remember when I was filling this out. I don't know if I asked for help or not.

Q. (By Michael Phillips) Do you have any knowledge about how you came up with $118.00 in back wages if you in fact made that calculation?

A. I would've looked at that ADP on how much I was paid.

Q. And how would that have helped you calculate back wages?

A. Looking at how much I made and how much I should've made.

Q. So did you calculate some kind of hourly rate?

A. I just said don't remember if I asked for help on this or not.

Q. So do you know as you sit here right now how you came up with that $118.00 in back wages per workweek?

A. I truthfully don't remember filling out this and doing the math on that. I do math very similar to that on a day-to-day basis for my accounts that I do now.

Q. Interrogatory 21 asks you to identify all Addison former or current employee with who you have communicated related to this lawsuit, any of your claims asserted against Addison in this lawsuit, or their interest in pursuing any wage

MAGNA
LEGAL SERVICES

Page 150

an hour claims against Addison?

You stated in response that you became aware of this settlement of the Vanderbeyden matter based on conversations with former coworkers, is that referring to Nina?

A. Yes.

Q. Have you spoken to any of your other former coworkers from Addison Group about this lawsuit?

A. No.

Q. Have you spoken with any of the other plaintiffs to this lawsuit outside or outside of the presence of attorney?

A. No.

Q. Do you know Juli Marconi at all?

A. No.

Q. Do you know Jessika Arrasmith?

A. No.

Q. Have you in any way participated in any effort to locate other potential plaintiff's for this lawsuit?

A. No.

Q. I'm done with this one and I will show you just one more document. I'm showing you exhibit 15. Have you seen this document before?

A. Yes.

(Exhibit No. 15 was marked.)

Q. Do you understand this to be the complaint that's been filed in this action?

Page 151

A. Yes.

Q. And then showing you -- This is exhibit 15, is this the consent to opt-in that you signed in connection with this lawsuit?

A. Yes.

Q. Did you understand by signing this opt-in and having your attorney's filed with the Court that you were joining this lawsuit?

A. Yes.

Q. Are you aware that you've been designated to be the lead plaintiff in this lawsuit in place of Ms. Marconi?

A. Yes.

Q. This lawsuit states that it is a FLSA collective action and rule 23 class action, do you know what that means?

A. No.

Q. Do you understand that you've been designated or will be designated as a representative of an FLSA collective?

A. Well, now I do.

Q. But not before?

A. Yes. I mean, I knew essentially what I was doing.

Q. Did you know that you would be representing other Addison Group employees in this lawsuit?

A. Yes.

Q. And did understand that as a class collective representative you have certain responsibilities to the other

Page 152

employees in the class of collective as the case maybe?

A. Yes.

Q. Do you know whether your claims are typical of other Illinois based Addison Group recruiters?

CARL FITZ: Objection. But you can answer.

A. I only know for my team and what I did. Just for the FAC. That's all I can speak on behalf of.

Q. You have knowledge of how things are operated in the FAC division in Chicago; is that correct?

A. Yes.

Q. But you don't have knowledge about how things operate in other verticals in Addison Group, right?

A. Not to extent that I know FAC.

Q. And you don't have first-hand knowledge about how things happen or work in other verticals, correct?

A. I'm sorry?

Q. You don't have first-hand knowledge about how things work in other verticals, correct?

A. No.

Q. And you don't have first-hand knowledge about how things worked in your vertical outside of Chicago; is that correct?

A. That is correct.

Q. And is it correct your supervisors Lauren and Jason only supervise recruiters in Chicago?

Page 153

A. That's correct.

Q. Do you know Emily Prosch?

A. No.

Q. Do you know Jarrett Cooper?

A. No.

Q. Do you know Christian Salvo?

A. I do not.

Q. Other than Nina and the recruiters who worked in FAC in Chicago, do you know any other Illinois based Addison Group recruiters?

A. At this time, no. I did during that time but not any people I stayed in connection with outside of being from the office.

Q. Do you know how other recruiters outside of your team were paid?

A. No.

Q. You don't know if they were paid a salary or by the hour or some other way?

A. As I mentioned, once I brought it up the one time I kept my mouth shut.

Q. So in other words you don't know?

A. No.

Q. So just looking at your complaint, paragraph 30 says that Addison uniformly misclassified the putative class members as exempt and paid them a salary with no overtime wages, you

MAGNA
LEGAL SERVICES

Page 154

don't know that to be true other than within your team, correct?

A. Like I said, when they told me to never talk about pay again I did not.

Q. So you didn't do anything to investigate how anyone else outside your team was paid, correct?

A. That is correct.

Q. And you didn't do anything to investigate how anybody outside your team -- strike that. You didn't do anything to investigate how many hours anybody outside your team worked, correct?

A. No. But I will say that our vertical was not the only vertical that was staying there after hours.

Q. And that's because you saw people there?

A. Yeah. After -- they would get there before us usually around eight and they would be there with us past the 6:30.

Q. And if you saw other people from verticals there at 6:00 or 6:30, you didn't know what time they had come in, right?

A. Well, they were there before me so depending on the day unless it was one of those mornings we have the cold calls we were usually the first people there but people would start trickling in around eight.

But I did not keep track of every specific

Page 155

person that was working at Addison Group of what time they got there and what time they left.

Q. Was there anybody who worked physically close enough to you that you would have knowledge of when they would arrive and when they would leave each day?

A. I mean, I would notice them there around the same times. I wasn't manually keeping track of my own pay or how many hours I was there and I wasn't doing that for anybody else either.

Q. And certainly after Covid when everybody was remote you didn't have first-hand knowledge of when people were working?

A. No. I did not have access to everyone's phone to what time they were logging in.

Q. I would certainly hope not. You told me earlier that you had some interaction with the Schaumburg office?

A. Yes.

Q. What was the nature of that interaction?

A. They handled all the outskirts so all the suburbs of the actual Chicago area. If we had some overlapping candidates or if we had some jobs that were kind of in between downtown and the suburbs and we were working with one of those candidates, I would either have to ask them for permission to work with their candidate or I would have to let them know about this job so they can potentially fill it.

Page 156

Q. And was that sort of an occasional thing that you might have to contact Schaumburg or was that more daily or weekly?

A. It was once in a blue moon and if that was the case we were instructed by our managers to consult them and they will handle it.

Q. Give me just one minute. Other than this complaint have you filed any complaints or reports with any governmental agency concerning any failure by Addison Group to pay overtime?

A. No.

Q. All right. I don't have any further questions for you.

A. Okay.

CARL FITZ: Plaintiff will read and sign and we will reserve our questions.

(Off the record at 2:47 p.m.)

Page 157

ERRATA PAGE

WITNESS NAME: CASSIDY WHITE     DATE: 03/29/2024

PAGE  LINE  CHANGE              REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____
CASSIDY WHITE                DATE



Page 158

I, CASSIDY WHITE, have read the foregoing transcript and hereby affix my signature that same is true and correct, except as noted above on the previous pages(s), and that I am signing this before a Notary Public

CASSIDY WHITE

THE STATE OF Texas)
COUNTY OF Harris)

Before me, Winette Smith, on this day personally appeared, CASSIDY WHITE, known to me or proved to me under oath, to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on this, the 29th day of March, 2024.

Notary Public in and for
The State of Texas
Commission Expires:04/30/2027

Page 160

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 29th day of March, 2024.

_WBSL_

WINETTE SMITH
Notary Public in and for
The State of Texas
My Commission expires 04/30/2027

Magna Legal Services
700 Milam St. Ste. 1300
Houston, Texas 77002
866 624-6221
WWW.MagnaLS.com

Page 159

REPORTER'S CERTIFICATION
DEPOSITION OF CASSIDY WHITE
TAKEN MARCH 29, 2024

I, WINETTE SMITH, Shorthand Reporter and Notary Public in and for the State of Texas, hereby certify to the following:

That the witness, CASSIDY WHITE, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the original deposition was delivered to CARL FITZ / MICHAEL PHILLIPS;

That a copy of this certificate was served on all parties and/or the witness shown herein on

_____.

I further certify that pursuant to FRCP No. 30(f)(i) that the signature of the deponent was requested by the deponent or a party before the completion of the deposition and that the signature is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor.



41 (Pages 158 to 160)