**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CASSIDY WHITE, Individually and For Others Similarly Situated,<br><br>            Plaintiff,<br><br>v.<br><br>APFS LLC d/b/a ADDISON PROFESSIONAL FINANCIAL SEARCH,<br><br>            Defendant. | Civil Action No. 1:23-cv-05464 |

**DEFENDANT APFS, LLC d/b/a ADDISON GROUP'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant APFS, LLC d/b/a Addison Group ("Addison"), by and through its undersigned attorneys, submits the following memorandum pursuant to Local Rule 56.1(a)(2) in support of its motion for summary judgment as to Plaintiff Cassidy White's ("Plaintiff" or "White") First Amended Class and Collective Action Complaint (Dkt. # 40).

## INTRODUCTION

White brings claims for overtime pay under both the Fair Labor Standards Act ("FLSA") and the Illinois Minimum Wage Law ("IMWL"), alleging that she was improperly classified as an exempt administrative employee by Addison because her primary duties were routine and governed by various plans and procedures created by Addison. Fatal to White's claims, however, is the fact that her own deposition testimony supports Addison's classification of her as an exempt administrative employee. In particular, White testified that she (1) performed various non-manual duties directly related to the business operations of Addison; and (2) exercised discretion and independent judgment as to matters of significance to Addison and its clients.

1

Because the undisputed material facts demonstrate that White was properly classified as an exempt administrative employee, Addison respectfully requests that this Court enter summary judgment in favor of Addison on both of White's claims.

## BRIEF FACTUAL BACKGROUND

### 1. The Parties

Addison is a company that offers staffing and recruiting services to clients in industry sectors such as information technology, finance and accounting, non-clinical healthcare, human resources, administrative, and digital marketing. (Addison's Statement of Undisputed Material Facts ("SMF") ¶ 1). Addison employs recruiting personnel to provide recruiting services to its clients. (SMF ¶ 2). White was employed as a Recruiter in the Finance and Accounting Division at Addison from November 2019 until August 2021. (SMF ¶ 3).

### 2. Addison's Business Operations

Addison is organized by staffing verticals which correspond to the professions of the employees Addison recruits. (SMF ¶ 5). White was employed as a Recruiter in the Finance and Accounting Contract vertical ("FAC"), which focuses on the placement of financing and accounting professionals in contract (temporary) positions. (SMF ¶¶ 6-7). Recruiters in the FAC are assigned to fill specific job orders, which are often generated by Business Development Managers ("BDM") within the FAC and consist of open job positions within Addison's clients. (SMF ¶¶ 8-9).

The Recruiters must find candidates with the requisite skills to fill the assigned job orders and then submit those candidates to the BDM by way of an online submission containing a summary of the candidate's qualifications for the position. (SMF ¶¶ 10, 36-37). The BDM then decides whether the candidate will be submitted to the client company. (SMF ¶ 39).

### 3. White's Employment at Addison

White was subject to a training period at Addison, which began when White was hired in November 2019 and lasted approximately one-and-a-half months and consisted of online training modules and in-person training in the Chicago office. (SMF ¶ 14).

According to White, her job duties as a Recruiter at Addison included the following: (i) cold calling candidates; (ii) conducting interviews of candidates; (iii) prepping and informing candidates of the open job positions and related expectations; (iv) ascertaining candidates' expectations with respect to pay, benefits, etc. (v) editing candidate resumes; (vi) identifying open job orders that candidates would most likely be interested in based on their qualifications; (vii) informing candidates of job orders in which they may be interested; (viii) submitting candidates to job orders; (ix) preparing candidates for job interviews with the client; (x) negotiating candidates' offers from the clients; (xi) maintaining contact with the candidates after they commence their contract assignments at the client companies; and (xii) addressing issues arising while the candidates are on their contract assignments. (SMF ¶ 16).

### 4. Recruiter Cold Calling

The job orders assigned to White during her time at Addison contained specifications of open positions, including, among other things, (i) what type of software was required; (ii) how many years of experience were required; and (iii) whether a degree was necessary for the position. (SMF ¶ 17). White would then identify and call candidates who she determined may be qualified for the position based on these specifications. (SMF ¶ 18).

White was solely responsible for deciding which candidates she would call for a specific job order. (SMF ¶ 19). She would begin her search for qualified candidates by looking in Bullhorn, a recruiting software program containing information about candidates. (SMF ¶ 20). Candidate

information was entered into the Bullhorn database by White and other Recruiters. (SMF ¶ 21). While looking in the Bullhorn database, White would filter her searches to reveal only those candidates who had been already interviewed and whose resumes had already been edited. (SMF ¶ 22).

White would then begin calling the candidates she located in Bullhorn and determined were qualified. (SMF ¶ 23). White's goal in cold calling candidates was to "expand the pipeline," or, in other words, to not only to potentially find a candidate to fill an assigned job order, but also to find candidates that could be used to fill future job orders. (SMF ¶ 24). White testified that she used her judgment during these cold calls to determine (i) what sort of position the candidate was interested in; (ii) whether the candidate would be a good fit for an open position; and (iii) whether the candidate had the requisite industry experience for the open position. (SMF ¶ 25).

White accepted only those candidates who she deemed as "good," *e.g.,* candidates that (i) have experience; (ii) know what they are doing; and (iii) have worked in contract positions before and therefore have realistic ideas of what the expectations are in terms of their employment with Addison. (SMF ¶ 26).

### 5. Initial Candidate Interviews

White would conduct one-on-one in-person interviews with candidates after the cold calls because, as White explained during her deposition, "[y]ou can pretty much tell when someone is pulling your leg on the phone or not and that's why we'll want to meet with them in-person." (SMF ¶ 27). During these interviews, White would (i) discuss the candidate's resume; (ii) review the candidates' specific job duties; (iii) explain the software the candidates would be working with; and (iv) provide any information the candidates were seeking regarding the position. (SMF ¶ 28).

4

White also testified that she used her judgment in these interviews to determine whether the candidates (i) had experience in the finance and accounting industry; and (ii) would be good to work with. (SMF ¶ 29). In addition, White would begin negotiating candidates' pay rate during these interviews. (SMF ¶ 30). White testified that she would use her judgment to determine the lowest salary amount a candidate would be willing to take for a certain position. (SMF ¶ 31). At times, White would also use a "negotiating tactic," which involved persuading the candidates to accept a salary amount below their expectations because the job opportunity would be good for the candidate. (SMF ¶ 32). Recruiters at Addison earn commissions based on their contract placements and their individual "spread," which is the difference between the bill rate and the pay rate of the candidate that they place. (SMF ¶ 12). As a Recruiter, one of White's duties was to maximize the spread of a contract placement by negotiating a lower pay rate with the candidate. (SMF ¶ 13). This allowed Addison to make more money on the placement. (*Id.*).

### 6. Candidate Placement

White would edit a candidate's resume to be submitted for a job order once she had met with the candidate and determined that the candidate had the requisite experience and would be good to work with. (SMF ¶ 33). White testified that she would use her judgment to edit the candidate's resume and determine how to best present the candidate to the client company, including by (i) confirming that the information in the resume accurately reflected the candidate's actual experience; (ii) adding an Addison letterhead to the resume; and (iii) removing any "stuff fluffed" in the resume. (SMF ¶ 34).

White would then send the edited resume back to the candidate for approval, and with the candidate's consent, would submit the candidate's resume to the job order. (SMF ¶¶ 35-36). In addition to submitting the candidate's resume to the job order, White also presented the candidate

to the BDM via a submission tool in Bullhorn. (SMF ¶ 37). White testified that she used her judgment to decide which aspects of the candidate's background made them a good fit for the job order, and would include those aspects in the submission she wrote to the BDM. (SMF ¶ 38).

White would also inform the candidate of any relevant job orders as they came in, along with details of the specific job order, including (i) job duties; (ii) company information; (iii) pay scale; (iv) benefits; and (v) contract length and timing. (SMF ¶ 40). After a candidate received a request for an interview from a client, White would be responsible for (i) informing the candidate of the interview process; (ii) preparing the candidate for the interview; and (iii) debriefing with the candidate after the interview. (SMF ¶ 41).

White would prepare a candidate for a client interview by reviewing the information about the client in the job order and relaying that information to the candidate. For example, White may let a candidate know that the client (i) has a "spunky personality"; and (ii) will likely ask the candidate a lot of detailed questions about the role based on what she saw in the job order. (SMF ¶¶ 42-43). White would also coach the candidate on what questions to ask a client during an interview. (SMF ¶ 44).

### 7. Post-Placement Duties

White's duties as a Recruiter continued even after a candidate began working for the client. (SMF ¶ 45). For example, White would follow-up the candidates on their first day of work and once a week thereafter to discuss how the job was going "because the candidate has to like the role as much as the role likes the candidate." (SMF ¶ 46). Candidates would also reach out to White if they were having issues at their job, after which White would bring those issues to the BDM, and would then go back to the candidate to communicate the proposed resolution of the issue to be decided by the BDM and the clients. (SMF ¶ 47). BDMs would similarly reach out to White with

any negative feedback from clients regarding the candidates, and White was responsible for calling the candidates to communicate that feedback. (SMF ¶ 48).

<u>**ARGUMENT**</u>

**1. Standard for Summary Judgment.**

Summary judgment is proper when depositions, affidavits, and other materials on file show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party may also fulfill its burden by showing the court there is an absence of evidence on an issue on which the non-movant has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party has carried its burden, the nonmoving party must respond with specific facts, supported by admissible evidence, showing a genuine issue for trial. Fed. R. Civ. P. 56(c), (e). But allegedly disputed facts must be material – the existence of only "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48.

**2. Addison's Summary Judgment Motion Should be Decided Prior to Conditional Certification.**

To the extent Plaintiff contends this Court should not decide Addison's Motion at this juncture, Courts in this district have recognized that it is appropriate for a court to rule on a summary judgment motion prior to ruling on a class certification motion "when there is sufficient doubt regarding the likelihood of success on the merits of a plaintiff's claims." *Hakim v. Accenture U.S. Pension Plan*, 735 F. Supp. 2d 939, 956 (N.D. Ill. 2010), *on reconsideration in part*, 818 F. Supp. 2d 1075 (N.D. Ill. 2011), *aff'd,* 718 F.3d 675 (7th Cir. 2013), and *aff'd,* 718 F.3d 675 (7th Cir. 2013). *See also* 3 William B. Rubenstein, *Newberg on Class Actions* § 7:8 (5th ed. 2017) (noting that "if a court grants a dispositive motion before class certification, it may preclude the

need to rule on certification at all thereafter," and that "the emerging trend in the courts appears to be to decide dispositive motions prior to the certification motion").

In fact, various Courts in this district have decided motions for summary judgment on FLSA claims prior to deciding motions for class certification. *See, e.g., Williams-Bell v. Brit. Standards Inst., Inc.,* 532 F. Supp. 3d 640, 652 (N.D. Ill. 2021) (granting defendant's motion for summary judgment on plaintiff's FLSA and IMWL claims and rendering plaintiff's motion for conditional certification of collective action as moot); *Blackstone v. Dearborn Life Ins. Co.*, 2024 WL 756835 at \*6 (N.D. Ill. Feb. 23, 2024) (granting defendant's motion for summary judgment on named plaintiff's claims rendering their motion for class certification moot); *Smith v. Safety-Kleen Sys., Inc.*, No. CIV.A. 10-C-6574, 2012 WL 162206, at \*7 (N.D. Ill. Jan. 18, 2012) (first examining defendant's motion for summary judgment and only ruling on FLSA decertification after denying summary judgment).

**3. White's Claims Under the FLSA and IMWL Fail As A Matter of Law Because Addison Properly Classified White As An Exempt Administrative Employee.**

The FLSA requires employers to pay employees overtime wages for any hours they have worked in excess of 40 per week. 29 U.S.C. § 207.[1]  However, an exemption to this requirement exists for those employees employed in a "bona fide…administrative…capacity." *Id.* The U.S. Department of Labor ("DOL") has published regulations interpreting this exemption, which state that it shall apply to employees "(1) who earn a salary of at least $684 per week;[2] (2) "[w]hose

---

[1] "A violation of the IMWL is contingent upon a violation of the FLSA." *Williams-Bell v. Brit. Standards Inst., Inc.,* 532 F. Supp. 3d 640, 645 (N.D. Ill. 2021). Therefore, since Plaintiff brings claims under both the IMWL and the FLSA, if Plaintiff's FLSA claims fail, "[her] related state law claims under the IMWL must fail as well." *Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 376 (7th Cir. 2005). As a result, the instant Motion analyzes Plaintiff's claims under the FLSA.

[2] The U.S. Department of Labor has issued a final rule increasing the minimum salary for purposes of the administrative exemption and other exemptions, effective July 1, 2024. However, because White worked for Addison prior to July 1, 2024, the relevant minimum salary is $684 per week or $35,568 per year. *See* https://www.dol.gov/agencies/whd/overtime/rulemaking.

primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) "[w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." *Williams-Bell,* 532 F. Supp. 3d at 645. An employer asserting that the administrative exemption applies "ordinarily must show that the employee's work satisfies all three criteria." *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1052 (7th Cir. 2020). These exemptions "must be given a fair, not a narrow, reading." *Id.*

As set forth in detail below, Addison properly classified White as an exempt employee under the administrative exemption because (1) White earned a salary in excess of $684 per week while employed as a Recruiter at Addison; (2) White's primary duties were the performance of non-manual work that was directly related to the general business operations of Addison and its customers; and (3) White's primary duties included the exercise of discretion and use of independent judgment with respect to matters of significance.[3]

> ### A. White Was Paid In Excess of the Weekly Salary Requirement.

It is undisputed that White satisfies the first requirement of the administrative exemption because she was paid at a rate not less than $684 per week while employed as a recruiter at Addison (SMF ¶ 11). More specifically, White was paid an annual salary of $46,000 throughout her employment at Addison, which equates to a weekly salary of approximately $884. (*Id.*).

> ### B. White's Primary Duties Were Non-Manual and Directly Related to the General Business Operations of Addison and Its Customers.

White's primary job duties as a Recruiter at Addison satisfy the second requirement of the administrative exemption because those duties were non-manual and "directly related to the

---

[3] Although Addison bases this motion solely on the administrative exemption to the FLSA, it reserves its right to assert that other exemptions are applicable as well.

management or general business operations of the employer or the employer's customers." *See* 29 C.F.R. § 541.200(a).

In order to meet this requirement, an employee must "perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." *Id.* at § 541.201(a). This includes work in functional areas such as personnel management, human resources, data base administration, and legal and regulatory compliance, among others. *Id.* at § 541.201(b).

Courts evaluating recruiter-type positions such as White's have found that the associated duties satisfy the second requirement of the administrative exemption. For instance, the Court in *Andrade v. Aerotek,* 700 F. Supp. 2d 738, 747 (D. Md. 2010) held that plaintiff, a recruiter for an international staffing company, performed non-manual duties directly related to the defendant's business operations when she found and placed financial services professionals in contract positions at defendant's clients. In particular, she "interviewed candidates, negotiated pay, including holiday and vacation pay, and helped manage the contractors once they were hired." *Id.* Based on these duties, the court explained, "it is clear that she was performing work in the functional areas of personnel management and human resources for [defendant]'s clients. Such work is squarely within the DOL's interpretation of "business operations"." *Id.*

In granting defendant's motion for summary judgment on plaintiff's misclassification claims, the court in *Drake v. Aerotek, Inc.,* No. 14-CV-216-BBC, 2016 WL 80672, at *6 (W.D. Wis. Jan. 7, 2016) found that plaintiff's primary duties of recruiting and hiring of new employees were directly related to the business operations of the defendant, as it "was the core of defendant's

business."[4] Plaintiff admitted in his deposition that his duties consisted of "searching for suitable applicants, regularly assessing them for their suitability for particular kinds of jobs and particular clients, preparing them for interviews, recommending them for jobs, stepping in to avert or resolve conflicts between contractors and clients, or following up with contractors." *Id.*

Finally, in *Quintiliani v. Concentric Healthcare Sols., LLC,* 944 F. Supp. 2d 738, 745 (D. Ariz. 2013), *rev'd in part*, 672 F. App'x 643 (9th Cir. 2016) the Court held that the plaintiff staffing coordinator's duties consisting of providing an administrative human resource service to defendant's clients by "fielding and making calls to [defendant]'s clients regarding staffing needs and then matching particular nurses/medical professionals that best fit the need" and responding "to discipline problems associated with staff" were directly related to defendant's business operations.

In addition to the case law detailed above, the federal regulations interpreting the FLSA provide examples of the types of employees who are exempt under the administrative exemption. Among those examples is a human resources manager. Specifically, the regulations note that "when the interviewing and screening functions are performed by the human resources manager or personnel manager who makes the hiring decision or makes recommendations for hiring from the pool of qualified applicants, such duties constitute exempt work, even though routine, because this work is directly and closely related to the employee's exempt functions." 29 C.F.R. § 541.203(e). The functions performed by the human resources manager in this example are similar to those functions performed by White.

---

[4] Drake brought his misclassification claim under Wisconsin state law; however, the Court noted that Wisconsin's exemption requirements "are to be interpreted similarly to the corresponding provision in the federal [FLSA.]" No. 14-CV-216-BBC, 2016 WL 80672, at *6 (W.D. Wis. Jan. 7, 2016).

The U.S. Department of Labor ("DOL") has also addressed the exemption status of recruiter in Opinion Letters. In 2005, the DOL considered whether staffing managers working for a temporary staffing agency were exempt under the FLSA's administrative exemption. *See* DOL WHD Ltr. Oct. 25, 2005.[5] Among the staffing managers' duties were: conferring with the client to evaluate what kind of skills were needed in a potential worker; negotiating the terms for the placement and fee for the client on behalf of the company; evaluating the potential worker's education, skills and experience, personality fit, and ability to work within a particular company; making recommendations to the client for placement of workers at particular assignments; staying in contact with the client and the worker to evaluate the worker's performance; and deciding whether counseling or disciplining a worker was necessary. *Id.* The DOL opined that the staffing managers in question were performing non-manual work directly related to the general business operations of their employer's clients because in performing their primary duties of recruiting, hiring and managing the temporary workers at the company clients, the staffing managers were performing work in the functional areas of personnel management, human resources, and labor relations, and that these primary duties were similar to the exempt human resources manager example in the regulations. *Id. See also* DOL WHD Ltr. Jan. 5, 2018[6] (consultants who primarily screened, interviewed and recommended candidates for hiring, supervised and counseled temporary professionals on issues of complaints and payroll, and addressed client facilities' concerns were exempt administrative employees).

Here, the duties performed by White as a Recruiter are almost identical to those duties analyzed in the case law and DOL guidance above. White's duties, therefore, were "directly

---

[5] *See e.g.* https://www.dol.gov/agencies/whd/opinion-letters/search;
https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/2005_10_25_45_FLSA.pdf. .
[6] *See e.g.* https://www.dol.gov/agencies/whd/opinion-letters/search;
https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/2018_01_05_12_FLSA.pdf.

related" to the business operations of Addison and Addison's customers in the functional areas of personnel management, human resources, and labor relations. *See* 29 C.F.R. § 541.201(b). There is no question that White performed various exempt administrative duties, including:

- Evaluating candidate qualifications to determine whether to contact a candidate about a position (SMF ¶¶ 10, 19);
- Developing her own criteria to determine when a candidate was "good" (SMF ¶ 26);
- Interviewing candidates to determine whether they should be submitted to a current or future job order (SMF ¶¶ 27, 29);
- Negotiating with employees about their desired salary range (SMF ¶¶ 30-31);
- Editing candidate resumes to appear more appealing to clients (SMF ¶ 33);
- Keeping candidates apprised of new job orders for which they were qualified (SMF ¶ 40);
- Preparing candidates for interviews with clients (SMF ¶¶ 41-43);
- Debriefing with candidates after their client interviews to offer advice on next steps (SMF ¶ 41);
- Managing candidates while they were on contract assignments with clients by reaching out to candidates to check in about how their experiences are (SMF ¶ 46); and
- Managing issues that candidates were having while on assignment (SMF ¶ 47).

As detailed above, the undisputed facts show that White's duties were directly related to Addison's general business operations.

### C. White's Primary Duties Included the Exercise of Discretion and Independent Judgment Related to Matters of Significance.

White's primary job duties as a Recruiter at Addison satisfy the third and final requirement of the administrative exemption because those duties "include[d] the exercise of discretion and independent judgment with respect to matters of significance." *See* 29 C.F.R. §541.200(a).

The interpretive regulations set forth by the DOL provide that "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). Further, "[t]he term 'matters of significance' refers to the level of importance or consequence of the work performed." *Id.* Factors such as "whether the employee carries out

13

major assignments in conducting the operations of the business" and "whether the employee performs work that affects business operations to a substantial degree" are to be considered when determining whether an employee exercised discretion and independent judgment in matters of significance. *Id.* at § 541.202(b).

This does not mean that the employee must have the power to make final decisions, free of review, but rather, that the employee is in the position of making recommendations. *Id.* at § 541.202(c). The phrase "discretion and independent judgment" must be applied in light of all the facts involved in the particular employment situations *Id.* at § 541.202(b).

White's job as a Recruiter put her in the position of making important recommendations about qualified candidates for Addison's clients, and the duties White performed involved a vast amount of discretion and independent judgment. In fact, White admitted during her deposition that she exercised independent judgment as to the following job duties:

- Determining whether a person was interested in a contract role at Addison (SMF ¶ 25);
- Determining whether a candidate would be a good fit for a certain job order within a certain industry (*Id.*);
- Determining which candidate[s] had the requisite skills and experience for a particular job order (*Id.*);
- Determining which candidate[s] to submit to a job order (SMF ¶ 38);
- Determining how to best present a candidate to a client (SMF ¶ 34); and
- Negotiating with candidates about their salary expectations (SMF ¶ 31).

Further, courts have found that the duties of positions similar to White's Recruiter position included the exercise of discretion and independent judgment as to matters of significance. In *Andrade,* the court held that the plaintiff satisfied the third requirement of the administrative exemption because, like White, she "developed her own recruiting strategies, compared contractors' skills to the applicable job descriptions, interviewed candidates, and determined whether they were a good fit based on her knowledge of the clients' personality." 700 F. Supp. 2d

14

at 747. The plaintiff also negotiated pay and other matters with candidates, prepared candidates for interviews and managed the candidates while on assignment. *Id.* All of these duties are in line with the duties that White performed at Addison.

Similarly, the Court in *Drake* found that a recruiter exercised discretion and independent judgment because he "was searching for suitable applicants, regularly assessing them for their suitability for particular kinds of jobs and particular clients, preparing them for interviews, recommending them for jobs, stepping in to avert or resolve conflicts between contractors and clients, or following up with contractors." 2016 WL 80672 at *6. *See also Hudkins v. Maxim Healthcare Servs., Inc.,* 39 F. Supp. 2d 1349, 1350 (M.D. Fla. 1998), *aff'd sub nom. Hudkins v. Maxim Healthcare Servs.,* 176 F.3d 493 (11th Cir. 1999) (recruiter exercised discretion and independent judgment in recruiting, hiring, counseling, and disciplining contract nurses).

Finally, White's exercise of discretion and independent judgment is clearly related to matters of significance because the work performed by White—namely, the recruitment and placement of quality candidates at Addison's clients—is vitally important to both Addison and its clients given that their businesses rely on recruitment efforts such as the ones White performed.

White's own deposition testimony makes it clear that she exercised discretion and independent judgment on matters of significance as a Recruiter at Addison. Thus, based upon the undisputed facts, all of the elements of the administrative exemption have been met and Addison is entitled to summary judgment on White's claims under the FLSA and the IWML.

## CONCLUSION

WHEREFORE, Defendant APFS, LLC d/b/a Addison Group respectfully requests that this Court grant its motion for summary judgment and dismiss White's claims with prejudice.

15

Dated: August 2, 2024

Respectfully submitted,

By: /s/ *Michael R. Phillips*
Michael R. Phillips
Katharine P. Lennox
McGuireWoods LLP
77 West Wacker Drive, 41st Floor
Chicago, IL 60601
T: (312) 849-8100  /  F: (312) 849-3690
mphillips@mcguirewoods.com
klennox@mcguirewoods.com
*Attorneys for Defendant APFS, LLC d/b/a Addison Group*

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2024, I electronically filed the foregoing *Defendant APFS, LLC d/b/a Addison Group's Memorandum in Support of Its Motion for Summary Judgment* with the Clerk of the Court using the CM/ECF system, which will send notification and service of such filing to all registered counsel of record.

> */s/ Michael R. Phillips*
> Michael R. Phillips