**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

Cassidy White, individually and for others
similarly situated,

    *Plaintiff,*

v.

APFS LLC d/b/a Addison Professional
Financial Search,

    *Defendant.*

No. 23-cv-05464

Judge Lindsay C. Jenkins

**MEMORANDUM OPINION AND ORDER**

Plaintiff Cassidy White brings claims for overtime pay under both the Fair
Labor Standards Act ("FLSA") and the Illinois Minimum Wage Law ("IMWL"). She
alleges that she was improperly classified as an exempt administrative employee by
her employer, APFS LLC ("Addison"), and therefore not paid any overtime. Before
the Court is Addison's motion for summary judgment. [Dkt. 46.] For the reasons that
follow, the Court denies Defendant's motion.

## I.    Response to Rule 56.1 Statement & Statement of Additional Facts

"On summary judgment, the Court limits its analysis of the facts to the
evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v.*
*Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). The statements serve a
valuable purpose: they help the Court in "organizing the evidence and identifying
disputed facts." *Fed. Trade Comm'n v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633
(7th Cir. 2005). "To dispute an asserted fact, a party must cite specific evidentiary
material that controverts the fact and must concisely explain how the cited material

controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." L.R. 56.1(e)(3).

The Seventh Circuit "has repeatedly recognized that district courts may require exact compliance with their local rules," including the "local rules governing summary judgment." *Allen-Noll v. Madison Area Tech. Coll.*, 969 F.3d 343, 349 (7th Cir. 2020) (collecting cases). Consistent with the purpose of Local Rule 56.1, however, the Court has "broad discretion" to relax or enforce strictly local rules governing summary judgment practice. *Edgewood Manor Apt. Homes, LLC v. RSUI Indem. Co.*, 733 F.3d 761, 770 (7th Cir. 2013) (citing *Modrowski v. Pigatto*, 712 F.3d 1168, 1169 (7th Cir. 2013)); *see also Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009).

White's responses to Addison's statement of facts contravene Rule 56.1 in several ways. Numerous times, after admitting Addison's factual statement, White cites additional material, ostensibly to offer color and context in response to Addison's statement. [*See e.g.*, dkt. 61 at ¶¶8–10, 13–17, 20, 28, 35, 41–42, 47–48.] In response to the moving party's submission, the non-movant may only admit, dispute, or admit in part and dispute in part the factual content of each paragraph. L.R. 56.1(e)(2). The rule does not contemplate the inclusion of additional facts where the party admits the asserted fact. *See* L.R. 56.1(e)(2) (responses "may not set forth any new facts"). If the non-movant wishes for the Court to consider any additional facts, she must file, as a separate document, a statement of additional facts supported by citations to the record. L.R. 56.1(b)(3). Consequently, the Court does not consider any of White's additional facts that are presented in this way.

In other places, *see id.* at ¶¶7, 12, 44, White admits Addison's statement of fact in part but does not clearly explain which portion (if any) is denied, nor does she "concisely explain how the cited material controverts the asserted fact." L.R. 56.1 (e)(2)–(3). Where the portion disputed is clear, and White supports her contrary assertion with evidence, the Court considers it. Otherwise, it is disregarded.

Problems continue with White's statement of additional facts. [Dkt. 64.] Addison correctly notes the local rules limit the opposing party to 40 concise numbered paragraphs. L.R. 56.1(b)(3), (d)(1), (d)(5). While White's statement of additional facts contains only 35 numbed paragraphs, she improperly padded many paragraphs in her statement of additional facts with multiple facts containing lengthy narratives in violation of L.R. 56.1(d)(1). [*See generally* dkt. 81 (Opposition to White's Statement of Additional Facts).] Some assertions are not facts at all, but instead offer argument or legal conclusions. [*See e.g.*, *id.* at ¶¶2–3, 35.] Many of the numbered paragraphs contain facts that are not material. [*See e.g.*, *id.* at ¶¶1–3, 5, 29, 32.] Others contain assertions that are not *additional* facts but are facts already included in Addison's filing. [*See e.g.*, *id.* at ¶¶4– 6, 9–10, 19, 23, 33.]

The citations White offers in her statement of additional facts frequently fail to support her rendition of the evidence. [*See e.g.*, *id.* at ¶¶6– 8, 11–16, 20–21, 23–24, 26, 28, 30–31, 33, 35.][1] In many of these cases, were it not for White's heavy gloss on

---

[1]  White's statement of facts describe what "Addison Recruiters" do generally, sometimes extrapolating from White's testimony about her experience. [*See e.g.*, *id.* at ¶¶10, 17, 20, 30.] While this case is a certified collective action under the FLSA [Dkt. 67], Addison's summary judgment motion concerns White's individual claims. Therefore, factual allegations concerning recruiters generally are not relevant.

the cited material, the evidence itself would otherwise be material and undisputed. [*See e.g.*, *id.*] By and large the Court follows Local Rule 56.1(d)(1) and disregards White's factual statements where unsupported by her citation. However, where Addison's response admits a portion of White's asserted fact and the fact is material to the dispute, the Court considers that portion only in ruling on Addison's summary judgment motion.

## II. White's Declaration

In support of her opposition to Addison's summary judgment motion, White attaches and relies upon her declaration. [Dkt. 61-2.] Addison protests that the contents of her declaration contradict her prior deposition testimony and therefore should be disregarded. [Dkt. 82 at 3.]

A court may disregard an affidavit or declaration offered by the non-moving party that contradicts prior deposition testimony. *Craig v. Wrought Washer Mfg.*, Inc., 108 F.4th 537, 543 (7th Cir. 2024); *Cocroft v. HSBC Bank USA, N.A.*, 796 F.3d 680, 687 (7th Cir. 2015) ("[A] party cannot 'manufacture' a dispute by offering its own (inexplicably) contradictory testimony.")

If a deposition and later-filed declaration conflict, courts disregard the declaration "unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Velez v. City of Chicago*, 442 F.3d 1043, 1049 (7th Cir. 2006) (quoting *Amadio v. Ford Motor Co.*, 238 F.3d 919, 926 (7th Cir. 2001) (excluding statements in affidavit that conflicted with prior deposition testimony where there was no

explanation for the conflict)). In absence of a plausible explanation, courts disregard the conflicting affidavit, reasoning that it is "so lacking in credibility as to be entitled to zero weight in summary judgment proceedings." *Donaldson v. Johnson & Johnson*, 37 F.4th 400, 406 (7th Cir. 2022) (quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67–68 (7th Cir. 1995)).

Still, the Seventh Circuit cautions against wholesale rejection of a declaration or even portions of a declaration unless the "party previously gave 'clear answers'" in their deposition which "'negate the existence of any genuine issue of material fact.'" *Johnson v. Statewide Investigative Servs., Inc.*, 2023 WL 8643636, at *2 (7th Cir. Dec. 14, 2023). Put another way, "[a] declaration is not a sham where it is an 'amplification rather than a contradiction.'" *Id.* (quoting *Cook v. O'Neill*, 803 F.3d 296, 298 (7th Cir. 2015); *Simmons v. Chi. Bd. of Educ.*, 289 F.3d 488, 492 (7th Cir. 2002) ("[A] party may attempt to clarify or augment (but not contradict) prior deposition testimony through affidavits.")

Portions of White's declaration conflict with her deposition testimony. She offers nothing to suggest that any conflict could be excused, and the Court sees no reason to excuse the conflicts. For clarity, the Court identifies and disregards the below portions of White's affidavit:

| Declaration | Conflicting Deposition Testimony |
|---|---|
| "[O]ur [Addison] manager would … direct us to the candidates in Bullhorn that fit the descriptions for our open positions." [Dkt. 61-2 at ¶6.] | Q: "And you mentioned earlier that … just about everyday you were given job orders to fill, right?" A: "Yes." Q: "And then you had to use judgment to determine which of the candidates in your |

| | |
|---|---|
| | pipeline had the best skills and experience for this particular job order, is that right?"<br>A: "Yes."<br>Q: "And once you made that determination, would you then contact candidates who you thought would be good fits for the role?"<br>A: "Yes." [Dkt. 47-1 at 23 (White Deposition 82:1–11).] |
| "When I say that I negotiated pay with candidates, what that means is that when I connected with a candidate, I would ask what level of pay they were looking for and find out the level of pay they would accept. Sometimes I would ask if they'd be willing to accept a salary amount below their stated expectations." [*Id.* at ¶8.] | Q: "Would you ever have to say to a candidate, I don't think I can get you $22.00 an hour but I think the client will pay $20?"<br>A: "Yes."<br>Q: "[W]ould you sometimes have to use your judgment to figure out what was the lowest amount that the candidate would be willing to take in order to work this role?"<br>A: "I particularly do that in the interview process."<br>Q: "You try to figure out where they're bottomed out in terms of pay rate?"<br>A: "Yes. But if it was … a contract-to-hire position and there was an opportunity to hire but the contract pay was 17 and they are looking for 18, I would tell them if you do well in this role you have the opportunity to be hired on full-time and this is where your salary would be and for the most part this was a negotiating tactic."<br>Q: "So sometimes you would try to persuade them to accept a pay rate that was below their expectations based on the opportunity in the role?"<br>A: "Yes." [*Id.* at 25–26 (93:15–94:90.] |
| "I wasn't … permitted to search elsewhere." [*Id.* at ¶9.] | Q: "I will give you another piece of this evaluation where Lauren says (as read) I marked needs improvement because this year will be about Cassidy being able to open her network outside of Bullhorn … [D]o you understand what Lauren means …?" |

| | A: Yes. Because they – at this point candidates were slimmer and slimmer during Covid, so they wanted to expand the job boards but they didn't know how to go about it because they had us using bullhorn [a recruiting software program] for so long." [*Id.* at 30 (111:13–23).] |
|---|---|
| "If a candidate's qualifications match the client's requirements, then that candidate might be a good fit. That was the comparison I performed. It was an objective comparison, not so much a subjective comparison where I used my own discretion." [*Id.* at ¶10.]<br><br>"This matching process didn't require any specialized skills or really any skills other than basic reading. [*Id.* at ¶11.] | Q: "And you mentioned earlier that … just about everyday you were given job orders to fill, right?"<br>A: "Yes."<br>Q: "And then you had to use judgment to determine which of the candidates in your pipeline had the best skills and experience for this particular job order, is that right?"<br>A: "Yes."<br>Q: "And once you made that determination, would you then contact candidates who you thought would be good fits for the role?"<br>A: "Yes." [Dkt. 47-1 at 23 (82:1–11).] |
| "I had to … put their resume on Addison letterhead." [*Id.* at ¶12.] | Q: "You said that you would edit someone's resume, can you explain how you would edit the resume?"<br>A: "I would make sure it was created correctly. They were using the same [tense] at the beginning of every word. I would make sure if there's kind of stuff fluffed in there. I would make sure that come down to the specifics of what their job actually was that they were doing." (*Id.* at 22 (80:17–23).] |
| "When I submitted candidates to a BDM, I … had to write up a summary … using Addison's template for submission. [*Id.* at ¶13.] | Q: "Did you have any type of template that you used to draft submissions?"<br>A: "I did not have a template..." (*Id.* at 28 (104:10–12).] |
| "Basically, my prep consisted of communicating to the candidate whatever the BDM wanted us to convey to the candidate." [*Id.* at ¶14.] | Q: "[W]ould you give the candidate advice on what would be good questions to ask or good questions not to ask?"<br>A: I would ask them if they already had questions prepared. I would ask them to read them to me. I would say, you know, make sure you ask about the |

| | environment, make sure you ask about the person that was filling the role before you, what qualities they had that they liked, what they didn't like, and seeing if it was a good fit on both ends just like every other job."<br>Q: "So again, you're using the specifics of the job order and the specifics of the interviewer to create an effective prep for your candidate, right?"<br>A: "Yes." [*Id.* at 25 (92:12–25).] |
|---|---|
| "Addison also had interview scripts for recruiters, highlighting the questions we had to ask …" [*Id.* at ¶19.] | Q: "[W]as it like a checklist of information that they were asking you to obtain from the interviews?"<br>A: "Yes."<br>…<br>Q: "They didn't give you any written out interview questions, correct?"<br>A: "Like the piece of paper and said you need to ask X, Y, and Z?"<br>Q: "Correct."<br>A: "They had recommendations and they had some questions that they wanted us to ask but it wasn't ever like take this piece of paper … and ask them verbatim these questions." [*Id.* at 29 (108:7–24).] |
| "Recruiters at Addison are subject to stringent oversight at all times and for all aspects of our jobs [including] … contacting the candidates our managers told us to." [*Id.* at ¶20.] | Q: "And you mentioned earlier that … just about everyday you were given job orders to fill, right?"<br>A: "Yes."<br>Q: "And then you had to use judgment to determine which of the candidates in your pipeline had the best skills and experience for this particular job order, is that right?"<br>A: "Yes."<br>Q: "And once you made that determination, would you then contact candidates who you thought would be good fits for the role?"<br>A: "Yes." [Dkt. 47-1 at 23 (82:1–11).] |

These portions of White's affidavit must be disregarded either because they directly conflict with her prior deposition testimony or because they substantively downplay the scope of her role as a recruiter as described in her deposition testimony. *See Drake v. Aerotek, Inc.*, 2016 WL 80672, at *1 (W.D. Wis. Jan. 7, 2016) (disregarding conflicting portions of declaration where "[r]eading both documents leaves the definite impression that plaintiff was trying to use his declaration to undermine the testimony he had given at his deposition.")

The Seventh Circuit's admonition not to disregard statements in declarations that are "amplification[s] rather than contradiction[s]" does not support the contrary conclusion. *Johnson*, 2023 WL 8643636, at *2 (quoting *Cook*, 803 F.3d at 298)). In *Johnson* the district court improperly disregarded plaintiff's statement in his declaration that he offered to work part-time, believing it conflicted with his deposition testimony that when he was fired "he did not ask to work part-time to keep his job." *Id.* The Seventh Circuit explained that plaintiff's "deposition testimony that he did not ask [his boss] to work part-time when [his boss] fired him over the phone does not foreclose the possibility that he asked for that change at another time." *Id.* In this way, his declaration amplified his original testimony—while he did not ask for an alternative working arrangement at the time he was fired, he asked for one prior to his termination. *Id.*

The issues with White's declaration are different. She's not introducing new facts like *Johnson*. Instead, she summarizes and describes her duties in a way that downplays any use of judgment, discretion, or skill that she testified to using during

her deposition testimony—walking back her prior testimony, not enhancing it. For example, at paragraph 12 of her declaration White summarizes the tasks she performed in advance of submitting a candidate to a job order. [Dkt 61-2 at ¶12.] While the steps she described are consistent with her deposition testimony, her declaration omits other tasks she performed, for example, with respect to preparing a candidate's resume, in a way that downplays her exercise of judgment and discretion. While it is not incorrect that White put candidates' resumes on Addison letterhead [*see* dkt. 47-1 at 19 (69:16)], White's declaration improperly suggests that that was the only task she performed when editing resumes.

Another example of such a conflict is paragraph 8 of her declaration, where she attempts to sanitize her prior testimony concerning pay negotiations. [Dkt. 61-2 at ¶8.] The steps and tasks she relays in her declaration are consistent with her deposition testimony, but do not reflect the skills she testified to using. Most importantly, at her deposition she testified to using judgment in negotiating pay with candidates and a "negotiating tactic." The declaration must be disregarded to this extent.

With these issues resolved, the Court recounts the facts.

## III.    Background

Unless noted, all facts recounted herein are undisputed either due to the parties' agreement or their failure to cite contrary evidence. The Court "present[s] the facts ... in the light most favorable" to White, the nonmovant. *Emad v. Dodge Cty.*, 71 F.4th 649, 650 (7th Cir. 2023). The Court only relays facts that are material. That

is, "facts that might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Addison is a company that offers staffing and recruiting services to clients in industry sectors such as information technology, finance and accounting, non-clinical healthcare, human resources, administrative, and digital marketing. [Dkt. 61 ("Response to Defendant's Statement of Undisputed Material Facts") at ¶1.] Addison employs recruiting personnel to provide recruiting services to its clients. [*Id.* at ¶2.] It is organized into "staffing verticals" which correspond to the professions of the employees Addison recruits. [*Id.* at ¶5.] Recruiters' primary objective is to place candidates in positions for Addison clients. [Dkt. 81 (Plaintiff's Statement of Additional Material Facts) at ¶18.]

Cassidy White was employed as a recruiter at Addison from November 2019 until August 2021. [Dkt. 61 at ¶3.] She was in the Finance and Accounting Contract ("FAC") vertical in Addison's Chicago office. [*Id.* at ¶6.] This vertical handles the placement of finance and accounting professionals in contract roles. [*Id.* at ¶7.]

In that role, White's manager assigned her specific job orders to fill. [*Id.* at ¶8.] White was not allowed to select assignments to work on. [Dkt. 81 at ¶24.] Business Development Managers ("BDMs") within the FAC vertical generated job orders which corresponded to open job positions with Addison's client companies. [Dkt. 61 at ¶9.] It was White's responsibility to find candidates with the requisite skills to fill the job orders assigned to her. [*Id.* at ¶10.]

During her tenure at Addison, White was paid a salary of $42,000 per year plus any earned commissions and bonuses. [*Id.* at ¶11.] Commissions were based on her "spread" which is the difference between the bill rate and the pay rate of candidates she placed to fill a job order. [*Id.* at ¶12.] White could earn higher commissions by maximizing her spread, that is placing a candidate in a contract role at a lower pay so that the difference between the candidate's bill rate and the pay rate was greater. [*Id.* at ¶13.]

When White began working for Addison, she had an initial training period that lasted approximately one-and-a-half months; it consisted of both online training modules and in-person training in Addison's Chicago office. [*Id.* at ¶14.] When asked how she learned to recruit, White testified, "you do something for so long you just kind of get the experience." [*Id.* at ¶15.] She added: "[o]nce you learn the Addison way of how to recruit that's the way to go about it." [Dkt. 81 at ¶9.]

All Addison Recruiters perform a common set of core functions. [*Id.*] White's duties included (1) cold calling candidates; (2) conducting interviews of candidates; (3) prepping and informing candidates of the open job positions and related expectations; (4) ascertaining candidates' expectations with respect to pay, benefits, etc.; (5) editing candidate resumes; (6) identifying open job orders that candidates would most likely be interested in based on their qualifications; (7) informing candidates of job orders they may be interested in; (8) submitting candidates to job orders; (9) prepping candidates for job interview with the client companies; (10) negotiating candidates' offers from the client companies; (11) checking in with the

12

candidates and the client companies once the candidates commence their positions at the client companies; and (12) addressing conflicts between the clients and candidates during the candidates' employment. [Dkt. 61 at ¶16.]

Addison provided White with email templates for her communications with candidates; it had templates for every type of communication between a recruiter and a candidate and wanted recruiters to use them, though the parties dispute the extent to which White customized the templates. [Dkt. 81 at ¶14.] Addison also had general scripts for recruiters to use when leaving a voicemail or starting a conversation with a candidate over the phone, but again the parties dispute the extent to which White customized those scripts. [*Id.* at ¶16.]

The job orders White's manager assigned her offered direction on how to recruit for the job by detailing position requirements including education, years of experience, and skills in using certain types of software. [Dkt. 61 at ¶17; Dkt. 81 at ¶10.] White would begin her search for qualified candidates by looking in Bullhorn, a recruiting software program containing information about candidates. [Dkt. 61 at ¶20.] Searching within Bullhorn was similar to Google searching. [Dkt. 81 at ¶11.] White would filter her searches in Bullhorn to reveal candidates who had already been interviewed and whose resumes had already been edited. [Dkt. 61 at ¶22.] She then read the job order requirements and compared them with prospective candidates' qualifications to see if they matched. [Dkt. 81 at ¶18.] Once she determined who may be qualified for the job opening based on the position

specifications, she would call those candidates. [Dkt. 61 at ¶¶18, 23.] It was White's responsibility to determine who to call to try to fill a specific job order. [*Id.* at ¶19.]

For candidates interested in working with Addison, White conducted one-on-one, in-person interviews. [*Id.* at ¶27.] Addison provided her with call scripts for interviews and a checklist of required information to ask about. [Dkt. 81 at ¶15.] During interviews, White and the candidate would discuss the candidate's resume, the specifics of their job duties, the software they would be working with in the position, and White would provide any information the candidates were seeking regarding their employment. [Dkt. 61 at ¶28.]

White testified that she used her judgment in these interviews to determine whether the candidate had experience in the finance and accounting industry and whether they would be good to work with. [*Id.* at ¶29.] She would also negotiate candidate's pay expectations: She would use judgment to determine the lowest amount the candidate was willing to take for the role, and she testified she'd consult with her managers on how much Addison should offer. [*Id.* at ¶¶30-31.][2] Sometimes, White would use a "negotiating tactic" which involved persuading candidates to accept a salary below their originally-stated expectations because there was the opportunity for the contract role to become a full-time, direct hire role. [*Id.* at ¶32.]

Before submitting a candidate's resume for a job order, White would edit their resume. She used her judgment to do so by confirming the information accurately

---

[2]     Neither party noted in its statement of facts that White consulted with her manager about what hourly rate to offer to candidates. [*See* Dkt. 47-1 at 25 (93:1–14).] Because this assertion is material and directly related to the fact asserted—White testified to both facts in the same section of her deposition—the Court considers it in ruling on Addison's motion.

reflected the candidate's actual experience, removing anything that was "fluffed," and adding Addison's letterhead. [*Id.* at ¶34.] Then she would send the edited resume back to the candidate for their approval. [*Id.* at ¶35.]

If the candidate approved, White would submit their resume to a job order through Bullhorn, a process by which the candidate's resume and White's summary of the candidate were sent to a BDM. [*Id.* at ¶¶36–37.] White testified to using judgment when writing her candidate summary, emphasizing aspects of the candidate's background that matched the job order requirements and made them a good fit for the job. [*Id.* at ¶38.] After reviewing these materials, the BDM would decide whether to submit the candidate to the client. [*Id.* at ¶39.] White did not make that decision. [Dkt. 81 at ¶8.]

White would also "cold call" candidates, not only to find a candidate to fill an assigned job order but also to find candidates to "fill the pipeline" and use for a future job order. [Dkt. 61 at ¶24.] White explained she used judgment during these calls to determine (1) if the worker was interested in a contract role, (2) if they would be a good candidate for an open position, and (3) if they had the requisite industry experience for the open position. [*Id.* at ¶25.][3] White considered certain candidates "good" if they had experience, "kn[ew] what they [were] doing," and had worked in contract positions before and therefore had realistic expectations. [*Id.* at ¶26.] Sometimes, when prospective candidates applied to Addison online, White's

---

[3]     White disputes this, but her citations to Salvo's deposition do not controvert her description of her own duties at Addison, even if other Addison employees had different duties.

managers would direct her to that profile and instruct her to call them. [Dkt. 81 at ¶11.] For candidates still in her pipeline and not yet placed in a job, White would inform them when new job orders came in and provide details of the position including (1) job duties, (2) company information, (3) pay scale, (4) benefits, and (5) contract length and timing. [Dkt. 61 at ¶40; Dkt. 47-1 at 21 (77:10–19).]

If a candidate received an interview request from an Addison client, White would be responsible for (1) informing the candidate of the interview process; (2) preparing the candidate for the interview; and (3) debriefing the candidate after the interview. [*Id.* at ¶41.] White would prepare a candidate for a client interview by reviewing the information about the client in the job order and relaying that information to the candidate. [*Id.* at ¶42.] For example, if the BDM indicated in the job order that the client had "a very spunky personality" or would "ask … a lot of detailed questions" during the interview, White would let the candidate know in advance of their interview. [*Id.* at ¶43; Dkt. 47-1 at 25 (90:3–91:11).] White would also coach the candidate on good questions to ask during an interview. [*Id.* at ¶44.]

White's duties as a recruiter continued even after the candidate began working for the client. [*Id.* at ¶45.] She would follow-up with candidates on their first day of work and once a week thereafter to discuss how the job was going "because the candidate has to like the role as much as the role likes the candidate." [*Id.* at ¶46.] Similarly, if a BDM contacted White conveying negative feedback from the client, Addison expected White to communicate that to the candidate. [*Id.* at 48.] White did not have the authority or ability to hire, fire, or discipline any candidates or

employees. [Dkt. 81 at ¶¶8, 25.] Generally, Addison recruiters don't post jobs or make job postings internally or externally. [*Id.* at ¶21.]

Addison had performance metrics for recruiters which were set at the corporate level; they were monitored and tabulated through Bullhorn which allowed recruiter activity to be tracked. [*Id.* at ¶27.] Addison imposed quotas on recruiters like White for various metrics. [*Id.* at ¶28.] If they consistently failed to meet their designated benchmarks, they could be terminated. [*Id.*] White testified that the required quotas were aggressive such that she had to work after her normal 8:30 am to 5:30 pm hours. [*Id.* at ¶¶30–31.]

During one of White's reviews with her supervisor, the supervisor noted that she wanted White "to utilize the BDM and [her supervisor] more" because her supervisor "d[idn't] want her wasting too much time relying on herself when she hasn't been in the office … long enough to have all the tools she needs 100 percent of the time yet." [Dkt. 61-2 at ¶22; 47-1 at 30 (110:3–18).]

## IV.  **Legal Standard**

"Summary judgment is proper when the moving party … 'shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Bunch v. United States*, 880 F.3d 938, 941 (7th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the

17

facts; these are jobs for a factfinder." *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

"To succeed on a motion for summary judgment based on an affirmative defense, the defendant 'must lay out the elements of the [defense], cite the facts which [the defendant] believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the [plaintiff] on the [defense].'" *Jones v. Lamb*, 124 F.4th 463, 467 (7th Cir. 2024) (quoting *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015)); *Ocean Tomo, LLC v. Barney*, 133 F. Supp. 3d 1107, 1114 (N.D. Ill. 2015) ("Where the party moving for summary judgment bears the burden of persuasion at trial, … such as a defendant asserting an affirmative defense, the moving party must establish all the essential elements of that defense with credible evidence that would entitle it to a directed verdict if not controverted at trial." (citation omitted)).

Put another way, Addison must "establish affirmatively the lack of 'sufficient evidence favoring [White] for a jury to return a verdict for that party.'" *Rsrv. Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 42 (7th Cir. 1992) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). Because Addison's motion for summary judgment centers on the application of the administrative exemption in the FLSA and IMWL, which is an affirmative defense, *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 533 (7th Cir. 1999), *overruled on unrelated grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013), *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 869 (7th Cir. 2008), it bears the ultimate burden at trial, and "the oft-

18

quoted rule of *Celotex* with respect to the obligation of the non-moving party which bears the burden of proof at trial is inapplicable." *Id.* White has no obligation "to rebut factual propositions on which [Addison] bears the burden of proof and that [it] has not properly supported in the first instance." *Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 662 (7th Cir. 2011)

## V.    Analysis

### A.    Differences Between FLSA and IMWL

At the outset, the parties disagree over whether the same analysis applies to the administrative exemption under both the FLSA and IMWL. The IMWL's administrative exception explicitly incorporates the FLSA but as it existed "on March 30, 2003." 820 ILCS 105/4a(2)(E). White and Addison agree that at that time, the exemptions were coextensive. [Dkt. 64 at 5; Dkt. 82 at 12.] However, the Department of Labor revised the FLSA in 2004, including changing the wording of the administrative exemption. That new version applies to White's case. A threshold question, then, is whether the revisions were substantive, such that the administrative exemption is different under both statutes. White argues that it is.

In *Roe-Midgett* the Seventh Circuit explained, with respect to the administrative exemption, the only differences between the pre-2004 version of the FLSA and the version after the 2004 amendment are "the salary requirement … and the additional explanation that an administrative employee must exercise discretion or independent judgment 'with respect to matters of significance.'" 512 F.3d 865, 870 (7th Cir. 2008). While at first blush that difference could seem substantive, the Court concluded it was not. It explained that "[w]hile that qualifying phrase was not

19

explicitly part of the old test, it was built into the old rule's definition of 'discretion and independent judgment' found elsewhere in the applicable regulations." *Id.* As a result, the Seventh Circuit concluded that "the new 'general rule' is essentially a simplified restatement of the old [rule]." *Id.*

White's cites to the contrary are distinguishable. *Driver v. AppleIllinois, LLC* is uninstructive as it does not discuss the administrative exemption under either the FLSA or IMWL. 2013 WL 5818899, at *1 n.1 (N.D. Ill. Oct. 29, 2013). The district court's opinion in *Bigger v. Facebook, Inc.* is not persuasive because it does not discuss *Roe-Midgett.* 375 F. Supp. 3d 1007, 1020 (N.D. Ill. 2019). Contrary to White's insinuation [Dkt. 64 at 6], the Seventh Circuit did not affirm the district court's holding in *Bigger* with respect to differences between the FLSA and IMWL's administrative exemptions; the IMWL claim was not appealed at all. *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1047 n.2 (7th Cir. 2020).

Because *Roe-Midgett* is clear that the FLSA's administrative exemption was substantively unchanged by the 2004 amendment, the same administrative exemption analysis applies to both White's FLSA and IMWL claims. *See also Urnikis-Negro v. Am. Fam. Prop. Servs.*, Inc., 2008 WL 5539823, at *6 (N.D. Ill. July 21, 2008), *aff'd sub nom. Urnikis-Negro v. Am. Fam. Prop. Servs.*, 616 F.3d 665 (7th Cir. 2010) ("The August 2004 version of the regulation does not substantively alter the former test."); *Markle v. Drummond Advisors, LLC*, 2022 WL 4604192, at *3 (N.D. Ill. Sept. 30, 2022) ("The IMWL, Illinois' state-law counterpart to the FLSA, contains the same requirements with respect to overtime and incorporates the FLSA standards

regarding exemptions."); *Marski v. Courier Express One, Inc.*, 2021 WL 4459512, at *13 (N.D. Ill. Sept. 29, 2021) (With respect to claims arising out of actions between 2015-2018 or later the court concluded that "[b]ecause the IMWL contains the same requirements with respect to overtime and incorporates the FLSA standards, the Court considers together Plaintiff's FLSA and IMWL claims for unpaid overtime.") For efficiency's sake, then, the Court will discuss only the FLSA exemption.

### B. Administrative Exemption

The FLSA requires payment of overtime for hours worked in excess of 40 per week unless an exemption applies. 29 U.S.C. §§ 207(a)(1), 213(a)(1). In this case, the relevant exemption applies to bona fide executive or administrative employees. *Id.* § 213(a)(1); *Verkuilen v. MediaBank, LLC*, 646 F.3d 979, 980 (7th Cir. 2011).

Three factors must be met. 29 C.F.R. § 541.200(a). First, the employee must receive a minimum salary of $684 per week. *Id.* Second, the employee's "primary duty" must be "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." *Id.* Finally, the employee's "primary duty" must "include[] the exercise of discretion and independent judgment with respect to matters of significance." *Id.* In interpreting the exemption, "the regulations must be given a fair, not a narrow, reading." *Markle v. Drummond Advisors, LLC*, 2022 WL 4604192, at *3 (N.D. Ill. Sept. 30, 2022) (citing *Bigger*, 947 F.3d at 1052.)

White and Addison agree the first factor is met. The Court will analyze the remaining two, over which there is considerable disagreement, in turn.

### 1.     Primary Duty is Administrative

As noted, "[t]o qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.201(a). "The term 'primary duty' means the principal, main, major, or most important duty that the employee performs." § 541.700(a). Although "[t]he amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee" and "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement," it is not the only factor. § 541.700(b). The test may still be met by employees who "spent more than 50 percent of their time performing exempt work." *Id.*

For the exemption to apply, the "employee must perform work directly related to assisting with the running or servicing of the business, as distinguished for example, from working on a manufacturing production line or selling a product in a retail or service establishment." § 541.201(a). The distinction between assisting with running the business and working on the manufacturing line is "often referred to as the administrative/production dichotomy" and "derives from traditional manufacturing and sales settings." *Markle*, 2022 WL 4604192, at *5. "[A]n employee who works on the manufacturing line or who sells an employer's products would not qualify as administratively exempt." *Id.* While the regulations provide a nonexhaustive list of "functional areas in which this kind of work is often performed," *Bigger*, 947 F.3d at 1053; § 541.201(b), courts must consider "all the facts in a

22

particular case with the major emphasis on the character of the employee's job as a whole," § 541.700(a).

To "decide as a matter of law that an employee customarily and regularly performed duties 'directly related to management or general business operations … [the Court must have] … a clear factual picture of those duties, including how they relate to the employer's and customers' enterprises." *Bigger,* 947 F.3d at 1054. Without those details, it would be impossible to determine whether the worker's tasks are administrative or more akin to working on a production line.

Addison's business offers staffing and recruiting services. [Dkt. 61 at ¶1.] With respect to the vertical within which White worked, Addison was in the business of recruiting finance and accounting professionals to work on a contract basis for its clients. [*Id.* at ¶¶2, 6–7.] When Addison received a job order from one of its clients—that is, an assignment to fill an open position—it recruited individuals to fill the role. [*Id.* at ¶¶8–9.] Because this vertical dealt with contract placements, candidates weren't normally hired directly by Addison's clients; instead, after Addison's client approved of the candidate, Addison would hire the candidate and pay them to work for the client. [*Id.* at ¶¶7, 12–13, 30–31.] Although the parties' statement of facts could be clearer about how Addison profits from this arrangement, it is evident that Addison generates revenue by paying the worker less than Addison's client pays to fill the role–that is the "spread" between "the candidate's bill rate and the pay rate." [*Id.*]

Whether White's "work directly related to" these operations or the operations of Addison's clients, § 541.201(a), "depends on the precise nature of [her] work." *Bigger*, 947 F.3d at 1053. Courts must look at "the central revenue generator … and the employee's involvement in it." *Id.*

While White and Addison disagree about how much discretion and judgment she exercised in the performance of her duties, by and large the parties agree on the types of tasks she performed. *C.f. Tamas v. Family Video Movie Club, Inc.*, 2013 WL 1286693, at *4 (N.D. Ill. Mar. 28, 2013) ("If there is a genuine dispute of fact as to the nature and scope of [plaintiff's] primary duty, summary judgment must be denied."). White worked to fill open job orders from Addison's clients by reviewing the job order and necessary qualifications, contacting candidates she believed may be qualified, assessing their interest and qualifications, editing their resume, submitting their resume to the BDM for consideration, prepping them for a job interview with the client company (if they were offered one), negotiating pay, and, if the candidate was hired and placed with an Addison client, White would periodically check in to see how things were going. [Dkt. 61 at ¶¶8, 10, 17–19, 25, 28–32, 34, 36–37, 41, 43, 46.]

Even though White didn't have the authority to hire anyone or make hiring recommendations directly to Addison's clients, her work supported Addison's core business with respect to contract placements performed by her Vertical. Indeed, it is hard to imagine tasks more directly related to running Addison's business. § 541.201(a).

White was the person seeking out and identifying prospective candidates, assessing their qualifications and aptitude for working on a contract basis for Addison, preparing their materials for submission, and preparing candidates for interviews. [Dkt. 61 at ¶16.] Placing candidates with clients is how Addison makes money, and White's tasks directly supported that effort. *See Quintiliani v. Concentric Healthcare Sols., LLC*, 944 F. Supp. 2d 738, 746 (D. Ariz. 2013), *rev'd in other part*, 672 F. App'x 643 (9th Cir. 2016) (finding that the work of a staffing coordinator at Concentric, a temporary staffing firm, was "directly related" because they helped locate and place "temporary medical professionals at client companies" and those medical professionals were "the 'product' of Concentric's business").

This isn't a close question like *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 573–75 (7th Cir. 2012) where the court had to split hairs to determine if plaintiffs' sales role went to the core of the defendant's business or was more akin to "a salesman for Best Buy or a technician sitting at a phone bank fielding random calls from [their] employer's customers," *Verkuilen*, 646 F.3d at 982; *c.f.* 29 C.F.R. § 541.201(a) (explaining the administrative exemption does not apply to individuals whose job is to "sell [the] product"). The tasks White performed were indispensable and directly related to how Addison generated revenue.

White argues that her duties were largely entry-level, clerical tasks subject to oversight and dictated by Addison's templates and procedures; and she also lacked authority to negotiate with Addison's clients. [Dkt. 64 at 9.] These points are better directed at the third prong of the administrative exemption test, concerning exercise

of discretion and independent judgment. Regardless of how much supervision and control Addison exercised over White's tasks, White has not meaningfully disputed that her tasks supported the core of Addison's business. *See Quintiliani*, 944 F. Supp. 2d at 746 (differing responsibilities of staffing coordinators at temporary placement firms was "a distinction without a difference" because the employee's role in helping to place "temporary professionals" with clients was directly related to "the 'product' of Concentric's business.") White's work, including helping to establish a pipeline of interested and qualified candidates and suggesting them to fill specific job openings with Addison's clients [*see* dkt. 61 at ¶24], was not akin to production-line or retail work. *Schaefer-LaRose*, 679 F.3d at 574. It directly supported the FAC Vertical's "central revenue generator." *Bigger*, 947 F.3d at 1053.

### 2. Primary Duty includes Exercise of Discretion and Independent Judgment

The final requirement of the administrative exemption is that the worker's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." *Id.* § 541.202(a). While this "implies that the employee has authority to make an independent choice, free from immediate direction or supervision," employees can qualify for the administrative exemption "even if their decisions or recommendations are reviewed at a higher level." *Id.* § 541.202(c).

Use of "independent judgment is not foreclosed by the fact that an employee's work is performed in accordance with strict guidelines." *Roe-Midgett*, 512 F.3d at 875. Still, the "exercise of discretion and independent judgment 'must be more than the use of skill in applying well-established techniques, procedures or specific standards.'" *Bigger*, 947 F.3d at 1055 (quoting § 541.202(e)). And work that is "repetitive, recurrent or routine" does not qualify. § 541.202(e).

"The term 'matters of significance' refers to the level of importance or consequences of the work performed." *Id.* § 541.202(a). The regulation provides a nonexhaustive list of factors to consider such as "whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; [and] … whether the employee has authority to commit the employer in matters that have significant financial impact." *Id.* § 541.202(b).

The regulations set up a dichotomy between human resource managers and personnel clerks. The former generally qualifies for the exemption; the latter does not. That is because, unlike human resource managers who "formulate, interpret or implement employment policies," clerks "'screen' applicants to obtain data regarding their minimum qualifications and fitness for employment." § 541.203 (e).

The Court's task is to determine on which side of the line White falls. Addison points to several out-of-circuit cases to support that White exercised discretion and independent judgment on matters of significance.

27

The first is *Andrade v. Aerotek*, 700 F. Supp. 2d 738, 747 (D. Md. 2010). Like this case, *Andrade* involved a recruiter who worked for an international staffing company. The court explained, relying on various Department of Labor opinion letters, that whether a recruiter is an exempt employee "depends on the amount of selectivity exercised in matching persons seeking employment with the requirements of the job opening and in deciding which employee to send to any particular employer for consideration, as opposed to referring to the employer several prospects who generally meet the qualifications for the job." *Id.* (citation and internal quotation marks omitted). The Court concluded the plaintiff's job was exempt because she "did much more than simply screen applicants based on minimum qualifications … she developed her own recruiting strategies" and, because she knew "the clients' personality," she would go beyond screening for minimum qualifications, instead often recommending candidates "whose personalities made them a good fit, even when their qualifications were not as impressive as others." *Id.* She also "sourced and interviewed candidates completely on her own, free from scrutiny" and, once contract employees were hired, she managed them, "assessed and investigated … problems, and counseled and disciplined contractors" without "the direct scrutiny of a supervisor." *Id.* at 748.

True, both White and the plaintiff in *Andrade* lacked the discretion to fire candidates. [Dkt. 82 at 7.] They also both "compared contractors' skills to the applicable job descriptions" and "interviewed candidates." [*Id.*]; *Andrade*, 700 F. Supp. 2d 738 at 747–48. But the similarities end there. Unlike the plaintiff in

*Andrade*, White lacked the authority to discipline anyone. [Dkt. 81 at ¶¶8, 25.] There is no evidence White interacted with Addison clients such she could draw her own conclusions about their "personalities" and needs. As a result, when she conveyed information about the client to the candidate, she was limited to the information the BDM gave her. [Dkt. 61 at ¶¶42–43.] While the plaintiff in *Andrade* was able to exercise independent judgment in this regard, White had little discretion—she was only in the position to convey the information she received.

Also unlike the plaintiff in *Andrade* who worked "free from scrutiny," White's daily tasks were organized and set by her supervisor. [Dkt. 81 at ¶¶10, 15, 24, 27–28.] She had meetings with her supervisors twice a day during which she was given assignments including which open positions to work on filling. [Dkt. 61-2 at ¶¶6–7; Dkt. 47-1 at 14, 19.] Her supervisors tracked her performance metrics to ensure she met her quotas. [Dkt. 81 at ¶¶27–28.] Last, there is no evidence White developed her own "recruiting strategy." To the contrary, she was directed to use numerous templates and outlines for her communications, and rather than using outside job boards, her candidate searches were limited to Bullhorn. [*Id.* at ¶¶ 14–16; dkt. 61-2 at ¶9.] Because of these significant differences, *Andrade* is not persuasive.

Addison also cites *Drake*, 2016 WL 80672, which involved a recruiter working for an international staffing company. *Id.* at *1. The court's analysis was limited. Drake conceded to being exempt under the FLSA (albeit not under the Wisconsin analogue), and the court readily concluded that his work qualified as exempt. *Id.* at *6. While the general tasks Drake performed are similar to White (searching for

29

suitable applicants, assessing them for particular jobs and clients, preparing them for interviews, etc.) the opinion does not discuss how much autonomy Drake had when performing these tasks. Given that point is in significant contention here, *Drake* is of limited persuasiveness.[4]

In contrast, the Sixth Circuit's opinion in *Perry v. Randstad General Partner (US) LLC*, 876 F.3d 191 (6th Cir. 2017) provides helpful guidance. The court reviewed, and affirmed in significant part, the district court's grant of summary judgment to the defendant staffing company. *Id.* at 194.

The court synthetized two guiding principles. First, "matching candidates to clients based on fit—meaning subjective criteria such as the match between a candidate's personality and a client's corporate culture—as opposed to objective criteria such as years of experience or test scores, involves meaningful discretion and independent judgment." *Id.* at 208. Second, a worker uses discretion and independent judgment where they "independently draft[] job descriptions, decid[e] which recruitment tools to use, negotiat[e] how much to pay the worker and how much to bill the client ... counsel[] workers and otherwise deal[] with unsuccessful placements." *Id.* Where the plaintiff's job duties with respect to recruitment hit both of those criteria, the fact that they were nonetheless subject to close scrutiny by

---

[4]     The same goes for Addison's citation to *Hudkins v. Maxim Healthcare Servs., Inc.*, 39 F. Supp. 2d 1349, 1350 (M.D. Fla. 1998), *aff'd sub nom. Hudkins v. Maxim Healthcare Servs.*, 176 F.3d 493 (11th Cir. 1999). Putting aside the distinct procedural posture, the recruiter performed significantly different tasks than White, including "approving higher rates of pay for nurses when the occasion demanded it in order to ensure the placement of the most capable nurses with the Defendant's client" and counseling, disciplining and participating in the termination of nurses who did not provide good service to clients. *Id.*

supervisors and had never "hired or fired a worker on [their] own authority" did not render them ineligible for the administrative exemption. *Id.* at 209.

Considering White's job responsibilities as a whole, material issues of fact remain as to whether her primary job duties involved the exercise of discretion and judgment with respect to matters of significance. Addison identifies a handful of tasks it believes qualify including, determining whether a person was interested in a contract role, would be a good fit for a certain job and had the requisite skills and experience, and then negotiating with them about their salary expectations. [Dkt. 48 at 14.]

While White testified to using her judgment to perform these tasks, [Dkt. 61 at ¶24], there is evidence that she applied "well-established techniques" and "standards" and that the tasks were repetitive and routine. *Bigger*, 947 F.3d at 1055; § 541.202(e). For example, White explained that a candidate was a "good fit" if they had experience, "kn[ew] what they [were] doing," and had worked in contract positions before and therefore had realistic expectations. [Dkt. 61 at ¶26.] She would also compare job order requirements against the candidate's qualifications to see if there was a match. [Dkt. 81 at ¶18.]

White elaborated little on any use of discretion to assess candidate's soft skills or personality. *See Perry*, 876 F.3d at 208 (holding that matching "a candidate's personality [with] a client's corporate culture" is evidence of using discretion and judgment). It is not clear from the record that White's assessment of a candidate's qualifications was subjective enough to qualify her for the exemption. Because there

is no evidence White had first-hand contact with clients, to the extent she had the ability to assess fit, she was limited to working from the information provided by the BDM. [Dkt. 61 at ¶¶42–43.]

While White made "an independent choice" about which candidates to recommend to a BDM, Addison erected guardrails around that decision, in the form of templates, checklists, and processes that limited White's exercise of discretion. In addition, during White's 2020 performance review her supervisor advised her to rely more on her supervisors rather than "relying on herself." [Dkt. 61-2 at ¶22; 47-1 at 30 (110:3–18)]. This fact cuts both ways. As Addison notes, it suggests both that White worked independently in some respects and that Addison preferred for her not to because she was too junior. [Dkt. 82 at 11–12.] Because the performance review is vague about what tasks White performed without sufficient oversight, though, this fact does not clearly support either party.

As for negotiation, White testified to using her judgment to determine the lowest salary a candidate was willing to take, and sometimes using a negotiating tactic to persuade a candidate to accept less. [Dkt. 61 at ¶¶30–32.] However, not included in the parties' statement of facts is White's admission that she would consult with her managers to determine how much they should offer a candidate. [Dkt 47-1 at 25 (93:1–14)]. While a worker may still exercise discretion despite final review of their decision, the fact that White received guidance from her managers with respect to salary negotiation is evidence that she lacked "the authority or power to make an independent choice." *Roe-Midgett*, 512 F.3d at 873 (citing § 541.202(c)). Putting aside

White's use of the word "judgment," it is unclear what she did with respect to salary negotiation that required judgment. Together these facts cut against the conclusion that White exercised independent judgment and discretion.

Even if White exercised discretion and judgment in some tasks, for the administrative exemption to apply she must have used discretion and judgment on "matters of significance" to Addison. Looking to the regulation for guidance, it is unclear that White's tasks fit the bill. For example, there is no evidence that she had the "authority to formulate, affect, interpret, or implement management policies or operating practices." § 541.202(b). It is also clear from the record that White lacked the "authority to waive or deviate from established policies and procedures without prior approval." *Id.* Aside from general expressions that White "ma[de] important recommendations," Addison does not explain how the facts marshalled support the conclusion that White's discretionary tasks concerned matters of significance, as required by the regulation. § 541.202(a). Addison also fails to support the necessary assertion that these tasks were her primary duties. § 541.700(a). The record is silent as to how much time she spent on these tasks as opposed to other concededly nonexempt tasks such as data entry. [Dkt. 82 at 5.]

Given that it is Addison's burden to prove that every element of the administrative exemption applies to White's work, it falls short. At bottom, the record is not "so one-sided as to rule out of prospect of finding in favor of [White] on the [administrative exemption defense]." *Jones*, 124 F.4th at 467.

## VI.    Conclusion

For the reasons stated above, Addison's motion for summary judgment is denied. [Dkt. 46.]

Enter: 23 C 5464
Date:  February 6, 2025

_____

Lindsay C. Jenkins
United States District Judge